UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

'23 NOV 21  PM 3: 31

CLERK

BY_____AL_____
DEPUTY CLERK

| | |
|---|---|
| **MID VERMONT CHRISTIAN SCHOOL**, on behalf of itself and its students and its students' parents; **A.G.** and **M.G.**, by and through their parents and natural guardians, Chris and Bethany Goodwin; **CHRISTOPHER GOODWIN**, individually; **BETHANY GOODWIN,** individually; **T.S. and K. S.**, by and through their parents and natural guardians, Nathaniel and Dawna Slarve; **NATHANIEL SLARVE**, individually; and **DAWNA SLARVE**, individually, <br><br> Plaintiffs, <br><br> v. <br><br> **HEATHER BOUCHEY,** in her official capacity as Interim Secretary of the Vermont Agency of Education; **JENNIFER DECK SAMUELSON**, in her official capacity as Chair of the Vermont State Board of Education; **CHRISTINE BOURNE**, in her official capacity as Windsor Southeast Supervisory Union Superintendent; **HARTLAND SCHOOL BOARD**; **RANDALL GAWEL**, in his official capacity as Orange East Supervisory Union Superintendent; **WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY) SCHOOL BOARD**; and **JAY NICHOLS**, in his official capacity as the Executive Director of The Vermont Principals' Association, <br><br> Defendants. | Case No. 2:23-cv-652 <br><br><br> **VERIFIED COMPLAINT** |

## INTRODUCTION

1.     This civil rights action seeks to protect a Christian school and its students and parents from unconstitutional religious discrimination and hostility.

2.      The State of Vermont has adopted its own orthodoxy on human sexuality and gender. Simply put, the State believes sex is mutable and biological differences do not matter.

3.      The State is entitled to its own views, but it is not entitled, nor is it constitutional, to force private, religious schools across the state to follow that orthodoxy as a condition to participating in Vermont's tuitioning program and the State's athletic association. *See Carson v. Makin*, 142 S. Ct. 1987, 2000 (2022) (citation omitted) (A "State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious.").

4.      But that is exactly what the State has done. The State—through its Agency of Education ("Agency") and the Vermont Principal's Association ("VPA")— requires religious schools like Mid Vermont Christian School ("Mid Vermont Christian" or "the School") to follow (and affirm compliance with) laws, rules, and policies that prevent those schools from operating consistently with their religious beliefs about sexuality and gender.

5.      Mid Vermont Christian is a Christian pre-K through 12th grade school in Vermont whose religious beliefs drive and form the foundation for everything it does.

2

6.     Mid Vermont Christian's educational and religious purposes are inseparable: "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of" the School's Mission. *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 140 S. Ct. 2049, 2064 (2020).

7.     Its religious beliefs include biblically based Christian beliefs on marriage, sexuality, and gender.

8.     Among other things, those beliefs teach that God uniquely creates each person as either a male or female, one's sex is determined at creation and based on biology, and that sex is immutable.

9.     Seeking to banish such "unorthodox beliefs," the State denied Mid Vermont Christian from participating in two generally available public programs because of the school's religious beliefs, character, and exercise.

10.    First, the Agency has once again discriminated against religious schools by refusing to designate Mid Vermont Christian as an approved independent school because of its religious beliefs about sexuality and gender, thereby denying it participation in the State's Town Tuitioning and Dual Enrollment Programs.

11.    The Agency has done so despite the Second Circuit ruling just two years ago that religious schools were "entitled to [Town Tuitioning Program] funding to the same extent as parents who choose secular schools for their children, regardless of [their] religious affiliation or activities." *In re A.H.*, 999 F.3d 98, 108

3

(2d Cir. 2021). And more recently, the United States Supreme Court reaffirmed the same principle in *Carson,* 142 S. Ct. 1987.

12.     The Agency's refusal to grant Mid Vermont Christian approved independent status caused the Windsor Southeast Supervisory Union and Orange East Supervisory Union to recoup tuition payments initially sent to the School.

13.     As of the date of this filing, Mid Vermont Christian is being denied Town Tuitioning funds.

14.     Second, the VPA kicked Mid Vermont Christian out of the State's athletic association—and refuses to allow the School back in—because the School operates its *own* athletic program consistent with its religious beliefs about sexuality and gender.

15.     Although the VPA has a boys/girls fairness policy that prohibits boys from competing on girls' teams, the VPA's gender identity policies allow biological males to compete on girls' teams if the male "identifies" as a girl. In those situations, the VPA treats the male as a girl for purposes of the fairness policy.

16.     The problem is that the VPA is demanding Mid Vermont Christian do the same and view biological males as girls if they so identify, despite the VPA's boys/girls fairness policy.

17.     When Mid Vermont Christian reluctantly forfeited a girls' high school basketball game against a team that had a biological male playing for them, the VPA kicked the School out of the association.

18.     Now, despite 28 years of prior participation in the league, Mid Vermont

4

Christian cannot compete in *any* VPA athletics, effectively blacklisting the School from all State-sponsored events in the state, including VPA spring sports for which schools are still creating schedules.

19.    The VPA won't even allow the School and its students to participate in co-ed academic competitions like the Geo-Bee, Science and Math Fair, and Debate and Forensics League—all because the School believes biological boys are boys and cannot affirm otherwise.

20.    The boys and girls who chose to attend Mid Vermont Christian are currently losing out on playing competitive sports in the state and participating in academic competitions in the VPA—thus harming not only the school but its students and athletes, including Plaintiffs A.G., M.G, T.S., and K.S.

21.    As a result, Mid Vermont Christian and its students are being irreparably harmed by being denied participation in the Town Tuitioning and Dual Enrollment Programs and middle school and high school athletics.

22.    Because being denied participation in the Town Tuitioning and Dual Enrollment Programs and school athletics harms Mid Vermont Christian *and* its students and their parents, the School raises claims on their behalf as well. *See Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary,* 268 U.S. 510 (1925); *Runyon v. McCrary,* 427 U.S. 160, 175 n.13 (1976).

23.    The State has thus put Plaintiffs to an impossible Hobson's Choice: (1) abandon their religious beliefs, character, and practices and adopt and follow the State's gender identity rules so they can participate in school athletics and the

5

Town Tuitioning Program, or (2) adhere to their religious beliefs, character, and practices, miss out on middle school and high school sports, lose valuable tuition reimbursements, and inevitably lose students necessary to keep its doors open.

24.     Such religious discrimination is "odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017).

## JURISDICTION AND VENUE

25.     This action raises federal questions under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

26.     This Court has original jurisdiction over the claims asserted in this Complaint under 28 U.S.C. § 1331, which provides jurisdiction for claims raising questions of federal law, and 28 U.S.C. § 1343(a), which provides jurisdiction for claims seeking vindication of civil rights protected by federal law.

27.     This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201 & 2202 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and (3) damages, costs, and attorney's fees under 42 U.S.C. §§ 1983 and 1988.

28.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, the effects of the challenged law are felt here, Defendants reside here, and Defendants can and do perform official duties here.

## PARTIES

### A.   Mid Vermont Christian School

29.   Plaintiff Mid Vermont Christian School is a private, Christian, pre-K through 12th grade school located in Quechee, Vermont. It was founded in 1987.

30.   Many families choose to send their children to Mid Vermont Christian precisely because of its Christian character and education.

31.   Families in some school districts that do not have a public high school desire to send their students to Mid Vermont Christian. Mid Vermont Christian has students attending school this year who have previously participated in the state's Town Tuitioning Program and desire to continue participating in the program for this year and years to come.

32.   Mid Vermont Christian also excels in academics and athletics. Its students frequently outperform public school students in SAT testing. And both its girls' and boys' basketball teams participated in the State playoffs last school year. Plaintiff M.G. is playing on the girls' team this year.

33.   Families like the Goodwins and Slarves send their children to Mid Vermont Christian because of Mid Vermont Christian's academic programs, athletic offerings, and Christian-based instruction and beliefs.

34.   Mid Vermont Christian holds sincere religious beliefs that drive and form the foundation for everything it does, including academics and athletics.

35.   Mid Vermont Christian's sincerely held religious beliefs are rooted in the Holy Bible, which Mid Vermont Christian believes is inspired by God and is the

7

authority on all issues of faith and life.

36. Students and families that choose the school are aware of the school's religious beliefs and many share the school's beliefs and choose the school precisely for that reason.

37. Mid Vermont Christian sincerely believes it must holistically educate its students in and through a biblical worldview, teaching them to love and serve God above all else and to spread His Gospel and teachings.

38. At Mid Vermont Christian, "God is central to all knowledge and learning." Mid Vermont Christian School Website Pages at 12, a true and accurate copy of which is attached as Exhibit 1

39. The School's purpose is "to glorify God by preparing each student for college, career, and Christian ministry through a program of academic excellence established in Biblical truth." *Id.* at 2.

40. "The Word of God is integrated into each classroom and each subject" and Mid Vermont Christian seeks to prepare its graduates "to continue to grow in their personal relationship with Jesus Christ, going out into the world to serve Him with all their intelligence, skills, and being." *Id.* at 17, 22.

41. To these ends, Mid Vermont Christian inculcates biblical truths through everything it does—from academics to athletics and everything in between. It teaches these truths not only by focusing on them in the classroom, but also by exemplifying them to its students and the world.

42. So the School cannot facilitate any event that would give the

8

appearance to its students and families that the School does not adamantly hold the beliefs it professes or that would undermine its beliefs.

43.     Mid Vermont Christian also sincerely believes that every person must be afforded compassion, love, kindness, respect, and dignity and treated with the love of Christ, regardless of their beliefs.

44.     Mid Vermont Christian holds sincere religious beliefs on biblical marriage, sexuality, and gender. Mid Vermont Christian sincerely believes that God wonderfully and immutably creates each person as male or female, that rejection of one's biological sex is a rejection of the image of God within that person, that the term marriage has only one meaning—the uniting of one man and one woman in a single, exclusive union, as delineated in Scripture—and that God intends sexual intimacy to occur only between a man and a woman who are married to each other.

45.     Mid Vermont Christian's religious beliefs—including its beliefs on marriage, sexuality, and gender—guide all aspects of the school's operation, as demonstrated by the school's rules and policies.

46.     Mid Vermont Christian requires that all employees agree with and abide by all of Mid Vermont Christian's religious beliefs, including those on biblical marriage, sexuality, and gender.

47.     Mid Vermont Christian requires all students to adhere to its internal rules and policies.

48.     For instance, Mid Vermont Christian is committed to serving students who may question their sexuality or gender and will not dismiss any such students

9

because they experience such thoughts or feelings.

49.     But due to its religious beliefs, Mid Vermont Christian requires all students to dress, use restrooms/locker rooms, use pronouns, and play on athletic teams based on their biological sex.

