UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 JUN 11  PM 4: 41

CLERK

BY_____

| | | |
|---|---|---|
| MID VERMONT CHRISTIAN SCHOOL, on behalf of itself and its students and its students' parents; A.G. and M.G., by and through their parents and natural guardians, Chris and Bethany Goodwin; CHRISTOPHER GOODWIN, individually; BETHANY GOODWIN, individually; T.S. and K.S., by and through their parents and natural guardians, Nathaniel and Dawna Slarve; NATHANIEL SLARVE, individually; and DAWNA SLARVE, individually;<br><br>      Plaintiffs,<br><br>      v.<br><br>HEATHER BOUCHEY, in her official capacity as Interim Secretary of the Vermont Agency of Education; JENNIFER DECK SAMUELSON, in her official capacity as Chair of the Vermont State Board of Education; CHRISTINE BOURNE, in her official capacity as Windsor Southeast Supervisory Union Superintendent; HEARTLAND SCHOOL BOARD; RANDALL GAWEL, in his official capacity as Orange East Supervisory Union Superintendent; WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY) SCHOOL BOARD; and JAY NICHOLS, in his official capacity as the Executive Director of The Vermont Principals' Association,<br><br>      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:23-cv-652 |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION
### (Doc. 14)

This case concerns two distinct disputes arising from the participation of plaintiff Mid Vermont Christian School in educational programs administered by the State of Vermont. These programs are the Town Tuitioning program that requires school districts that do not operate their own high schools to pay tuition for students attending public and independent schools and the supervision of athletic competitions between high schools by the Vermont Principals Association (the "VPA").

Plaintiffs include the Mid Vermont Christian School ("Mid Vermont") as well as four students and their parents.

Plaintiffs have sued the interim Secretary of the Vermont Agency of Education and the Chair of the Vermont State Board of Education (collectively the "State Defendants"), the Superintendents of the Windsor Southeast Supervisory Union and the Orange East Supervisory Union (collectively the "Supervisory Unions"), the Hartland and Waits River Valley School Boards (the "Schools"), and the Executive Director of the VPA. All individuals are sued in their official capacities only. Plaintiffs seek injunctive and declaratory relief as well as compensatory damages and attorneys' fees.

Plaintiffs allege that Defendants have violated the Free Exercise Clause of the First Amendment by denying their eligibility for payments under the Town Tuitioning program as well as admission to the VPA.[1] They also allege that the school's expulsion from the VPA in a

---

[1] In addition to the Town Tuitioning program, plaintiffs allege that they are excluded from the Dual Enrollment Program that subsidizes the tuition of certain high school students when they take a university-level course. For purposes of this case, the criteria for participation are the same. The court includes the dual enrollment program when it refers to the Town Tuitioning program.

dispute over the participation of a transgender student athlete in high school competition violates their constitutional rights. (*See* Doc. 1 ¶¶ 272–302 (Comp. First and Second Claims for Relief).) They raise claims for violation of the Free Speech Clause (*Id.* at ¶¶ 303–18 (Third Claim for Relief)) and the right to religious autonomy and expressive association under the First Amendment (*Id.* at ¶¶ 319–29; ¶¶ 330–42 (Fourth and Fifth Claims for Relief).) They make an additional claim of violation of the right to parental autonomy under the Fourteenth Amendment. (*Id.* at ¶¶ 343–55 (Sixth Claim for Relief).) They make a claim of retaliation for Plaintiffs' actions in asserting their rights of religious exercise, speech, and association. (*Id.* at ¶¶ 356–68 (Seventh Claim for Relief).)

## **Pending Motions**

Plaintiffs have filed a motion for a preliminary injunction. They seek re-admission to the VPA and a declaration from the court that they are eligible to participate in the Town Tuitioning program as an approved school. (*See* Doc. 14.) Defendants oppose the motion on the grounds that the VPA was within its rights to expel Mid Vermont from the VPA after Mid Vermont forfeited a girls basketball game against another high school. Defendants assert that Mid Vermont is an approved school and is currently entitled to receive payments through the Town Tuitioning program.

Defendants have filed the following motions to dismiss:

The Schools seek dismissal on grounds of standing and mootness. They assert that Mid Vermont has received all tuition payments due under the Town Tuitioning Program and has received recognition as an "approved independent school" at all times relevant. The Schools also direct attention to their limited role in approving requests for tuition payments. (Doc. 28.)

The State Defendants seek dismissal on standing grounds and, for related reasons, on the ground that Plaintiffs have not alleged a continuing violation of federal law sufficient to support the exception to sovereign immunity created by the doctrine of *Ex Parte Young*. (Doc. 39.) Like the Schools' motion, this motion to dismiss rests largely on the assertion that Mid Vermont continues to receive the tuition payments it is due.

The Principals' Association seeks dismissal on grounds of claim preclusion, standing, and abstention. The Association also asserts that Plaintiffs fail to make plausible allegations of a violation of their rights under the First or Fourteenth Amendments. (Doc. 40).

The court held a hearing on all pending motions on April 19, 2024. Both sides have supplied evidence through exhibits attached to the Complaint and the motion papers. No additional evidence was offered at the hearing. Briefing is complete.