50.     Mid Vermont Christian also believes that by competing against a boy who identifies as a girl on a girls' sports team (or a girl who identifies as a boy on a boys' sports team), it would be affirming that sex is mutable, in violation of its beliefs.[1]

51.     And Mid Vermont Christian believes that engaging in such competition would cause it to be complicit in furthering the falsity that sex is mutable, in violation of its beliefs.

52.     Simply put, Mid Vermont Christian's religious education *is* its religious exercise. Anything that impedes, prohibits, or undermines the former, burdens the latter.

**B.     The Goodwins.**

53.     Plaintiff A.G., a minor child, is a student who is a member of Mid Vermont Christian's varsity boys' basketball and track teams. Because A.G. is a minor, he sues by and through his parents and natural guardians, Chris Goodwin and Bethany Goodwin.

54.     Plaintiff M.G., a minor child, is a student who is a member of Mid

---

[1] The same situation is not present in co-ed sports because the classification of the competition itself recognizes that it is open to both males and females.

Vermont Christian's girls' basketball team this school year. Because M.G. is a minor, she sues by and through her parents and natural guardians, Chris Goodwin and Bethany Goodwin.

55.     Plaintiff Chris Goodwin is the father of A.G. and M.G. He sues on behalf of himself and his children. Mr. Goodwin is the head coach of Mid Vermont Christian's girls' varsity basketball team.

56.     Plaintiff Bethany Goodwin is the mother of A.G. and M.G. She sues on behalf of herself and her children.

57.     Plaintiffs A.G., M.G., Chris Goodwin, and Bethany Goodwin are collectively referred to as "the Goodwins" unless the context indicates otherwise.

58.     The Goodwins reside in Quechee, Vermont.

59.     A.G. is enrolled at Mid Vermont Christian and plays on Mid Vermont Christian's varsity boys' basketball and track teams. A.G. is a senior in high school.

60.     A.G.'s sister, M.G., is enrolled in eighth grade this year at Mid Vermont Christian. Eighth graders are eligible to participate in varsity sports and she plays girls' varsity basketball at Mid Vermont Christian. M.G. intends to continue playing basketball at Mid Vermont Christian in the future.

61.     A.G. and M.G. play on Mid Vermont Christian's sports teams because Mid Vermont Christian is a Christian school with athletes who share their personal and family's beliefs and values. Mid Vermont Christian is also close to the Goodwin's home.

62.     A.G., M.G., T.S., and K.S. all desire to continue playing on Mid

Vermont Christian sports teams that compete in the VPA.

63.     The Goodwins hold sincere religious beliefs that are rooted in the Holy Bible.

64.     The Goodwins share the same religious beliefs as Mid Vermont Christian, including the belief that by competing against (or on the same team as) a boy who identifies as a girl on a girls' sports team (or a girl who identifies as a boy on a boys' sports team), it would be affirming that sex is mutable, which violates their beliefs about sexuality and gender.

65.     The reason the Goodwins choose to attend Mid Vermont Christian is because of the Christian education Mid Vermont Christian provides.

C.     The Slarves

66.     Plaintiff T.S. is a tenth-grade student at Mid Vermont Christian. Because T.S. is a minor, he sues by and through his parents and natural guardians, Nathaniel and Dawna Slarve.

67.     T.S. also currently plays on the Mid Vermont Christian boys' basketball team.

68.     Plaintiff K.S. is an eighth-grade student at Mid Vermont Christian. Because K.S. is a minor, she sues by and through her parents and natural guardians, Nathaniel and Dawna Slarve.

69.     K.S. plays on Mid Vermont Christian's girls' volleyball team.

70.     Plaintiffs Nathaniel and Dawna Slarve are the father and mother of T.S. and K.S. They sue on their own behalf and on behalf of T.S. and K.S.

71.     Plaintiffs T.S., K.S., Nathaniel Slarve, and Dawna Slarve are

collectively referred to as "the Slarves" unless the context indicates otherwise.

72.     The Slarves reside in North Hartland, Vermont, within the Hartland School District.

73.     Because the Hartland School District does not operate a public high school, T.S. must attend high school out of the District. The Slarves have participated in Vermont's tuitioning program.

74.     The Slarves chose to send T.S. and K.S. to Mid Vermont Christian because of the Christian education it provides.

75.     The Slarves share the same religious beliefs as Mid Vermont Christian.

### D.     Defendants

76.     Defendant Heather Bouchey is the Interim Secretary of the Vermont Agency of Education. Secretary Bouchey replaced Former Secretary Daniel French, who resigned in March 2023. Secretary Bouchey is sued in her official capacity only.

77.     Secretary Bouchey's duties include supervising and directing the execution of laws relating to public schools and ensuring compliance with such laws. 16 V.S.A. § 212.

78.     Secretary Bouchey is responsible for supervising the expenditure and distribution of all money appropriated by Vermont for public schools under Title 16 of the Vermont Statutes. *Id.*

79.     Defendant Jennifer Deck Samuelson is the Chair of the Vermont State Board of Education, which has supervision over, and management of, the Agency of

Education. She is sued in her official capacity only.

80.     Defendants Bouchey and Samuelson are collectively referred to as "the Agency" unless the context indicates otherwise.

81.     The Agency decides which schools are approved as "independent schools" capable of receiving public benefits in the state and have the authority to enforce compliance with the law by stripping public funding from school districts.

82.     The Agency denied Mid Vermont Christian's application for approved independent status and instead designated Mid Vermont Christian as a recognized school.

83.     So the School is not capable of receiving Town Tuitioning or Dual Enrollment funds.

84.     Defendant Hartland School Board bears the responsibility for providing education for children who live within its district. 16 V.S.A. § 822(a)(1).

85.     Defendant Hartland School Board bears the legal burden of funding an education to students who reside in the district. 16 V.S.A. § 824(a).

86.     The Hartland School Board initially paid the Slarves' tuition request to Mid Vermont Christian for the 2023-2024 school year, but the Hartland School Board then recouped that payment because Mid Vermont Christian was not approved as an "independent school" by the Agency.

87.     Defendant Christine Bourne is the Windsor Southeast Supervisory Union Superintendent who implements the policies of the Hartland School Board. 16 V.S.A. § 242.

14

88.     On information and belief, Superintendent Bourne advised the Hartland School Board to refrain from paying Mid Vermont Christian Town Tuitioning funds because Mid Vermont Christian was not approved as an "independent school" by the Agency.

89.     Defendant Waits River Valley (Unified #36 Elementary) School Board bears the responsibility for providing education for children who live within its district. 16 V.S.A. § 822(a)(1).

90.     Defendant Waits River Valley (Unified #36 Elementary) School Board bears the legal burden of funding an education to students who reside in the district. 16 V.S.A. § 824(a).

91.     The Waits River Valley (Unified #36 Elementary) School Board initially paid at least two Mid Vermont Christian families' tuition requests for the 2023-2024 school year, but the Waits River Valley (Unified #36 Elementary) School Board then recouped those payments because Mid Vermont Christian was not approved as an "independent school" by the Agency.

92.     Defendant Randall Gawel is the Orange East Supervisory Union Superintendent who implements the policies of the Hartland School Board. 16 V.S.A. § 242.

93.     Upon information and belief, Superintendent Gawel advised the Waits River Valley School Board to refrain from paying Mid Vermont Christian Town Tuitioning funds because Mid Vermont Christian was not approved as an "independent school" by the Agency.

94.     Neither the Hartland School District nor the Waits River Valley
(Unified #36 Elementary) School District maintain public high schools in their
districts for the education of its resident students.

95.     Defendant Jay Nichols is Executive Director of the VPA, an association
of Vermont schools and school leaders that oversees sports and other activities in
Vermont for its 270 member schools. Defendant Nichols is sued in his official
capacity only.

96.     As Executive Director, Defendant Nichols is the "chief executive
officer" of the VPA and has the "powers, duties, and responsibilities usually
associated with the office." One of those powers, duties, and responsibilities is
enforcing VPA policies. VPA Bylaws art. 6, § 1, a true and accurate copy of which is
attached as Exhibit 2.

97.     Defendant Nichols is referred to as the "VPA" unless the context
indicates otherwise.

98.     The VPA is a state actor.

99.     The VPA is a state actor in part because it "includes most public
schools located within the State [of Vermont], acts through their representatives,
draws its officers from them, is largely funded by their dues and income received in
their stead, and has historically been seen to regulate in lieu of the [Agency] of
Education's exercise of its own authority." *Brentwood Acad. v. Tenn. Secondary Sch.
Athletic Ass'n*, 531 U.S. 288, 290–91, 298–302 (2001) (holding that the TSSAA is a
state actor).

100.    The VPA oversees sports and activities for its 270 member schools in Vermont.

101.    The VPA currently oversees 28 sports and activities in Vermont.

102.    The VPA is the only sports association that includes both public and private middle and high schools in Vermont.

103.    The VPA controls scheduling, participation in, and the rules for VPA sports competitions.

104.    A majority of middle schools in Vermont and all high schools, including all public high schools, in Vermont are members of the VPA.

105.    Over 95% of the VPA's member schools are public schools.

106.    Defendant Jay Nichols, Executive Director of the VPA, is the former Superintendent of Schools of the Franklin Northeast Supervisory Union, which serves seven public schools in Vermont.

107.    The VPA member schools, including its public school members, are represented in the VPA by the principal or a designee of the principal of each school. The principal or designee that represents each school is "entitled to vote for that school on activity matters and also to serve on committees related to activities." VPA Bylaws art. 3, § 1.

108.    The VPA Executive Council is "the governing body" of the VPA. The VPA members, including its public school members, select the members of the Executive Council, including the VPA's President and President-elect. The Executive Council approves the Executive Director of the VPA. *Id.* art. 6, §§ 1, 3.

109.   Twelve out of the thirteen current members of the Executive Council (92%), including the VPA's President and President-elect, are principals, former principals, or other senior administrators of public schools.

110.   VPA policies are established by the VPA's members, including its public school members.

111.   The VPA Executive Council has "the authority to appoint any necessary committees and delegate responsibilities to those committees," including the VPA's Activity Standards Committee. *Id.* art. 3, § 3.

112.   The VPA's Activity Standards Committee, which includes nine VPA members, votes on "[a]ll policies governing student activities ... subject to the approval by the Executive Council." *Id.* art. 7, § 2.

113.   All members of the 2022-2023 Activity Standards Committee were principals, athletic directors, or other senior administrators of public schools. Defendant Nichols likewise attends Activity Standards Committee meetings.

114.   There are no private schools represented on the current Activity Standards Committee.

115.   In 2022, over 89% of the VPA's annual revenue ($1,793,104) came from membership dues from its predominately public-school members ($423,946) and from admissions to, sales at, and sponsorship for VPA-regulated sports and activities ($1,176,372 collectively).