The court will resolve the motion for preliminary injunction in this order and address the motions to dismiss in a separate ruling.

## I.     Motion for Preliminary Injunction

The legal standard for issuance of a preliminary injunction on notice is well-established. The moving party must demonstrate that:

1.  Plaintiffs are likely to succeed on the merits or, at least, have raised serious questions going to the merits, and the balance of hardships tips in their favor;

2.  Plaintiffs are experiencing irreparable harm; and

3.  An injunction is in the public interest.

*See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). In this case, Plaintiffs seek what they describe as "a prohibitive preliminary injunction restoring the status quo ante – returning the parties to 'the last actual, peaceable uncontested status which

preceded the pending controversy.'" (Doc. 14-1 at 12 (citing *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,* 883 F.3d 32, 37 (2d Cir. 2018) (citation omitted)).)

### A. Likelihood of Success on the Merits

In order to tell whether Plaintiffs are likely to succeed on the merits, the court makes a preliminary determination of the facts. *O.N. Equity Sales Co. v. Staudt*, No. 2:07-cv-142, 2008 WL 271329, at \*5 (D. Vt. Jan. 30, 2008). In this case, the facts are not greatly in dispute. At the hearing conducted by the court, neither side sought an opportunity to call a witness. Instead, they relied on the documents submitted in support of their motion papers. The parties draw very different conclusions from these documents. For purposes of the preliminary injunction only, the court relies upon the exhibits and affidavits submitted by both sides. Where there is a factual dispute, the court seeks to highlight it. These are vanishingly rare in this case, since the dispute has developed primarily through the exchange of letters and emails.

### Facts Related to Eligibility for Tuition Payments

The court begins with the dispute over Mid Vermont's eligibility for tuition payments and the receipt of these payments. This story requires a little background drawn from the records of this court as well as the reported decisions of the First Circuit and the United States Supreme Court.

In 2022, the Supreme Court issued its decision in *Carson v. Makin*, 596 U.S. 767, holding that Maine must provide tuition payments from school districts that do not operate high schools to private schools without regard to the sectarian nature of the school. "A State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.* at 781. The *Carson* decision is the third in a series of recent rulings removing the

traditional barrier preventing the use of public funds to subsidize religious schools.[2] *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) (requiring Missouri to permit religious schools to apply for grant money to improve playground safety) and *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020) (striking down Montana's prohibition on state scholarship aid to students attending religious schools).

Since Vermont also provides tuition reimbursement in a system similar to that in use in Maine, it is not surprising that this court has seen cases similar to the litigation in Maine. Even before the decision in *Carson*, the Second Circuit granted mandamus relief requiring Vermont state and municipal authorities to make tuition payments on behalf of children attending religious schools "to the same extent as parents who choose secular schools for their children, regardless of [a school's] religious affiliation or activities." *In re A.H.*, 999 F.3d 98 (2d Cir. 2021). This ruling in June 2021 ended any dispute about whether tuition reimbursement is available to religious schools that meet other criteria for recognition as an "approved school." *See also A.H. by and through Hester v. French*, 985 F.3d 165 (2d Cir. 2021) (requiring Vermont to open its "dual enrollment" scholarship program to students attending religious high schools).

One other feature of Vermont law is relevant. 16 V.S.A. § 166 creates two categories of independent schools: those that are "recognized" and those that are "approved." Attendance at either satisfies the requirement that with certain exceptions, children between 6 and 16 years of age attend school. *See* 16 V.S.A. § 1121. Only students at approved schools are eligible for tuition reimbursement. These schools must satisfy requirements related to evaluation by the state board of education or third-party accreditation, curriculum, and services. *See* 16 V.S.A. §

_____

[2] The court uses "religious schools" to refer to schools such as Mid Vermont that are founded on religious principles and teach religious beliefs as part of the curriculum.

166(b).  Recognized schools are held to a less exacting standard and must provide assurances

that they meet standards for a minimum course of study—a standard applicable to all schools as

well as home schooled children—and meet criteria for attendance, faculty and school safety.  *See*

16 V.S.A. § 166(c).

In response to the *Carson* decision, the Vermont Secretary of Education Daniel French

wrote to all school superintendents on September 13, 2022, advising them that "[s]chool districts

may not deny tuition payments to religious approved independent schools [or similar schools].

Requests for tuition payments for resident students to approved independent religious schools …

must be treated the same as requests for tuition payments to secular approved independent

schools…".  (Doc. 1-4.)  Secretary French's letter notified the superintendents of the availability

of "[a] directory of independent schools—specifying whether the program is an approved

independent school, recognized independent school, or another type of program"—at the

Agency's Independent Schools webpage.  (*Id.* at 2–3.)

The process of identifying independent schools as "approved" has long been in place.

The record is not clear about when Mid Vermont was first approved.  Its most recent approval

occurred at a meeting of the State Board of Education on February 21, 2017, when its application

appeared on a consent agenda with five other independent schools.  Mid Vermont has retained its

approval status since 2017.  During the 2022-2023 school year, the school received tuition

payments for four students who resided in public school districts.  (Doc. 14-15 (Aff. of Vicky

Fogg, ¶ 37).