116.   In charging for admissions, the VPA "exercises the authority of the predominantly public schools to charge for admission to their games; the [VPA] does

not receive this money from the schools, but enjoys the schools' moneymaking capacity as its own." *See Brentwood Acad.*, 531 U.S. at 299.

117.    The VPA works hand-in-hand with the Agency in various ways.

118.    For example, the Agency's "Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students" states that "[p]articipation in competitive athletic activities and sports will be resolved on a case-by-case basis" and that "[s]chools should refer to the Vermont Principal's Association Activities/Athletics Policies: Article 1 Section 2." *See* Vermont Agency of Education's Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students at 6, a true and accurate copy of which is attached as Exhibit 3.

119.    And a goal of the VPA Executive Council is to "[c]ollaborate with [the Vermont Agency of Education] to support Principals." *See About the VPA*, Vermont Principals' Association, https://perma.cc/9KN9-8QMZ.

120.    The Agency also promotes VPA resources and events on its website.[2]

---

[2] *See, e.g.*, *Vermont Principals Association Sanctions First Lego League and First Technical Challenge as a School Activity*, (Feb. 24, 2015), https://education.vermont.gov/sites/aoe/files/documents/edu-press-release-vpa-sanctions-robotics-competitions.pdf [https://perma.cc/HLN9-FJM6]; *Employment*, State of Vt. Agency of Educ., https://education.vermont.gov/about-us/employment [https://perma.cc/U4CM-G3PT]; *Weekly Field Memo, Volume 13, Issue 18*, State of Vt. Agency of Educ., https://education.vermont.gov/weekly-field-memo/volume-13-issue-18 [https://perma.cc/VV2G-9P3V]; *Weekly Field Memo, Volume 17, Issue 2*, State of Vt. Agency of Educ., https://education.vermont.gov/weekly-field-memo/volume-17-issue-2 [https://perma.cc/27LV-9J82]; *Weekly Field Memo, Volume 13, Issue 37*, State of Vt. Agency of Educ., https://education.vermont.gov/weekly-field-memo/volume-13-issue-37 [https://perma.cc/4MNG-HYX9]; *Weekly Field Memo, Volume 13, Issue 25*, State of Vt. Agency of Educ.,

121.    The Vermont Legislature, moreover, has delegated important public

functions and duties to the VPA:

a.  "When a school district hires a principal or a career technical center
    director who has not been employed previously in that capacity, the
    superintendent serving the district, ***in consultation with the Vermont
    Principals' Association***, shall work to ensure that the new principal or
    technical center director receives mentoring supports during at least the
    first two years of employment. Mentoring supports shall be consistent
    with best practices, research-based approaches, or other successful
    models, and ***shall be identified jointly by the Vermont Principals'
    Association*** ...." 16 V.S.A. § 245(a) (emphasis added).

b.  "The Secretary of Education or designee, ***assisted by members of the
    Vermont Principals' Association selected by that association***, ...
    shall develop statewide guidelines, forms, and other materials, and update
    them when necessary, that are designed to educate coaches, youth
    athletes, and the parents and guardians of youth athletes regarding
    [concussions]." 16 V.S.A. § 1431(b) (emphasis added).

c.  The Secretary of the Agency of Education shall "establish an Advisory
    Council to review and coordinate school and statewide activities relating
    to the prevention of and response to harassment, hazing, and bullying. ...
    The Council shall include ... ***the Executive Director of the Vermont
    Principals' Association or designee***." 16 V.S.A. § 570(d)(2) (emphasis
    added).

d.  "Prior to appointing a member [of the Vermont Standards Board for
    Professional Educators], the Governor shall consult with the State Board
    of Education and, as appropriate, ... ***the Vermont Principals
    Association*** ...." 16 V.S.A. § 1693(b) (emphasis added).

122.    In short, the VPA is pervasively entwined with the State.

123.    All of the defendants are collectively referred to as "Defendants,"

"Vermont," or the "State" unless the context indicates otherwise.

124.    Defendants are entities and individuals acting under color of state law

---

https://education.vermont.gov/weekly-field-memo/volume-13-issue-25
[https://perma.cc/ASU3-JKUX].

and therefore are subject to liability under 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

### A. The State of Vermont excludes Mid Vermont Christian from the Town Tuitioning Program because of its religious beliefs and exercise.

#### 1. The Town Tuitioning and Dual Enrollment Programs.

125.   In Vermont, some school districts do not operate public high schools. Under Vermont's Town Tuitioning Program, these districts use public funds to pay for students residing in the district to attend independent schools or public schools in other districts.

126.   Specifically, Vermont school districts must either maintain their own high school or "provide for the high school education of its students by paying tuition to a public high school, an approved independent high school, or an independent school meeting education quality standards, to be selected by the parents or guardians of the student, within or outside the State." 16 V.S.A. § 822(a)(1).

127.   While the Town Tuitioning Program is administered by school boards of the individual school districts, ultimate oversight authority in individual cases is vested in the Vermont State Board of Education ("State Board"). 16 V.S.A. § 828.

128.   The State Board supervises and manages Vermont's Agency of Education.

129.   Districts that pay tuition for their students instead of maintaining a public high school are called "sending districts." Under the Town Tuitioning

Program, sending districts directly pay the amount of tuition on behalf of their students to the public school or the private independent school of each student's choice. 16 V.S.A. § 824.

130.   Vermont's Dual Enrollment Program similarly permits students in grades 11 or 12 to take up to two postsecondary courses while still in high school "for which neither the student nor the student's parent or guardian shall be required to pay tuition." 16 V.S.A. § 944(b)(2).

131.   Students who wish to participate in the Dual Enrollment Program must be enrolled at either a public school, an approved independent school that is designated as the public secondary school for the student's district of residence, an approved independent school in which the student's district of residence pays publicly funded tuition on behalf of the student, or is home-schooled. *Id.* § 944(b)(1).

132.   Vermont provides two statuses for independent (private) schools: approved independent schools or recognized schools.

133.   "Approved independent schools" are private schools that meet certain educational quality and curriculum requirements established by the Vermont State Board and are eligible to participate in the Town Tuitioning Program, Dual Enrollment Program, and other public benefits programs.

134.   Those requirements are set forth in Vermont Rule Series 2200 ("Rule 2200"). *See* 7-1 Vt. Code R. § 3:2220, *et seq.*

135.   "Recognized schools" are private schools that are not eligible to participate in the Town Tuitioning Program, Dual Enrollment Program, or other

22

public benefits programs in the state.

136.    The approved independent school designation is conferred by the State Board and recognized by the Agency.

### 2.    The Second Circuit ends Vermont's past religious discrimination.

137.    For several years, as directed and encouraged by the Agency, school districts would not make tuition payments under the Town Tuitioning Program for students who chose to attend religious schools.

138.    In 2021, however, the United States Court of Appeals for the Second Circuit held that Vermont's refusal to provide Town Tuitioning Program funding to religious schools was unconstitutional. *In re A.H.*, 999 F.3d at 108. The Second Circuit concluded that religious schools "have been deprived of a public benefit as a result of the state's and the school districts' decades-long policy of unconstitutional religious discrimination" and that religious schools were "entitled to [Town Tuitioning Program] funding to the same extent as parents who choose secular schools for their children, regardless of [their] religious affiliation or *activities*." *Id.* (emphasis added).

139.    Then, in 2022, the Supreme Court decided *Carson v. Makin*, removing any doubt about whether the government could "exclude otherwise eligible schools on the basis of their religious exercise." 142 S. Ct. 1987, 2002 (2022). In *Carson*, the Supreme Court held that Maine's tuition assistance program, which was substantially the same as the Town Tuitioning Program, violated the Free Exercise Clause of the First Amendment. *Id.* at 2002.

140.     Following those decisions, Vermont began allowing religious schools to
participate in the Town Tuitioning Program. In 2022, Former Secretary French
issued "guidance" to Vermont superintendents explaining that "[i]n light of the U.S.
Supreme Court's decision in *Carson v. Makin*, ... [s]chool districts may not deny
tuition payments to religious approved independent schools or religious
independent schools that meet educational quality standards." Sep. 13, 2022
Guidance from Secretary French at 1, a true and accurate copy of which is attached
as Exhibit 4.

141.     After years of discrimination, Mid Vermont Christian was able to
participate in the Town Tuitioning Program.

### 3.     Vermont's amended Rule 2200 requires Mid Vermont Christian to violate its religious beliefs and exercise to participate in the Town Tuitioning Program.

142.     Finding a new way to exclude religious schools, last year Vermont
finalized changes to Rule 2200 to again withhold funding from religious schools
because of their religious beliefs and exercise. *See* 7-1 Vt. Code R. § 3:2220, *et seq.*

143.     This time, instead of barring religious schools from the Town
Tuitioning and Dual Enrollment Programs simply because of their religious
identity, the State told religious schools they must stop their religious exercise if
they want to participate in the Program.

144.     The State did so by making compliance with the Vermont Public
Accommodations Act and the Vermont Fair Employment Practices Act a condition
for obtaining approved independent school status.

24

145.   Specifically, schools applying for initial approval or renewal as

approved independent schools must provide in their application:

> "(1) A statement of nondiscrimination, posted on the school's website and
> included in the school's application materials, that is consistent with the
> Vermont Public Accommodations Act ... and the Vermont Fair Employment
> Practices Act"; and

> "(2) An assurance, signed by the Head of School, that the school complies
> with the Vermont Public Accommodations Act in all aspects of the school's
> admissions and operations."

7-1 Vt. Code R. § 3:2226.6.

146.   And to participate in the Program, the State Board must find that

"[t]he school substantially complies with all statutory requirements for approved

independent schools and the Board's rules for approved independent schools

including nondiscrimination in admissions and operations." *Id.* § 3:2227.8

147.   The Vermont Public Accommodations Act provides that "[a]n owner or

operator of a place of public accommodation ... shall not, because of the ... marital

status, sex, sexual orientation, or gender identity of any person, refuse, withhold

from, or deny to that person any of the accommodations, advantages, facilities, and

privileges of the place of public accommodation." 9 V.S.A. § 4502(a).

148.   And the Vermont Fair Employment Practices Act prohibits, among

other things, employers from discriminating against employees or potential

employees "because of ... religion ... sexual orientation, [and] gender identity." 21

V.S.A. § 495.

149.   The Agency thus requires Mid Vermont Christian to comply with the

Vermont Public Accommodations Act's and Fair Employment Practices Act's

25

prohibition on religion, sexual orientation, and gender identity discrimination in its operations, admissions, and employment in order to receive approved independent status. [3]

150.   Consequently, Mid Vermont Christian must affirmatively agree not to "discriminate" on the basis of religion, sexual orientation, or gender identity as a condition of receiving tuition.