Since approval must be renewed every five years, Mid Vermont initiated the process to

renew its status as an approved school in 2022.  A review team from the Agency visited the

school in October 2022 and filed a recommendation in favor of a five-year renewal of approved

status. (Doc. 39-2) Decl. of Heather Bouchey, ¶ 3. Mid Vermont retains its approval status while the renewal process is pending. Vt. Admin. Code 7-1-2:3333.6.   To this day, it remains an approved school.

The *Carson* decision in 2022 led the Agency to promulgate regulations to provide guidance to educators and others navigating the procedures for applying for tuition reimbursement for independent schools. *See* Rule 2200 Independent School Program Approval. https://education.vermont.gov/sites/aoe/files/documents/SBE%20Rule%202200%20Adopted%2 0Rule%20Filing-2022.pdf [https://perma.cc/UT3T-D84V].   The new regulations, issued on May 10, 2022, include a requirement for a certification that a school seeking independent status complied with federal and state law, including a statement that "the school complies with the Vermont Public Accommodations Act in all aspects of the school's admissions and operations." State Board of Education Rule 2226.6(2).

Vicky Fogg signed such a certification on January 5, 2023 as part of Mid Vermont's application for re-approval as an approved school.   Her certification came with a qualification:

> The Mid Vermont Christian School is signing this form with the understanding that it must be read consistent with existing law and the U.S. and Vermont Constitutions.   As a religious organization, the school has a statutory and constitutional right to make decisions based on its religious beliefs, including hiring and disciplining employees, associating with others, and in its admissions, conduct, and operations policies and procedures.   By signing this form, the Mid Vermont Christian School does not waive any such rights.   To the extent Rule 2200's requirements conflict with any of the school's beliefs, including on marriage and sexuality, the school has not included that language in its handbook or online, nor can it affirm that particular aspect of the Vermont Public Accommodations Act.

(Doc. 1-5).

On February 1, 2023, Secretary French recommended that the Vermont State Board of Education extend "conditional approval" to Mid Vermont and another school.   Both schools had submitted qualified attestations as described above.   The Board voted in favor of extending

8

conditional approval to Mid Vermont. (Doc 14-3 (Minutes of State Board of Education February 1, 2023).)

The Board returned to Mid Vermont's application for approval at its meeting on February 15, 2023. The conditional certification remained a potential obstacle to re-approval. The Board voted to "postpone consideration of re-approval until such time a completed application has been received to include a signed Addendum for Independent School Applications – the "attestation clause" – without revision and consistent with Rule 2226.6 that requires the head of school to sign an assurance that the school complies with the Vermont Public Accommodations Act (9 V.S.A. Chapter 139) in all aspects of the school's admissions and operations." (Doc. 42-2 at 4– 5).

On March 9, 2023, Ms. Fogg wrote to the Board in response to the grant of conditional approval. She explained that Mid Vermont did not believe it was subject to the Vermont Public Accommodations Act since it is a private institution. She renewed her statement that the school was a "religious organization with a constitutionally protected right to operate consistently with the religious principles for which we were established and maintained." (Doc. 14-4 at 3.) She requested that the Board renew the school's application as an approved independent school. (*Id.*) The Board responded that it was "not taking further action at this time." (Doc. 14-5 at 2.)

On July 1, 2023, the Agency published a directory of all approved independent schools and other educational programs. Mid Vermont appears on the list of "Approved Independent Schools." (Doc. 28-5 at 10.) The rules of the Board provide that "approval of a school completing a timely application for further approval shall extend until the Board acts on further approval." Rule 2223.6 (Extension) Lexis Doc. CVR 22-000-004. The Agency has never removed Mid Vermont from its list of approved independent schools.

During the spring and summer of 2023, some confusion developed over whether Mid Vermont was approved or recognized. Both parties had a hand in the error. According to Ms. Fogg, on April 24, 2023, she received a memorandum from the Agency titled "Recognized Independent School Contacts." (Doc. 14-15 (Fogg Aff., ¶ 52).) It provided information about continuing a school's "'recognized independent school status, pursuant to 16 V.S.A. § 166(c).'" (*Id.*)

On July 6, 2023, an employee of the Agency of Education sent Mid Vermont an email attaching "the forms to seek recognized school status for the 2023-2024 school year." This was an error, since in July the Agency published Mid Vermont's name as an *approved* independent school. Mid Vermont compounded the error by submitting an application for *recognized* status on July 26, 2023. The letter stated that Mid Vermont "should be classified as an approved independent school, capable of receiving town tuition funds and other public benefits, for the 2023-2024 school year. (Doc. 50-7.)

On August 3, 2023, the same employee who had sent the July 6 email sent Mid Vermont a letter advising that the agency "considers the school for 2023-2024 "to be a Recognized Independent School within the meaning of 16 V.S.A. § 166(c)....". (Doc. 1-6.)

In September 2023, the Hartland and Waits River Valley school boards both sent Mid Vermont tuition checks for high school students from their districts. (Doc. 14-15 (Fogg Aff., ¶ 61).) These payments were required by the Board's conditional recognition of Mid Vermont as an approved school in February and its inclusion in the list of approved schools published in July 2023.