151.   After the changes to Rule 2200 were finalized, each school seeking initial approval or renewal as an independent school was "required to affirm compliance with [these new] provisions" by signing an addendum to their application. *See* January 5, 202[3] Mid Vermont Christian Addendum for Independent School Applications, a true and accurate copy of which is attached as Exhibit 5.

---

[3] Mid Vermont Christian disputes that it is a place of public accommodation, as it is not a school "offered to the general public." 9 V.S.A. § 4501. Instead, the services it provides are customized and selective in nature. *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1880–81 (2021). Further, even if applicable to Mid Vermont Christian, the statute does not apply when the health or safety of others is at risk. 9 V.S.A. § 4502(h). Such was the case here. And further, the law contains numerous categorical exemptions. *See* 9 V.S.A. § 4502(d) (permitting small lodging facilities to discriminate based on sex or marital status); 9 V.S.A. § 4502(l) (exempting religious organizations with respect to weddings). In addition, the School disputes that it is subject to the Fair Employment Practices Act, as it is a religious educational institution. *See* 21 V.S.A. § 495(e).

152.    To clarify that Mid Vermont Christian would continue to adhere to its

religious beliefs, Mid Vermont Christian signed the addendum, but with the

following amendment:

> The Mid Vermont Christian School is signing this form with the
> understanding that it must be read consistent with existing law and
> the U.S. and Vermont Constitutions. As a religious organization, the
> school has a statutory and constitutional right to make decisions based
> on its religious beliefs, including hiring and disciplining employees,
> associating with others, and in its admissions, conduct, and operations
> policies and procedures. By signing this form, the Mid Vermont
> Christian School does not waive any such rights. To the extent Rule
> 2200's requirements conflict with any of the school's beliefs, including
> on marriage and sexuality, the school has not included that language
> in its handbook or online, nor can it affirm that particular aspect of the
> Vermont Public Accommodations Act.

*Id.*

153.    After receiving Mid Vermont Christian's Addendum, the Agency stated

that to be approved Mid Vermont Christian must submit an Addendum without

revision. Defendant Samuelson further stated that Mid Vermont Christian was not

compliant with Agency rules and told the school it had to choose what its next

course of action was going to be.

154.    In response, Mid Vermont Christian sent the State Board a letter

explaining the inapplicability of the Vermont Public Accommodations Act and why

it included language on the assurance form.

155.    Upon receipt of that letter, the State Board then informed Mid

Vermont Christian that it was not going to take further action on its requested

approval.

156.    Defendants' inaction resulted in a denial of Mid Vermont Christian as

27

an approved independent school capable of participating in the State's Town Tuitioning Program, Dual Enrollment Program, or any public benefits associated with that distinction.

157.    This denial was confirmed via email on July 6, 2023, when the Agency sent Mid Vermont Christian a memorandum (dated April 24, 2023) and form to be completed so that it could be considered a "recognized school" (and therefore able to operate) for the 2023-24 school year.

158.    Recognized schools are not allowed to participate in the State's public benefits programs, including the Town Tuitioning or Dual Enrollment Programs.

159.    Mid Vermont Christian responded to the Agency, informing it that the School should be granted *approved* independent school status so that it can participate in the Town Tuitioning and Dual Enrollment Programs.

160.    But on August 3, 2023, the Agency confirmed that it "considers [Mid Vermont Christian] for 2023-24 to be a Recognized Independent School ...." Agency of Education August 3, 2023 Status Letter, a true and accurate copy of which is attached as Exhibit 6.

161.    The Agency refused to renew Mid Vermont Christian's status as an approved independent school because Mid Vermont Christian's religious beliefs and practices prevented it from agreeing to comply in full with Rule 2200.

162.    The new requirements of Rule 2200 require Mid Vermont Christian to adhere to the Vermont Public Accommodations Act and Vermont Fair Employment Practices Act in all aspects of the school's admissions and operations.

163.    To comply with the new requirements, Mid Vermont Christian would have to change its policies in a way that conflicts with Mid Vermont Christian's religious beliefs and would have to hire individuals who do not share and live out the school's religious beliefs.

164.    Mid Vermont Christian has employment, admissions, and internal operations policies that are based on Mid Vermont Christian's religious beliefs regarding marriage, sexuality, and gender. For example, employees of Mid Vermont Christian must agree with and abide by the School's beliefs, including those on marriage and sexuality. And, while students who are questioning their sexuality and gender are welcome to attend Mid Vermont Christian, the School expects all students to adhere to all school policies, including the school's policies on bathroom and locker room usage, pronoun usage, dress codes, and participation in athletics that are based on Mid Vermont Christian's religious beliefs.

165.    The School cannot change its policies or post the State's desired policies without violating its religious beliefs and free speech rights.

166.    Mid Vermont Christian raised the issue and requested a religious exemption from the Agency.

167.    Yet the Agency refused to grant Mid Vermont Christian a religious exemption to Rule 2200's new requirements.

168.    Mid Vermont Christian has been denied designation as an approved independent school eligible to receive public benefits solely because Mid Vermont Christian will not violate its religious beliefs on marriage, sexuality, and gender.

169.    Mid Vermont Christian satisfies all other conditions and requirements
necessary to obtain approved independent school status.

> **4.    The Agency's denial has excluded Mid Vermont Christian
> and its families from public benefit programs causing
> ongoing harm.**

170.    During the 2022-2023 school year, families could choose to send their
children to Mid Vermont Christian under the Town Tuitioning Program. That
school year, four Mid Vermont Christian students participated in Vermont's Town
Tuitioning Program.

171.    Families—including the Slarves—also sought to participate in the
Town Tuitioning Program for the 2023-2024 school year and sent the necessary
paperwork to their respective sending districts by early summer 2023.

172.    In September 2023, Hartland School Board sent a check to Mid
Vermont Christian for the tuition payment of T.S. because the Slarves reside within
the Hartland School District but T.S. attends Mid Vermont Christian.

173.    Also in September 2023, Waits River Valley (Unified #36 Elementary)
School Board sent a check to Mid Vermont Christian for the tuition payment of two
students who resided within the Waits River Valley (Unified #36 Elementary)
School District but attended Mid Vermont Christian.

174.    However, in October 2023, after learning that Mid Vermont Christian
was no longer an "approved independent school," both School Boards via Defendants
Gawal and Bourne requested the tuition money back until they received "clear
guidance from the [Agency] on this matter." *See* Gawel October 4, 2023 Email to

Vicky Fogg, a true and accurate copy of which is attached as Exhibit 7; Bourne

October 4, 2023 Email to Vicky Fogg, a true and accurate copy of which is attached

as Exhibit 8.

175.    Mid Vermont Christian complied.

176.    Upon information and belief, the Agency never responded to the School

Boards or the superintendents.

177.    The Agency never responded to Mid Vermont Christian.

178.    Neither the School Boards nor the superintendents have responded to

the School since their emails on October 4, 2023.

179.    As of the date of this filing, the Agency and Board of Education has not

designated Mid Vermont Christian an approved independent school.

180.    As a result, T.S. is not currently participating in the Town Tuitioning

Program and the Hartland School Board has not paid T.S.'s tuition at Mid Vermont

Christian.

181.    The other current students at Mid Vermont Christian who reside

within the Waits River Valley (Unified #36 Elementary) School District are also not

participating in the Town Tuitioning Program but would like to do so.

182.    In addition, Mid Vermont Christian has at least one student who

sought to participate in the Dual Enrollment Program but could not because Mid

Vermont Christian is not an approved independent school.

183.    That student is otherwise eligible and satisfies all requirements to

participate in the Dual Enrollment Program, apart from the fact that Mid Vermont

31

Christian has not been approved as an independent school.

184. That student could not participate in the Dual Enrollment Program because Mid Vermont Christian is not an approved independent school.

185. Instead, Mid Vermont Christian covered the tuition cost for that student to take postsecondary courses at an out-of-state university.

**B. Vermont also has excluded Mid Vermont Christian and its athletes from Vermont sports because of their religious beliefs and exercise.**

186. Not only has Vermont excluded Mid Vermont Christian from the Town Tuitioning Program because of Mid Vermont Christian's religious beliefs and practices, but it has also excluded Mid Vermont Christian from all middle school and high school sports for the same reason.

187. In May 2023, the VPA expelled Mid Vermont Christian from participating in *any* middle school and high school sports, thereby punishing the school and the 12- to 18-year-old student-athletes and their families, simply because they and their school exercise their religious beliefs.

**1. The VPA governs Vermont sports and academic competitions.**

188. Participation in VPA sports and academic competitions is limited to teams from VPA member schools.[4] *See* VPA Athletic Policies § 4, a true and accurate copy of which is attached as Exhibit 9. Only students enrolled in VPA member schools can participate in VPA sports and other activities.

---

[4] *Student Activities*, Vermont Principles Association, https://vpaonline.org/student-activities/ [https://perma.cc/27K6-VZ42].

189.    Accordingly, as long as Mid Vermont Christian is not a member of the VPA, the School and its students cannot participate in any VPA sports or academic competitions. That includes students at Mid Vermont Christian who historically were able to join teams at VPA member schools in sports that Mid Vermont Christian did not offer.

190.    Students at VPA member schools whose schools do not offer particular sports can participate in such sports at other VPA member schools through the VPA's "Member-to-Member Program." *See id.* § 33.

### 2.    The VPA's policies penalize Mid Vermont Christian and its students for their religious beliefs.

191.    The VPA's "Commitment to Racial, Gender-Fair, and Disability Awareness" policy states that the VPA and its member schools "are committed to creating an environment in our activities and programs that promotes respect for and appreciation of racial, gender, sexual orientation, religious and ethnic differences, and is disability aware." *Id.* § 1.

192.    The VPA's "Policy on Gender Identity" also states that "[t]he VPA is committed to providing all students with the opportunity to participate in VPA activities in a manner consistent with their gender identity." *Id.* § 2.

193.    This policy is based on "the Vermont Agency of Education Best Practices For Schools For Transgender and Gender Nonconforming Students" (*see* Ex. 3) and the Vermont Public Accommodations Act. *Id.*

194.    That VPA policy prohibits "discrimination based on a student's actual or perceived sex and gender." *Id.*

195.   The VPA defines "gender identity" as "an individual's actual or perceived gender identity ... regardless of the individual's assigned sex at birth." *Id*.

196.   The VPA also enforces the Vermont Public Accommodations Act against member schools, and compliance with the Vermont Public Accommodations Act is a requisite for membership. *See id*. (pointing to the Vermont Public Accommodations Act as prohibiting discrimination, including "based on a student's actual or perceived sex and gender.").