Ms. Fogg responded by advising the Agency that Mid Vermont was surprised to receive the funds because she believed Mid Vermont had not been granted approved school status. She

10

asked for "clarity on MVCS's school status and how those funds should be handled." (Doc. 26-3 at 1.)

The districts requested the return of the checks until the confusion could be cleared up. Ms. Fogg complied. (Doc. 14-15 (Fogg Aff., ¶ 61-62).) She insists that her school remains classified as a recognized school "which means the School and the families that go here are not eligible for the Program and cannot receive Town Tuitioning funds, nor can they participate in the Dual Enrollment Program or other public benefit programs in the state." (*Id.* ¶ 56.)

Despite Ms. Fogg's gloomy forecast, the Agency stands by its original designation of her school as an approved school. On January 4, 2024, the Interim Secretary wrote to Mid Vermont advising that the application for approved status remained pending and that, until final action, "Mid Vermont Christian School remains an approved independent school." (Doc. 26-4 at 1.) In her affidavit, Secretary Bouchey describes the error as resulting from Mid Vermont's application for recognized status on July 26, 2023 and its approval by Agency staff on August 3, 2023. "This statement was an error, as the Board Rules specifically state that a school retains its approved independent status until the Board rules on an application for renewal." (Doc. 26-2 (Bouchey Aff., ¶ 6).)

Secretary Bouchey supplied copies of her January 4 letter to the two school districts that had previously sent tuition money to Mid Vermont. The two schools returned the funds to Mid Vermont. (Doc. 28-1 (Aff. of Christine Bourne, ¶ 7); Doc. 28-2 (Aff. of Randall Gawel, ¶ 7).) It is unclear from the record before the court whether Mid Vermont cashed the tuition checks after it received them for the second time.

Mid Vermont's application for renewal of its approved status remains pending due to delays related to "new rules primarily relating to special education requirements that went into

effect on July 1, 2023." Secretary Bouchey anticipates releasing its recommendation concerning Mid Vermont "in late spring or early summer" 2024. (Doc. 28-1 (Bouchey Aff., ¶ 9).)

### Facts Related to the Controversy over the Transgender Basketball Player

The VPA is a professional association of principals and other educational leaders. It offers a variety of programs to support educators. It is best known for its role in promulgating rules and policies governing high school interscholastic sports in Vermont as well as state-wide extracurricular activities such as spelling bees, debate, drama, and science and math teams. The VPA is open to independent schools. https://vpaonline.org [https://perma.cc/XQR2-HM5Q]. Membership in the VPA is a condition of participating in the athletic events and other activities it sponsors.

Prior to 2023, Mid Vermont was a member of the VPA. It fielded various student sports teams, including a high school girls basketball team.

On February 16, 2023, Mid Vermont wrote to the VPA about its concern that "there is a biological male playing on the girls' basketball varsity team at The Long Trail School." (Doc. 14-7 at 2.) Mid Vermont requested that "if we end up being their opponent in the State Tournament, that the biological male would not be allowed to play." (*Id.*) The letter identified the "clear advantage [males have] over females in the physical realm, namely size, speed, quickness, strength, muscle mass, bone density, lung capacity, etc." (*Id.*) It stated that girls playing on Mid Vermont's team were "extremely uncomfortable playing a contact sport with a member of the opposite sex both for reasons of safety and the overall uncomfortableness of the proximity and contact necessary to play this sport to its fullest." (*Id.*)

The VPA responded by email the same day. It pointed to the VPA's policy on gender identity and participation and stated that excluding a student would violate both the Vermont

Public Accommodations Act, 9 V.S.A. § 4502, and the Agency of Education's Best Practices for Schools for Transgender and Gender Nonconforming Students. It stated that "[w]e do not intend to violate our policy by honoring your request." (Doc. 14-8 at 2.)

Events moved quickly. On February 20, 2023, Mid Vermont forfeited a playoff game against another high school because one of the players was a transgender girl. (Doc. 1-10.)

The executive council of the VPA met on March 13, 2023 and "determined that Mid-Vermont Christian's forfeit (2/20/23) and corresponding rationale as shared in the Valley News of 2/25/23 violates VPA Policies, which are aligned with Vermont state law. Specifically, the school's actions do not meet the expectations of VPA's 1st and 2d policy, *Commitment to Racial, Gender-Fair and Disability Awareness* and *Policy of Gender Identity*, respectively. Thus, Mid-Vermont Christian school is ineligible to participate in VPA activities going forward." (Doc. 1-10 at 3.)

By letter dated March 19, 2023 to the VPA, Mid Vermont appealed its expulsion. (Doc. 14-9.) In its letter, Mid Vermont complained about procedural deficiencies, including the lack of written notice and the recommended penalty. On the merits, Mid Vermont renewed the arguments made in its letter of February 16, 2023 concerning the advantage of biological males over females. The school also raised the issue of religious belief. "By forcing our young ladies to compete against biological males, the VPA is forcing [Mid Vermont] to affirm something that violates our religious beliefs—i.e., that the males who play in the girls' leagues are females." (*Id.* at 3.) The school stated that forfeiting one game was "'punishment' enough for these students and our school" and requested reinstatement to the VPA. (*Id.* at 2–3.)