197.   The VPA policies also require that sports seasons be scheduled to "maximize gender equity." *Id*. § 26.

198.   Collectively, these VPA policies are referred to as the VPA's "gender identity policies."

199.   The VPA also has a "boys/girls fairness policy" that provides, in part:

> ***Interscholastic athletics involving mixed (boys/girls) competition is prohibited*** except in those instances where the member school does not offer equivalent (same) activities for girls. ...

> ***Therefore, boys shall not try out for traditional girls' sports and be eligible for state competition***. For purposes of this policy, the following activities are identified as girl's sports: field hockey, softball, girls soccer, girls basketball, girls golf, girls gymnastics, girls hockey, girls lacrosse, girls alpine and nordic skiing, girls tennis, girls track and field, girls snowboarding, girls volleyball and girls ultimate. ***This policy recognizes traditional boys-dominated sports and the need to protect opportunities for girl athletes.***

*Id*. § 16.11 (emphasis added).

200.   Despite the VPA's boys/girls fairness policy, the VPA allows biological males to compete in girls' sporting events under the VPA's gender identity policies.

201.   The VPA's gender identity policies thus conflict with its boys/girls

fairness policy.

202.    The only way to reconcile the two policies is for the VPA to believe that biological boys who "identify" as female are, in fact, females, and thus their competition in girls' sports does not violate the VPA's boys/girls fairness policy.

203.    VPA's gender identity policies require: (1) Mid Vermont Christian to assign athletes to its own athletic teams based on the athletes' chosen gender identity (rather than biological sex); and (2) Mid Vermont Christian's girls' athletic teams to compete against biological males, despite the VPA's boys/girls fairness policy.

204.    Forcing Mid Vermont Christian and its students—including Plaintiffs A.G., M.G., T.S., and K.S.—to do these things violates their religious beliefs and exercise.

205.    Moreover, forcing Mid Vermont Christian's female athletes to compete against biological males (via the VPA's gender identity policies) raises safety concerns for the School's female athletes, as reflected by the VPA's boys/girls fairness policy.

206.    For instance, last fall a high school girl in North Carolina suffered severe head and neck injuries resulting in long-term concussion symptoms after a biological male on the other team spiked a volleyball in her face. This story was widely reported in the media and known to Mid Vermont Christian.[5]

---

[5] Alec Schemmel, *Injured volleyball player speaks out after alleged transgender opponent spiked ball at her*, ABC 13 News (Apr. 20, 2023),

3. **The VPA expelled—and effectively denies readmission to—Mid Vermont Christian because of the school's religious beliefs and exercise.**

207.    The Mid Vermont Christian girls' 2022-2023 varsity basketball team qualified for and was scheduled to compete in the 2023 VPA Division 4 Girls' State Basketball Tournament.

208.    The first-round playoff opponent for Mid Vermont Christian was the Long Trail School in Dorset, Vermont.

209.    Due to the VPA's gender identity policies, a biological male at Long Trail was permitted to compete in VPA high school girls' basketball games during the 2022-2023 season. The male was over six feet tall.[6]

210.    As noted, Mid Vermont Christian's religious beliefs teach that an individual's status as male or female is determined by biological sex, not his or her perceived gender identity.

211.    Concerned about the situation, the apparent violation of the VPA's

---

https://wlos.com/news/local/volleyball-player-injured-after-transgender-opponent-spiked-ball-at-her-speaks-out [https://perma.cc/6QW3-4KLL].

[6] *Mid Vermont Christian Forfeits Tournament Game Over Opponents Transgender Player*, Stateline Sports Network (Feb. 27, 2023), https://statelinesportsnetwork.net/2023/02/27/mid-vermont-christian-forfeits-tournament-game-over-opponents-transgender-player/ [https://perma.cc/QK5B-RGDN]; Aaron Warner, *David vs. Goliath, dressed as a girl*, Vermont Daily Chronicle (Feb. 23, 2023), https://vermontdailychronicle.com/david-vs-goliath-dressed-as-a-girl/ [https://perma.cc/WX7D-WSW2]; Tom Haley, *Mountain Lions roar back to top PHS*, Rutland Herald (Feb. 7, 2023), https://www.rutlandherald.com/sports/mountain-lions-roar-back-to-top-phs/article_13ebdf09-9355-5a99-8f1c-d1c22f1a4ad7.html [https://perma.cc/GKU6-9NDG].

boys/girls fairness policy, and the safety of its female athletes, Mid Vermont Christian contacted the VPA to discuss the game against Long Trail.

212.    Multiple news stories regarding the Long Trail girls' basketball team underscored Mid Vermont Christian's concerns. The biological male on Long Trail's team is taller than any girl on Mid Vermont Christian's team. Available video of the biological male playing basketball, which showed the athlete repeatedly blocking girls' shots, throwing elbows, and knocking girls down further underscored Mid Vermont Christian's concerns.

213.    Before the game, consistent with the VPA's boys/girls fairness policy, Mid Vermont Christian asked the VPA that its girls' team not have to play against the male.

214.    In response to Mid Vermont Christian's concerns, the VPA stated it would not honor Mid Vermont Christian's request because doing so would violate the Vermont Public Accommodations Act, the Agency of Education's Best Practices For Schools Regarding Transgender And Gender Nonconforming Students, and the VPA's gender identity policies.

215.    Because its girls' basketball team was being asked to play against a biological male—in violation of the VPA's boys/girls fairness policy—Mid Vermont Christian decided to forfeit the playoff game.

216.    In response, the VPA made "an immediate determination of ineligibility" and expelled Mid Vermont Christian from the Association, penalizing the School for its religious beliefs about sex and gender. *See* Mar. 13, 2023 VPA

37

Press Release and Ineligibility Determination Letter, a true and accurate copy of which is attached as Exhibit 10.

217.    The VPA's termination letter to Mid Vermont Christian stated that the school violated the VPA's gender identity policies, which were "aligned with Vermont state law"—which meant the Vermont Public Accommodations Act. *Id.*

218.    As a result, the VPA barred Mid Vermont Christian and *all* of its students from competing in *any* VPA sports or activities, not just girls' basketball.

219.    On multiple prior occasions, other Vermont schools have forfeited VPA-sponsored athletic events without any apparent repercussions from the VPA. *See* Mawson, Michael, *Spaulding football forfeits Friday night's game against Mount Anthony*, Bennington Banner, (Sept. 9, 2022), https://perma.cc/E2PG-HF8A; Abrami, Alex, *Vermont high school football: Missisquoi forced to forfeit game*, Burlington Free Press, (Sept. 14, 2018), https://perma.cc/FLB4-84R8. That includes at least three instances of schools forfeiting due to their refusal to play against a player with a COVID-19 exemption. *See* Danforth, Austin, *Nobody would play Woodstock—until a policy change allowed Hartford to step up*, Burlington Free Press, (Feb. 25, 2021), https://perma.cc/MQ6C-DSW5.

220.    Worse still, on February 22, 2023, while commenting on a potential bill that could impact the Town Tuitioning Program during a Vermont House Education Committee hearing, Defendant Nichols showed hostility toward Mid Vermont Christian's religious beliefs. Nichols criticized Mid Vermont Christian for allegedly supporting "blatant discrimination under the guise of religious freedom." Jay

Nichols Testimony re. H.258 at 2, a true and accurate copy of which is attached as
Exhibit 11.

221.    In March 2023, the VPA sent a letter to Mid Vermont Christian
reiterating that the School's religious beliefs and practices did not meet the
expectations of its gender identity policies and that the school was ineligible to
participate in VPA activities going forward.

222.    Following the decision, Defendant Nichols explained that it was the
VPA's way or no way: "If you don't want to follow VPA rules, that's fine. ... But then
you're just not a VPA member. It's fairly simple. That's really all we're gonna really
say about it."[7]

223.    Moreover, despite Mid Vermont Christian raising its concerns with the
VPA prior to the playoff game, the VPA falsely told the media that it first learned of
the School's rationale for forfeiting the game through the School's statement to
*Valley News*.[8]

224.    The VPA also inaccurately told the media that the VPA offers no

---

[7] Peter D'Auria, *Vermont religious school that refused to play team with trans player
banned from sporting events*, VTDigger (Mar. 13, 2023),
https://vtdigger.org/2023/03/13/vermont-religious-school-that-refused-to-play-team-
with-trans-player-banned-from-sporting-events/ [https://perma.cc/3LU5-2TY4].

[8] Tory Rich, *Mid Vermont Christian School to appeal ban from Vermont Principals
Association*, Manchester Journal (Mar. 14, 2023),
https://www.manchesterjournal.com/local-news/mid-vermont-christian-school-to-
appeal-ban-from-vermont-principals-association/article_886e9c32-c28d-11ed-82e6-
3b724e767d13.html [https://perma.cc/CB3K-TRTU]; Tory Rich, *Mid Vermont
Christian School ousted from Vermont Principals Association- sanctioned activities*,
Bennington Banner (Mar. 13, 2023),
https://www.benningtonbanner.com/sports/mid-vermont-christian-school-ousted-

appeals process for schools that are barred from VPA sporting events.[9]

225.   Rather than engage in a conversation with Mid Vermont Christian, as the School requested, the VPA immediately expelled Mid Vermont Christian from all VPA activities and publicly mocked its beliefs while testifying before the Vermont House.

226.   On top of that, by immediately expelling Mid Vermont Christian from the VPA, the VPA failed to follow its own disciplinary action procedures, including the necessity of submitting a written notice of probable violation.

227.   When Mid Vermont Christian sought an appeal, the VPA's Activities Committee had to inform Defendant Nichols how to hold and conduct a proper appeal procedure.

228.   After finally allowing Mid Vermont Christian to move through the appeals process, the School raised religious objections and concerns to the VPA's gender identify policies.

229.   At no point during the appeal process did the VPA seriously consider Mid Vermont Christian's religious beliefs, exercise, and objections.

230.   The VPA's Activity Standards Committee eventually held a hearing on Mid Vermont Christian's appeal, which the School attended. The Committee is comprised of nine VPA members, all of whom represent public schools.

---

from-vermont-principals-association-sanctioned-activities/article_b6831e9e-c1da-11ed-a49c-dbcea321d30a.html [https://perma.cc/M3RH-6GCL].

[9] D'Auria, *supra* note 8.

231.    The Activity Standards Committee unanimously denied Mid Vermont Christian's appeal and upheld the VPA's "penalty of expulsion," saying "[t]his case has nothing to do with beliefs."

232.    The VPA also told Mid Vermont Christian that "[i]t is a myth that transgender students endanger others when they participate in high school sports or create unfair competition" and pointed to California as an example.