On April 3, 2023, the VPA Activities and Standards Committee wrote to Mid Vermont and to the executive director of the VPA to outline the procedures for a review of the VPA's

action. (Doc. 30-2.) These procedures required an initial determination by the executive director of a probable violation and the recommended penalty, notice to the alleged violator, and an opportunity for a hearing. (*Id.*)

On April 4, 2023, the executive director sent Mid Vermont a notice of probable violation. (Doc. 30-3.) The letter identified the same violations of VPA policies previously described by the executive council on March 13, 2023. (Doc. 1-10.)

By letter dated April 9, 2023, Mid Vermont appealed for a second time to the VPA. The letter identified safety concerns, physical and athletic advantages, and the school's religious beliefs and "its own position on issues of sexuality" as the basis for its request for reinstatement. (Doc. 14-10 at 3.) In Mid Vermont's view, the VPA policy on transgender student athletes placed its students at risk, violated its religious beliefs, and forced "MCVS and its students to engage in speech and expression they do not wish to convey in order to participate equally in the VPA and its events." (*Id.*) Mid Vermont requested a ruling on the record as it stood on April 9, 2023. It did not seek an opportunity to introduce evidence.

Mid Vermont's appeal was heard by the VPA's Activities Standards Committee. By letter dated May 8, 2023, the committee rejected the appeal. (Doc. 14-11.) The letter identifies two bases for the school's position: the issues of safety and competitive advantage and the school's religious beliefs. The committee first addressed the policy of the VPA and, more broadly, the Agency of Education and the Vermont Chapter of the American Academy of Pediatrics in seeking to include transgender students in activities, including sports, consistent with their gender identity. The committee surveyed Vermont legislation, federal regulations, the position of Governor Scott, and the experience of other states—all of which the committee found

14

supported its position that transgender girls should be allowed to play on girls' high school teams and can do so safely and without unfair advantage. (*Id.*)

Turning to the issue of religion, the committee rejected the school's contention that sending students to play on the same court as a transgender girl amounted to an endorsement of her gender choice. The committee concluded:

> Participating in an athletic contest does <u>not</u> signify a common belief with the opponent. Brigham Young University athletes do not compromise their Mormon faith—or endorse Catholicism—when they play Notre Dame. The act of playing together on a basketball court does not imply any approval of the values or beliefs of the opponent.

(*Id.* at 5.) The committee identified the actions of Mid Vermont in "stigmatiz[ing] a transgender student who had every right to play" as the basis for the discipline. (*Id.*) It declined to confine the penalty to the forfeiture of the game at issue. Identifying participation as the goal of high school sports, the committee upheld the penalty of expulsion. It invited Mid Vermont to seek readmission if it agreed to "abide by VPA Policies and Vermont law, and [confirm] that its teams would compete with other schools who include transgender athletes…." (*Id.*)

## I.   Likelihood of Success on the School Funding Claim

Plaintiffs seek a preliminary injunction "because they are currently losing out on public funds and athletic and extracurricular activities." (Doc. 14 at 3.) They seek an order requiring the state defendants to "(a) approve Mid Vermont Christian School as an approved independent school eligible to receive public funds and (b) allow the School to participate in the Town Tuitioning and Dual Enrollment Programs." (*Id.*) They are unlikely to succeed on this claim for a very simple reason: the defendants agree that Mid Vermont is entitled to the public funding they demand. The record before the court at this preliminary stage of the case shows that Mid Vermont has always been designated as an "approved school" by the Agency of Education.

During the summer of 2023, Mid Vermont also applied to be a "recognized school." Through a series of errors, it received that designation, mere weeks after being included in the official directory of "approved schools." While Mid Vermont – and, to be entirely fair, a staff person at the Agency of Education -- was confused about its status, the two sending schools involved in the case were not. Both sent tuition checks to Mid Vermont, which Mid Vermont returned. By January 2024, Mid Vermont had received confirmation from the State Defendants that it was entitled to the tuition payments. The schools returned the checks to Mid Vermont. The defendants all agree that Mid Vermont is currently an approved school entitled to tuition payments from the "sending schools." These actions moot out any controversy over whether Mid Vermont's students are entitled to tuition reimbursement and participation in the dual enrollment program. *Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001) ("The mootness doctrine, which is mandated by the 'case or controversy' requirement in Article III of the United States Constitution, requires that federal courts may not adjudicate matters that no longer present an actual dispute between parties.").

Mid Vermont has a second string to its bow. It also seeks an injunction prohibiting the state defendants "from requiring [it]—as a condition to obtaining approved independent school status—to adopt and post a statement of nondiscrimination consistent with the Vermont Public Accommodations Act and Vermont Fair Employment Practices Act." (Doc. 14 at 3.) A reader will recall that Mid Vermont qualified its certification, reserving its right to act in compliance with its religious convictions. The state defendants have not ruled on Mid Vermont's re-application for approved school status. It is not known whether the addendum will present an obstacle to approval. A ruling by the court on this issue should not precede administrative actions. *Stern v. Shulkin*, No. 5:18-CV-71 (MAD/TWD), 2019 WL 6895417, at *4 (N.D.N.Y.