233.    But days later, a California high school sports governing body, the California Interscholastic Federation, came under fire from individuals and organizations, including the Independent Council on Women's Sports, when a biological male finished in second place in the varsity girls' 1,600-meter run finals, thereby securing a spot at the California State Track & Field Championships.[10]

234.    The VPA's denial, and its failure to seriously consider Mid Vermont Christian's concerns, shows hostility toward the School's religious beliefs.

235.    As of the date of this filing, Mid Vermont Christian and its students remain expelled from the VPA and unable to compete in VPA middle school and high school athletics and other VPA activities.

236.    Instead, Mid Vermont is currently competing in the New England Association of Christian Schools.

237.    The New England Association of Christian Schools ("NEACS") contains

[10] Ryan Gaydos, *Transgender California High School Runner's 2nd-place Finish in Girls Race Draws Backlash*, Fox News (May 21, 2023),
https://www.foxnews.com/sports/transgender-california-high-school-runner-athena-ryan-2nd-place-finish-girls-race-draws-backlash [https://perma.cc/84LB-6UMR].

members in Connecticut, Rhode Island, New Hampshire, Vermont, and
Massachusetts.

238.    The closest school to Mid Vermont in the NEACS is in Concord, New
Hampshire, over one hour away.

239.    After missing out on spring 2023 sports and activities as well as the
increased time and expense of traveling to NEACS for competition, Mid Vermont
decided to reapply for membership in the VPA.

240.    During the fall of 2023, Mid Vermont Christian asked the VPA how it
could reapply for school membership in the VPA and requested any required forms
as suggested by the VPA's website.

241.    In response to Mid Vermont Christian's request, the VPA pointed the
School back to its prior expulsion decision.

C.    **The State of Vermont's policies and actions against Mid
Vermont Christian have irreparably harmed—and continue to
irreparably harm—Plaintiffs.**

242.    The State's actions against Mid Vermont Christian and its families,
including the Goodwins and Slarves, have caused them irreparable harm.

243.    Although Mid Vermont Christian meets all other requirements to be
an approved independent school, the State is refusing Mid Vermont Christian
approved independent school status (capable of participating in the Town
Tuitioning Program and other public benefit programs) solely because the school
will not agree to violate its religious beliefs and exercise and post statements
affirming the government's orthodoxy.

42

244.    If Mid Vermont Christian gave up its religious beliefs and exercise on marriage, sexuality, and gender, the School and the Slarves could participate in the Town Tuitioning Program.

245.    Tuition at Mid Vermont Christian is currently $14,000 per year for junior and senior high school students.

246.    Because Defendants Bourne, Hartland School Board, Gawel, and Waits River Valley (Unified #36 Elementary) School Board have recouped Town Tuitioning payments, and are withholding future Town Tuitioning payments, Mid Vermont Christian has been forced to cover the cost of tuition for those students who sought to participate in the Town Tuitioning Program, including Plaintiff T.S.

247.    Moreover, as long as Mid Vermont Christian is not an approved independent school eligible to receive public benefits, Mid Vermont Christian and its students cannot participate in Vermont's Dual Enrollment, early college, and fast forward programs.

248.    Mid Vermont Christian currently has students who desire to participate in Vermont's Dual Enrollment, early college, and fast forward programs.

249.    The State of Vermont has also irreparably harmed Mid Vermont Christian and its students through enforcing the VPA's policies.

250.    Because of Mid Vermont Christian's religious beliefs, the VPA expelled Mid Vermont Christian and its students from all VPA activities after Mid Vermont Christian had participated in VPA sports for at least 28 years with no issue.

251.    Mid Vermont Christian currently offers girls' varsity and junior high

basketball, girls' varsity volleyball, girls' varsity and junior high cross country, boys'
varsity and junior high cross country, girls' varsity and junior high track, boys'
varsity and junior high track, boys' varsity and junior high basketball, and girls'
and boys' varsity golf. Up until their exclusion from the VPA, all of these teams
competed against other VPA schools.

252.   If a Mid Vermont Christian student desires to compete in a sport not
offered by Mid Vermont Christian, that Mid Vermont Christian student has
previously been able to play that sport at other VPA member schools through the
VPA's "Member-to-Member Program."

253.   Mid Vermont Christian and its students—including the Goodwins or
Slarves—now cannot participate in VPA sports or activities, including the VPA's
2023 winter and spring 2024 sports for which schools are still creating schedules.
Mid Vermont Christian cannot join those schedules while it is excluded from the
VPA. Mid Vermont Christian and its athletes were also excluded from the VPA's
2023 spring sports such as Track and Field.

254.   All Mid Vermont Christian athletes are negatively impacted by the
VPA's actions against Mid Vermont Christian. For example, each year, about ten to
twelve Mid Vermont Christian high school students participate in each of boys'
basketball, girls' basketball, and girls' volleyball; about fifteen to seventeen
students participate in boys' soccer; about four to eight students participate in golf;
and about eight to ten students participate in track and field.

255.   Now, M.G. will not be able to participate in VPA girls' basketball

44

competition. And neither M.G.'s brother, A.G. (who is a senior), nor T.S. will be able to participate in VPA basketball because of the State's actions. Likewise, A.G. will not be able to participate in VPA track as a result.

256. Mid Vermont Christian and its students will also no longer be able to participate in the VPA's "Member-to-Member Program" through which students can play sports at schools they do not attend if the students' schools do not offer the sport. *See* Ex. 9 at § 33. Multiple students from Mid Vermont Christian have participated in that program, including one male student who can no longer play VPA baseball due to the VPA's action.

257. Some Mid Vermont Christian students also withdrew from the School because they were no longer able to play sports at the School or through the VPA's Member-to-Member Program.

258. As another example, Mid Vermont Christian did not offer girls soccer this fall, so one of its 12-year-old female Mid Vermont Christian students asked her local public high school whether she could participate on their girls' soccer team. She was denied because Mid Vermont Christian was no longer a VPA member.

259. And it's not just Mid Vermont Christian students that have been punished. Students at public schools are impacted too. For example, some students at Woodstock Union were interested in joining Mid Vermont Christian's girls' volleyball team this fall because Woodstock Union did not have a team. Those girls could not participate because Mid Vermont Christian was excluded from the VPA.

260. Mid Vermont Christian and its students will also not be able to

45

compete in VPA academic competitions such as the VPA's Geo-Bee, Science and Math Fair, and Debate and Forensics League.

261.    The VPA's gender identity policies also force Mid Vermont Christian to allow biological males who identify as female to play on its own girls' athletic teams and biological females who identify as male to play on boys' athletic teams in violation of Mid Vermont Christian's religious beliefs. Those same policies would thus require Mid Vermont Christian to re-write its own internal policies in order to satisfy the State's requirements.

262.    Mid Vermont Christian and the Slarves have suffered financial harm because the State—including Defendants Bourne, Hartland School Board, Gawel, and Waits River Valley (Unified #36 Elementary) School Board—have denied them Town Tuitioning program funds.

263.    Vermont's actions against Mid Vermont Christian have also caused Mid Vermont Christian competitive and reputational harm by conveying to prospective and current students that they cannot receive tuition payments like other Vermont families and that they will have limited opportunities to participate in sports and other activities if they attend Mid Vermont Christian.

264.    The State has penalized Mid Vermont Christian and its students by preventing them from participating in the Town Tuitioning Program and VPA sports and other activities because they exercised their constitutional rights.

265.    The State has put Plaintiffs to the following unconstitutional choice: (a) adhere to their religious beliefs and be excluded from the Town Tuitioning

Program and *all* VPA activities and events; or (b) abandon their religious beliefs and be eligible to receive Town Tuitioning Program funding and participate in VPA activities and events like everyone else.

266.    Mid Vermont Christian and its students suffer harm each day that they face that choice. The daily deprivation of their constitutional rights "unquestionably" causes them "irreparable injury." *Hsu By & Through Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 872 (2d Cir. 1996) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

267.    Mid Vermont Christian and its students have no adequate remedy at law for the ongoing constitutional violations and will continue to suffer irreparable harm.

268.    Mid Vermont Christian's, the Goodwins', and the Slarves' injuries are traceable to Defendants and can be redressed by declaratory and injunctive relief.

269.    Mid Vermont Christian and its students need declaratory and injunctive relief to protect their ability to exercise their constitutional rights while participating in public programs like other Vermont schools and families.

270.    An injunction protecting Plaintiffs outweighs any harm to the State and benefits the public interest.

271.    The requested declaratory and injunctive relief is warranted for the past and ongoing constitutional violations.

## LEGAL ALLEGATIONS

### FIRST CLAIM FOR RELIEF
### Violation of the Free Exercise Clause: Religious Discrimination & Hostility
### (All Plaintiffs Against All Defendants)

272.    Plaintiffs incorporate by reference paragraphs 1–271.

273.    The Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988). It also forbids government officials from "exclud[ing] religious observers from otherwise available public benefits." *Carson*, 142 S. Ct. at 1996.

274.    The government cannot "discriminate[]" against otherwise eligible religious schools "by disqualifying them ... solely because of their religious character," *Trinity Lutheran*, 582 U.S. at 462, or "on the basis of their religious exercise," *Carson*, 142 S. Ct. at 2002.

275.    Mid Vermont Christian exercises its religious beliefs by engaging in the education of its students and operating its school—including through its internal policies on restroom usage, pronouns, dress code, and students' sports—in accordance with its religious beliefs.

276.    The Goodwins and Slarves exercise their religious beliefs by choosing to attend or send their children to Mid Vermont Christian due to its distinctly religious education.

277.    Mid Vermont Christian's religious beliefs and exercise prevent it from complying with the new requirements of Rule 2200, including the Vermont Public

Accommodations Act and Fair Employment Practices Act, because doing so would force Mid Vermont Christian to violate its religious beliefs and exercise.

278.   The Agency of Education denied Mid Vermont Christian as an approved independent school eligible to receive public funds because of its religious character, status, beliefs, and exercise, thus disqualifying it from the Town Tuitioning Program.

279.   And the Agency of Education has deprived eligible Mid Vermont Christian students and their families—including the Slarves—tuitioning funds because they have chosen to attend Mid Vermont Christian—a school that shares their religious views and ideals.

280.   Moreover, Mid Vermont Christian's religious beliefs and exercise prevent it from complying with the VPA's gender identity policies because by complying, Mid Vermont Christian would be affirming that sex is mutable, contradicting its religious beliefs.

281.   Because Mid Vermont Christian's religious beliefs teach that gender is determined by biological sex, the VPA expelled Mid Vermont Christian from the VPA, disqualifying the school and its students—including the Goodwins and Slarves—from participating in any VPA middle school and high school athletics in the state.

282.   Now, the VPA refuses to grant Mid Vermont Christian membership in its association unless Mid Vermont Christian agrees with the VPA's gender identity policies, including the belief that sex is mutable.