16

Dec. 18, 2019) ("the Court is hesitant to intervene into unresolved administrative matters which address this exact issue").

The short answer to the motion for a preliminary injunction concerning the school funding issue is that the issue is either not ripe or moot. There is no evidence that school funding has ever been withheld from Mid Vermont. Instead, Mid Vermont has refused to take "yes" for an answer: returning the public funds and denying that it retains its "approved school" status despite repeated assurances in a published directory and from the Agency itself that its status remains unchanged. Instead, what Mid Vermont really seeks to contest is whether the Agency will accept its "addendum" to the certification that Mid Vermont will follow the Vermont Public Accommodations Law. That remains an open question and, depending on the answer, may give rise to a constitutional issue. But the court is not willing to be the first to answer this question, since a judicial ruling may be unnecessary if the Agency accepts the certification, as qualified, and Mid Vermont qualifies in other respects for approved status. If approved status is denied in the future because of Mid Vermont's statement of religious conviction, there will be time to consider the constitutionality of the state's action then, not before it happens.

The court denies the preliminary injunction concerning state funding because the claim is unlikely to succeed on the merits. It is moot as to payments already sent to Mid Vermont. It is premature as to state action such as a denial of approved status which has not occurred and may never take place.

## I.      Likelihood of Success on Claims Arising from the Expulsion of Mid Vermont from the Vermont Principals Association

The claim that the expulsion of Mid Vermont from the Vermont Principals Association violates Plaintiffs' constitutional rights stands on a different footing. The action about which

17

Mid Vermont complains has happened, and it has had real consequences for students who can no longer participate in athletic competitions and other activities sanctioned by the VPA.   The issue presents a conflict between the religious beliefs of Mid Vermont and the policy decision by the state educational authorities to allow transgender students to compete on the teams of their gender.   The court recognizes the sincerity and good faith of both sides.   The court will begin by restating the values for which each side advocates.

## A.   Mid Vermont's Religious Beliefs

Mid Vermont identifies itself as a Christian school "whose religious beliefs drive and form the foundation for everything it does."  (Complaint, ¶ 5.)  These tenets include a belief "that God uniquely creates each person as either a male or female, one's sex is determined at creation and based on biology, and that sex is immutable."  (Complaint, ¶ 8.)  "…[D]ue to its religious beliefs, Mid Vermont Christian requires all students to dress, use restroom/locker rooms, use pronouns, and play on athletic teams based on their biological sex."  (Complaint, ¶ 49.)  These deeply held views prevent Mid Vermont from "facilitat[ing] any event that would give the appearance to its students and families that the School does not adamantly hold the beliefs it professes or that would undermine its beliefs."  (Complaint, ¶ 42.)  These principles extend to a belief "that by competing against a boy who identifies as a girl on a girls' sports team … [Mid Vermont] would be affirming that sex is mutable, in violation of its beliefs."  (Complaint, ¶ 50.)  "Simply put, Mid Vermont Christian's religious education is its religious exercise.  Anything that impedes, prohibits or undermines the former, burdens the latter."  (Complaint, ¶ 52.)

## B.  The State's Policy on Gender Identity of Students

The State of Vermont sees these issues in a different light.

In 2017, the Agency of Education issued "Continuing Best Practices for School

Regarding Transgender and Gender Nonconforming Students."

https://education.vermont.gov/sites/aoe/files/documents/edu-best-practices-transgender-and-

gnc.pdf [https://perma.cc/P39U-WH6E].  The directive seeks to reduce the high rate of

harassment and assault directed against transgender students by highlighting their rights to self-

determination, privacy, safety, and freedom from discrimination.  *Id.* at 3.  It endorses the

inclusion of transgender students on sports teams "in accordance with the student's gender

identity."  *Id.* at 6.  The directive advocates for a case-by-case resolution of issues raised by a

student's participation in competitive sports.  *Id.*  It directs attention to the policies of the VPA.

*Id.*

The Best Practices document identifies the legal bases for its policy as the Vermont

Public Accommodation Law, 9 V.S.A. § 4502(a), that forbids discrimination on the basis of

multiple characteristics including "gender identity" as well as the prohibition against harassment

in schools established by 16 V.S.A. § 570.  It also references federal statutes including the

Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq; Title VI of the Civil Rights Act of 1964, 42

U.S.C. § 20000d and other provisions.  The Best Practices recognize the high rates of

mistreatment and attempted suicide experienced by transgender students.  The measures

recommended include responses to discrimination and harassment; protection of students'

privacy and official records; choice of names and pronouns; and concerns about restrooms,

locker room accessibility, and gender segregation in activities such as overnight field trips.

The VPA issues Athletic Policies that govern many aspects of school sports.  These now

include a "Policy on Gender Identity."  The policy follows the Agency's Best Practices in

"providing all students with the opportunity to participate in VPA activities in a manner

consistent with their gender identity…". The policy describes the process by which a student may apply to try out for the team of the student's gender identity. It is a serious decision involving the student, parents, the district superintendent, and, if the student chooses, documentation from a doctor, psychologist, or counselor. There is a right to appeal a determination to the VPA.