283.    Through both the Town Tuitioning Program and middle school and high school athletics, the State requires Plaintiffs to abandon their religious beliefs and exercise in order to participate in public, state funded programs.

284.    Requiring Plaintiffs to forfeit their religious status, beliefs, and exercise to participate in the Town Tuitioning Program and to gain readmission in the VPA violates the Free Exercise Clause.

285.    Rule 2200, the VPA's gender identity policies, and the State of Vermont's enforcement of them do not serve a compelling governmental interest and are not narrowly tailored to achieve any purported compelling interest, and therefore violate the Free Exercise Clause of the First Amendment.

286.    What's more, Vermont engaged in impermissible religious hostility by asserting that Mid Vermont Christian engaged in discrimination under "the guise of religious freedom," and by skirting its own rules and procedures under the VPA to immediately punish the School. The VPA's decision to exclude Mid Vermont Christian from VPA membership and VPA sports and activities was based on hostility towards the school's religious beliefs.

287.    And the State has a history of attempting to exclude religious schools from public benefits, even when courts have ruled against them. *See., e.g., A.H. ex rel. Hester v. French*, 985 F.3d 165, 170-74 (2d Cir. 2021). The Agency's purposeful attempt to exclude religious schools from the Town Tuitioning Program in light of the Second Circuit and Supreme Court's decisions is based on religious hostility.

288.    The State's religious hostility is unconstitutional per se. *See*

50

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719 (2018).

## SECOND CLAIM FOR RELIEF
## Violation of the Free Exercise Clause: Not Neutral or Generally Applicable
## (All Plaintiffs Against All Defendants)

289. Plaintiffs incorporate by reference paragraphs 1-271.

290. Mid Vermont Christian's sincerely held religious beliefs guide and permeate everything that it does.

291. Mid Vermont Christian exercises its religious beliefs by engaging in the education of its students and operating its school—including through its internal policies on restroom usage, pronouns, dress code, and students' sports—in accordance with its religious beliefs.

292. The Goodwins and Slarves exercise their religious beliefs by choosing to attend Mid Vermont Christian due to its distinctly religious education.

293. Rule 2200 and the VPA's gender identity policies burden Plaintiffs' religious exercise.

294. Rule 2200 and the VPA's gender identity policies are not neutral or generally applicable.

295. Both the Agency of Education's decisions about whether to designate schools as approved independent schools (capable of receiving public benefits) and the VPA's decisions about whether to admit or exclude certain schools under its gender identity policies are made in a system of individualized assessments and thus are not neutral or generally applicable. *See Fulton v. City of Phila.*, 141 S. Ct. 1868 (2021).

51

296.    And both Rule 2200 and the VPA's gender identity policies require Mid
Vermont Christian to comply with Vermont's Public Accommodations Act, but that
Act is neither neutral nor generally applicable because it contains myriad
exemptions. *See* 9 V.S.A. § 4502.

297.    For instance, the Vermont Public Accommodations Act exempts certain
lodging facilities from the prohibition on sex or marital status discrimination, *id.* §
4502(d); exempts entities when they determine an individual poses a "direct threat
to the health or safety of others," *id.* § 4502(h); exempts entities when they believe a
person is disruptive due to alcohol or drugs, *id.* § 4502(i); and partially exempts
religious organizations when the service pertains to the "solemnization" or
"celebration of a marriage," *id.* § 4502(l).

298.    Moreover, Rule 2200 requires Mid Vermont Christian to comply with
the Vermont Fair Employment Practices Act, but that Act isn't neutral or generally
applicable either because it contains exemptions, including an exemption for
religious organizations. Yet the Agency of Education has refused to provide Mid
Vermont Christian a religious accommodation from any aspect of Rule 2200,
including the requirement that the School comply with the Vermont Fair
Employment Practices Act's nondiscrimination provisions.

299.    The VPA's actions also are not neutral or generally applicable because
the VPA can and has allowed other schools to forfeit athletic events for secular
reasons without later penalizing or excluding those schools from the VPA for their
decisions. Yet the VPA has penalized and excluded Mid Vermont Christian because

52

of its religious beliefs and exercise. This "devalues religious reasons ... by judging them to be of lesser import than nonreligious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537 (1993). "Thus, religious practice is being singled out for discriminatory treatment." *Id.* at 538.

300.   Rule 2200 and the VPA's gender identity policies—and the State's enforcement of them—are also not neutral or generally applicable because the practical "effect" of those provisions is to exclude only those schools and families with religious beliefs and practices like Mid Vermont Christian's and its families. *Id.* at 535–36 (the "effect" of the challenged law "in its real operation is strong evidence of its object").

301.   Rule 2200 and the VPA's gender identity policies cannot survive strict scrutiny because they do not serve a compelling governmental interest and are not narrowly tailored to achieve any purported governmental interest.

302.   Rule 2200 and the VPA's gender identity policies, therefore, violate the Free Exercise Clause as applied to Plaintiffs.

### THIRD CLAIM FOR RELIEF
### Violation of the Free Speech Clause
### (All Plaintiffs Against All Defendants)

303.   Plaintiffs incorporate by reference paragraphs 1–271.

304.   The First Amendment's Free Speech Clause protects Plaintiffs' ability to speak in accordance with their religious views and protects their ability to not speak.

305.   Plaintiffs engage in protected speech by teaching and expressing that

sex is immutable, based on biology from birth, and determined by God. They also engage in protected speech by using pronouns based on a person's biological sex.

306.   Rule 2200 and the VPA's gender identity policies restrict and compel Plaintiffs' speech about human sexuality and gender based on the speech's content and viewpoint.

307.   Specifically, Rule 2200 requires Plaintiffs to comply with the Vermont Public Accommodations Act, which prohibits Mid Vermont Christian from discriminating based on gender identity "in all aspects of the school's admission and operations," meaning Mid Vermont Christian must use pronouns based on a person's preferred gender identity and not based on biological sex. *See* 7-1 Vt. Code R. § 3:2226.6(2).

308.   Rule 2200 forces Mid Vermont Christian to publish statements of nondiscrimination consistent with the Vermont Public Accommodations Act and Vermont Fair Employment Practices Act on its website and in its application materials. *Id.*

309.   Moreover, Rule 2200 specifically requires Mid Vermont Christian to *affirm* compliance with the Vermont Public Accommodations Act by signing an assurance stating the same and including such information on its website.

310.   If Mid Vermont Christian does not publish said nondiscrimination statements or sign the assurance, it cannot obtain approved independent school status and therefore cannot participate in Town Tuitioning or other public benefit programs.

311.   Rule 2200 thus compels Mid Vermont Christian to speak in accordance with the State's views on gender identity and restricts its speech to the contrary.

312.   And the VPA's gender identity policies require Mid Vermont Christian to affirm that sex is mutable by competing against teams with transgender athletes and allowing such athletes to compete on its own teams.

313.   If Mid Vermont Christian were to compete against a team with a transgender student, it would be acknowledging that one's sex can be changed.

314.   Indeed, the VPA expelled Mid Vermont Christian from the Association because it refused to compete against a biological male on a girls' basketball team.

315.   To regain membership, the VPA requires Mid Vermont Christian to adopt, accept, and speak the State's views on gender and sexuality, which Mid Vermont Christian will not do.

316.   The VPA thus compels Mid Vermont Christian to speak in accordance with the State's views on gender identity and restricts its speech to the contrary.

317.   Rule 2200 and the VPA's gender identity policies are thus content- and viewpoint-based limitations on speech, do not serve any compelling or even valid interest in a narrowly tailored way, and infringe Plaintiffs' right to free speech as applied.

318.   Requiring Plaintiffs to forfeit their rights to free speech to participate in the Town Tuitioning Program and middle school and high school athletics violates the Free Speech Clause.

### FOURTH CLAIM FOR RELIEF
### Violation of the First Amendment: Religious Autonomy
### (Mid Vermont Christian Against All Defendants)

319.    Mid Vermont Christian incorporates by reference paragraphs 1-271.

320.    The First Amendment protects Mid Vermont Christian's "power to decide for [itself], free from state interference, matters of [internal] government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

321.    The right to religious autonomy also protects Mid Vermont Christian's internal employment decisions about who should further its religious purposes and goals. This right contains two similar but separate protections: the ministerial exception and the coreligionist exemption.

322.    Under the ministerial exception, the government cannot interfere with the school's employment decisions about its "ministerial employees." *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060–61 (2020).

323.    Mid Vermont Christian has ministerial employees, including but not limited to its teachers.

324.    The coreligionist exemption is broader in that it applies to all of Mid Vermont Christian's employees, but it only protects the school's decisions about non-ministerial employees when they are rooted in the school's religious beliefs, practices, or observances.

325.    To participate in the Town Tuitioning Program, Mid Vermont Christian must comply with Rule 2200, including by agreeing to comply with the

Vermont Fair Employment Practices Act, which prohibits Mid Vermont Christian from hiring only employees who agree with and abide by its religious beliefs, including religious beliefs on marriage, sexuality, and gender. *See* 7-1 Vt. Code R. § 3:2226.6(1); *see also* 21 V.S.A. § 495 (prohibiting employment discrimination "because of ... religion, ... sexual orientation, [and] gender identity").

326.    The Agency will not apply the Vermont Fair Employment Practices Act's religious employer exemption in enforcing Rule 2200.

327.    Rule 2200 thus violates both the ministerial exception and coreligionist exemption by prohibiting Mid Vermont Christian from hiring only those who agree with and live out its religious beliefs, including its beliefs on marriage, sexuality, and gender.

328.    In addition, the VPA's gender identity policies also violate this right to religious autonomy by forcing Mid Vermont Christian to structure its own athletic teams in a way that conflicts with its religious beliefs and teachings—i.e., by structuring its athletic teams based on athletes' chosen gender identity rather than biological sex.

329.    As such, the State's rules and policies violate Mid Vermont Christian's right to religious autonomy.

### FIFTH CLAIM FOR RELIEF
### Violation of the First Amendment: Expressive Association
### (All Plaintiffs Against All Defendants)

330.    Plaintiffs incorporate by reference paragraphs 1–271.

331.    The First Amendment protects the right of persons to speak and

associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

332.   When an association expresses a collective message, the First Amendment prohibits the government from forcing the association to admit those who disagree with its message, seek to change that message, or express a contrary view.

333.   The First Amendment protects the right of Mid Vermont Christian and its families and students to freely associate for religious and educational reasons.

334.   Mid Vermont Christian employs only like-minded believers to fulfill its educational and religious purposes and to express its religious beliefs to the world.

335.   And every Mid Vermont Christian student must have at least one parent who is a born-again, Bible-believing Christian and who must be in full agreement with the doctrinal and philosophical positions of the school.