The policy on gender identity creates an exception to the general policy of the VPA that "interscholastic athletics involving mix (boys/girls) competition is prohibited [unless there is no girls team]. …Therefore, boys shall not try out for traditional girls' sports and be eligible for state competition." VPA Athletic Policies, ¶ 16.11.
https://docs.google.com/document/d/1_DMlEHHX3zIzO2jgqzaXLv2Puklx-o4y7IriQtRjQ0I/edit?pli=1#heading=h.uhyazdvuarq9 [https://perma.cc/924W-Z3BZ].

Read together, the Continuing Best Practices and the VPA Policy on Gender Identity express a commitment to accepting the gender decisions of students and including these students in school sports on the same basis as other children. The state educational policy is that a student who wishes to try out for girls' basketball and has followed the procedure for designating their gender as female should have that opportunity.

These opposing world views collided when Mid Vermont forfeited a girls' basketball game against another high school because a transgender student was playing for the other team. The VPA expelled Mid Vermont from the league because it had violated the gender identity policy.

Mid Vermont makes no bones about its intent to continue to forfeit games in which it believes a transgender student is playing. It seeks readmission to the VPA on the condition that it will not be penalized if it forfeits games for this reason in the future. When asked at the

20

preliminary injunction hearing about the basis for its participation in the future, counsel stated that Mid Vermont intends to refuse to play against any team in single-sex sports like basketball that includes a transgender player.

### C.  Governing Legal Standard

The first legal issue for decision in this and any other free exercise case is whether the case is subject to the rational basis test as applied in *Employment Div., Dept of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) or strict scrutiny as in cases similar to *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).  Because this area of the law remains in a state of unrest, the court takes a moment to review the principal decisions.

The Free Exercise and Establishment clauses of the First Amendment were not applied to the states until the decision of the Supreme Court in *Cantwell v. State of Connecticut*, 310 U.S. 296 (1940).  The Court struck down a Connecticut statute requiring the Jehovah's Witnesses to obtain a license before soliciting door-to-door and vacated a conviction for breach of the peace. The Court identified the issue which continues to cause confusion and controversy in Free Exercise cases to this day.

> Thus, the [First] Amendment embraces two concepts, freedom to believe and freedom to act.  The first is absolute, but, in the nature of things, the second cannot be.  Conduct remains subject to regulation for the protection of society.  The freedom to act must have appropriate definition to preserve the enforcement of that protection.

*Id.* at 303–04 (footnote omitted).  There the matter rested until *Sherbert v. Verner*, 374 U.S. 398 (1963), in which the Court extended the strict scrutiny standard, already developed in cases involving free speech and equal protection, to Free Exercise cases.  As in other settings, the legal standard requires the court to determine whether the law burdens a sincere religious exercise, whether the state can identify a compelling interest for passing the law, and whether there is a less restrictive means to fulfill that interest.  *Id.* at 403–10.

The difficulty left by *Sherbert* was that "[i]n the 1970s and 1980s … courts granted very few religion-based exemptions to generally applicable laws despite applying strict scrutiny in many decisions." Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vanderbilt Law Rev. 793, 858-59 (2006). In *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1996), the Court eliminated strict scrutiny in cases involving laws of general application. "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* at 878–79. Instead, laws of general application are subject to a more lenient rational basis test.

The Court soon developed exceptions to the *Smith* rational basis test. These include restrictions on beliefs as opposed to acts; issues of church autonomy; cases involving the "hybrid" assertion of a second civil right at the same time, most frequently free speech; cases in which the state applies the law on a case-by-case basis; and cases explicitly targeting religion. Durham and Smith, *Religious Organizations and the Law*, § 3.7 (2023).

Mid Vermont seeks to apply strict scrutiny to the Defendants' actions both in enacting Rule 2200 and in enforcing the VPA's gender identity policy. (Doc. 14-1 at 15–16.) It argues that these policies "fail[] general applicability" because they allow for "individualized exemptions" and "individualized assessments." (*Id.*) Mid Vermont points to exceptions in the Vermont Public Accommodations Law for small lodging facilities, religious venues for weddings, and threats to health or safety. (*Id.* at 17.)

While Defendants respond to many aspects of Mid Vermont's motion, they have not addressed the legal standard.

22

For purposes of the motion for preliminary injunction, the court concludes that the Agency regulations governing the approved status of independent schools and the VPA and Agency directives concerning transgender athletes are rules of general application and neutral as to religion. Like Oregon's ban on peyote that was the subject of *Smith*, the state's regulations concerning transgender athletes apply to all schools, public and independent. That enforcement only results in the expulsion of schools that are offended by the participation of transgender athletes does not diminish the general application of the state's policy.

The examples of individualized exemptions offered by Mid Vermont are not persuasive. Of course, the decision about whether a transgender student should be allowed to try out for the girls' basketball team is an individualized decision about that athlete. No one claims otherwise. But that is not the decision in dispute. The decision in dispute is Mid Vermont's decision to refuse to play against teams that include such an athlete. There is no suggestion that some schools are given license to forfeit games and others not. There is no showing of individualized exemptions from the state regulations and the rules of the VPA that would support strict scrutiny.