336.   So Mid Vermont Christian associates with its students and their families to fulfill its educational and religious purposes and to express its religious beliefs to the world.

337.   Rule 2200 punishes Mid Vermont Christian by disqualifying it from the Town Tuitioning Program and other Vermont public benefits programs unless the school agrees to employ individuals who do not share and adhere to the school's religious beliefs and who cannot express the same message as the school.

338.   Rule 2200 also punishes Vermont students and families—like the Slarves—by disqualifying them from the Town Tuitioning Program because of their

desire to expressively associate with others for educational and religious reasons by sending their children to Mid Vermont Christian.

339.    Similarly, the VPA's gender identity policies punish Vermont families—like the Goodwins—by disqualifying their children from participating in Vermont middle school and high school athletics because of their desire to expressively associate with others for educational and religious reasons by sending their children to Mid Vermont Christian.

340.    Both Rule 2200 and the VPA's gender identity policies thus unconstitutionally force Plaintiffs to expressively associate with people who do not hold the same religious views and who cannot express the same message in order to participate in the State's public tuition program and school athletics.

341.    Rule 2200 and the VPA's gender identity policies cannot survive strict scrutiny because they do not serve a compelling governmental interest and are not narrowly tailored to achieve any purported governmental interest.

342.    Requiring Plaintiffs to forfeit their rights to expressive association to participate in the Town Tuitioning Program and school athletics violates the First Amendment.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Fourteenth Amendment: Fundamental Parental Right to Control the Upbringing of Children**
**(All Plaintiffs, including Mid Vermont Christian on behalf of its students' parents, Against All Defendants)**

343.    Plaintiffs incorporate by reference paragraphs 1–271.

344.    Mid Vermont Christian has standing to assert, on behalf of its students' parents their constitutional right to direct their children's education. *See*

59

*Runyon v. McCrary*, 427 U.S. 160, 175 n.13 (1976).

345.   Parents have the natural, fundamental, and common-law right to control and decide the upbringing, education, and care of their children.

346.   The Fourteenth Amendment protects parents' right to control the education and upbringing of their child. Indeed, the right is "perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (collecting cases).

347.   This fundamental right "without doubt" includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska,* 262 U.S. 390, 399, 401 (1923).

348.   This right allows parents to choose a religious education for their children without governmental interference or punishment. *See Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

349.   Parents of Mid Vermont Christian students—including the Goodwins and Slarves—exercise this fundamental right by choosing to send their children to Mid Vermont Christian.

350.   Both Rule 2200 and the VPA's gender identity policies interfere with this right by penalizing the parents—like the Goodwins and Slarves—who send their children to Mid Vermont Christian by denying those parents participation in the Town Tuitioning and Dual Enrollment Programs and by prohibiting their children from playing *any* VPA middle school or high school athletics.

351.    Parents who choose to send their children to public schools (or secular private schools) are fully able to participate in the Town Tuitioning and Dual Enrollment Programs and their children can compete in VPA middle school and high school athletics in the state.

352.    The State thus penalizes Mid Vermont Christian parents for choosing to send their children to the School, which penalizes them for exercising their parental right to direct the education and upbringing of their children.

353.    Because the State infringes the parents' fundamental rights, strict scrutiny applies.

354.    The State's infringement of the parents' fundamental rights cannot survive strict scrutiny because the State lacks a compelling, legitimate, or rational interest and any purported interest is not narrowly tailored.

355.    Rule 2200 and the VPA's gender identity policies—and the State's enforcement of them—violate Mid Vermont Christian's parents', Chris and Bethany Goodwins', and Nathaniel and Dawna Slarves' Substantive Due Process rights under the Fourteenth Amendment.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the First Amendment – Retaliation**
**(All Plaintiffs Against the VPA)**

356.   Plaintiffs incorporate by reference paragraphs 1–271.

357.   The First Amendment prohibits the government from retaliating against individuals or organizations for exercising their constitutionally protected freedoms, including the rights to religious exercise, free speech, and expressive association.

358.   Mid Vermont Christian engaged in protected speech when it expressed its religious beliefs about sexuality and gender and the proper treatment of female athletes.

359.   Mid Vermont Christian engages in protected speech and expressive association when it requires employees to adhere to its beliefs and adopts policies on bathroom and locker room usage, pronoun usage, and dress codes based on biological sex, instead of gender identity.

360.   Mid Vermont Christian engages in protected speech and expressive association when it chooses to assign athletes to sports teams and condition access to private spaces based on their biological sex, instead of their chosen gender identity.

361.   Mid Vermont Christian and its student-athletes also engaged in protected expressive association when they chose not to participate in a girls' athletic event where a biological male was allowed to compete.

362.   The Goodwins and other Mid Vermont Christian families engage in

protected speech, association, and religious exercise by choosing to send their children to Mid Vermont Christian, by participating in athletics at Mid Vermont Christian, and by expressing the same views as Mid Vermont Christian about sexuality and gender.

363.   The VPA took adverse action against Plaintiffs by terminating Mid Vermont Christian's membership, denying the school readmission in the VPA, and excluding Mid Vermont Christian and its students—including the Goodwins, Slarves, and other families at Mid Vermont Christian—from participation in middle school and high school sports and activities in retaliation for their protected speech, association, and religious exercise.

364.   In fact, the VPA failed to follow its own disciplinary action procedures before excluding Mid Vermont Christian from athletics and all activities.

365.   The VPA's actions were motivated or substantially caused by Plaintiffs' exercise of their constitutional rights.

366.   The VPA's decision to terminate Mid Vermont Christian's membership, deny the school readmission, and exclude Mid Vermont Christian and its students from participating in VPA sports and activities because they expressed and exercised their religious beliefs would be sufficient to deter a person of ordinary firmness from exercising his or her constitutional and civil rights.

367.   There is a causal connection between the VPA's adverse actions against Plaintiffs and their protected religious exercise, speech, and association.

368.   The VPA's adverse actions against Plaintiffs have injured Plaintiffs

and constitute retaliation in violation of the First Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants and order the following relief:

a.    A preliminary and permanent injunction, enjoining Defendants Bouchey, Samuelson, Bourne, Hartland School Board, Gawel, Waits River Valley (Unified #36 Elementary) School Board, and any person acting in concert with them from denying Mid Vermont Christian as an approved independent school capable of receiving public benefits because of its religious character, beliefs, or exercise;

b.    A preliminary and permanent injunction prohibiting Defendants Bouchey, Samuelson, Bourne, Hartland School Board, Gawel, Waits River Valley (Unified #36 Elementary) School Board, and any person acting in concert with them from enforcing the new requirements of Rule 2200 related to religion, sexual orientation, and gender identity against the constitutionally protected activities of Plaintiffs, including Mid Vermont Christian's right to enact and enforce employment, admissions, and internal operations policies that are based on Mid Vermont Christian's religious beliefs about marriage, sexuality, and gender;

c.    A preliminary and permanent injunction prohibiting Defendant Nichols and any person acting in concert with him or the VPA from enforcing the VPA's gender identity policies against the constitutionally protected activities of Plaintiffs, including: (1) their right to determine the members of their own athletic teams based on their religious beliefs (i.e., based on athletes' biological sex, not

gender identity), and (2) their right to not participate in girls' athletic events where biological males are competing;

      d.     A preliminary and permanent injunction prohibiting Defendant Nichols and any person acting in concert with him or the VPA from denying membership to Mid Vermont Christian because of its religious beliefs and exercise about sexuality and gender, thereby allowing Mid Vermont Christian to regain VPA membership and to resume participating in VPA sports and activities, including this year's VPA winter and spring sports, for which schools are still creating schedules;

      e.     Declare that Rule 2200 and the VPA's gender identity policies as applied to Plaintiffs violate their free exercise, free speech, religious autonomy, expressive association, and fundamental parental rights, under the First and Fourteenth Amendments to the U.S. Constitution;

      f.     Declare that the VPA's decisions to terminate Mid Vermont Christian's membership, to deny the School readmission to the VPA, and to exclude Mid Vermont Christian and its students from participating in VPA sports and activities because they expressed and exercised their religious beliefs constitutes unlawful retaliation in violation of the First Amendment;

      g.     Nominal damages against all Defendants;

      h.     Compensatory damages against Defendants Bourne, Hartland School Board, Gawel, and Waits River Valley (Unified #36 Elementary) School Board;

      i.     Court costs and expenses, including reasonable attorney's fees; and

j.     Any other and further relief to which Mid Vermont Christian may be
entitled.

Dated: November 20, 2023.

Respectfully submitted,

Michael J. Tierney
VT Bar No. 5275
Gretchen M. Wade
NH Bar No. 273726
WADLEIGH, STARR & PETERS, P.L.L.C.
95 Market Street
Manchester, NH 03101
Telephone: (603) 669-4140
Fax: (603) 669-6018
mtierney@wadleighlaw.com
gwade@wadleighlaw.com

David Cortman
AZ Bar No. 29490
Ryan J. Tucker*
AZ Bar No. 034382
Katherine Anderson*
AZ Bar No. 033104
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street Scottsdale, AZ 85260
(480) 444-0020
rtucker@adflegal.org
dcortman@adflegal.org
kanderson@adflegal.org

Jacob Reed*
VA Bar No. 97181
ALLIANCE DEFENDING
FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Attorneys for Plaintiffs*
**Pro Hac Vice Application Pending*

66

## VERIFICATION OF COMPLAINT

I, Nathaniel Slarve, a citizen of the United States and a resident of the State of Vermont, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the facts alleged therein related to me and my family are true and correct.

Executed this ___20___ day of November, 2023, in North Hartland, Vermont.

NATHANIEL SLARVE

## VERIFICATION OF COMPLAINT

I, Dawna Slarve, a citizen of the United States and a resident of the State of Vermont, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the facts alleged therein related to me and my family are true and correct.

Executed this 20ᵗʰ day of November, 2023, in North Hartland, Vermont.

DAWNA SLARVE

## VERIFICATION OF COMPLAINT

I, Christopher Goodwin, a citizen of the United States and a resident of the State of Vermont, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the facts alleged therein related to me and my family are true and correct.

Executed this 20 day of November, 2023, in Quechee, Vermont.

CHRISTOPHER GOODWIN

## VERIFICATION OF COMPLAINT

I, Bethany Goodwin, a citizen of the United States and a resident of the State of Vermont, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the facts alleged therein related to me and my family are true and correct.

Executed this 20 day of November, 2023, in Quechee, Vermont.

BETHANY GOODWIN

## VERIFICATION OF COMPLAINT

I, Vicky Fogg, a citizen of the United States and a resident of the State of Vermont, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the factual allegations contained therein, and the facts as alleged are true and correct.

Executed this _____ day of November, 2023, in Quechee, Vermont.

_____
Vicky Fogg