In its briefing, Mid Vermont points to other examples of conduct which it finds sufficient to trigger strict scrutiny. It directs attention to *Fulton v. Philadelphia*, 593 U.S. 522 (2021), in which the Court identified individualized decision-making by local government as conduct which justified strict scrutiny. Examples included a system of exemptions from regulation and laws that prohibit conduct by religious organizations while allowing it by secular participants.

Mid Vermont argues that the case-by-case consideration of a *student's* decision to try out for a team consistent with their gender identity is an example of individualized enforcement. But that is not an example of disparate enforcement on religious grounds. Rather, the case-by-case consideration concerns relations between students and their school administrators when a

23

student first seeks to play on a different team than the one that matches the student's sex assigned at birth.

Mid Vermont also argues that the VPA exercises discretion over whether to punish a team for forfeiting. Obviously, teams who lack enough players to compete due to illness or injury will not be punished when they forfeit their game. That is in no way an example of treating religious schools differently than secular schools. The health example from the COVID era is a little closer to this case. In her declaration, Ms. Fogg points to events in the midst of the COVID crisis when three schools forfeited girls' basketball games because an opposing player was exempt from a league-wide mask requirement. She notes that the VPA did not expel those schools. A health concern in the midst of the fear and caution that gripped us during the COVID emergency is scant evidence that the VPA and Agency applies its policies concerning transgender athletes on an individualized basis. The court concludes that Mid Vermont is unlikely to demonstrate at trial that the state defendants engaged in the type of subjective, individualized decision-making concerning membership in the VPA that would require this court to engage in strict scrutiny.

A third basis for imposing strict scrutiny is the presence of what the *Smith* decision calls a "hybrid situation" that features the "Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press." *Smith*, 494 U.S. at 881–82. The reason the VPA expelled Mid Vermont is not in dispute: it was because Mid Vermont declined to play against a team with a transgender athlete for reasons of religious belief and student safety. There is no evidence that the expulsion of Mid Vermont was for some other reason, separately protected by the Constitution such as free speech or association.

The court concludes that this case is one of neutral application of educational policies that apply to all Vermont schools. Looking at the case through the lens of the preliminary injunction motion, there is no evidence that the Defendants developed the policies at issue with a view towards restricting religious practice or belief as in *Church of Lukumi*. The state policy of gender inclusion is neutral as to religion. It applies to all high schools that join the VPA. As Justice Frankfurter observed in *Minersville School Dist. Bd. of Ed. V. Gobitis*, 310 U.S. 586, 595 (1940), "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." (footnote omitted). For these reasons, the court concludes that the legal standard which it will apply when it reaches the merits is the rational basis test.

## II.      Likelihood of Success on the Challenge to Expulsion from the VPA

Application of a rational basis test to Vermont's policy of recognizing the gender choice of high school athletes is not likely to result in a ruling favorable to Mid Vermont.

The policy decision about how to respond to transgender high school students who wish to play on the girls' sports teams is complicated. As the parties' briefing illustrates, the problem presents issues of compromise, inclusion, safety, competitive fairness, personal autonomy, and privacy, both of the transgender student and of the other girls on both teams. It is not easy to know how to proceed. But "easy" has never described the work of the Agency of Education, and the Best Practices document illustrates the pains that the Agency took in addressing the concerns of the many stakeholders.

Obviously Mid Vermont is unhappy with the outcome. The court accepts without reservation the sincerity of the school's commitment to traditional views of gender and sexuality. Faced with the presence of a transgender student on an opposing team, the school had choices. It

25

could have explained to its students that the world holds many forms of belief and behavior, not all of which are universally accepted, and that playing basketball with a transgender student was no endorsement of their gender identity. Or it could withdraw from the competition—which is the course it chose. Mid Vermont has been candid with the Agency and the court about its decision to withdraw from any single sex competition in which a transgender student participates, now and in the future. Mid Vermont seeks a procedure under which it chooses which games it will contest and which it will sit out, based on what it hears about the gender choices of students on the other team. The VPA has rejected this proposed procedure. As its denial of Mid Vermont's appeal illustrates, it has concerns over the consequences to other schools and transgender athletes of allowing Mid Vermont to shun a transgender student in a public act of forfeiture.

The narrow legal issue is whether the VPA's policy has a rational basis. To state the question is to answer it. It is not necessary to agree with the decision the VPA and the Agency of Education reached. It is enough to recognize that their policy of inclusion received broad support from elected officials and representatives, from medical authorities, and from existing state law. It is sufficient to uphold the implementation of these policies to recognize that the state has a legitimate interest in extending the protection of inclusion to transgender students and has concluded that the better course is to permit them to participate in girls' sports (or boys) despite their sex assigned at birth. Since the state applies its athletic policy uniformly and does not single out religious organizations for enforcement or discrimination, it is unlikely to be found to have violated Mid Vermont's First Amendment rights, including its right of free exercise of religion.

## <u>Conclusion</u>

For these reasons, the court DENIES the motion for a preliminary injunction.  The court will rule separately on the pending motions to dismiss.

Dated at Burlington, in the District of Vermont, this 11th day of June, 2024.

Geoffrey W. Crawford, Chief Judge
United States District Court