**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF VERMONT**

| | |
|---|---|
| **MID VERMONT CHRISTIAN SCHOOL**, on behalf of itself and its students and its students' parents; **ABEL GOODWIN**; **M.G.**, by and through her parents and natural guardians, Christopher and Bethany Goodwin; **CHRISTOPHER GOODWIN**, individually; **BETHANY GOODWIN**, individually; **O.P.**, by and through his father and natural guardian, Nathan Partington; and **NATHAN PARTINGTON**, individually, <br><br> Plaintiffs, <br><br> v. <br><br> **ZOIE SAUNDERS,** in her official capacity as Secretary of the Vermont Agency of Education and in her individual capacity; **JENNIFER DECK SAMUELSON**, in her official capacity as Chair of the Vermont State Board of Education and in her individual capacity; **WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY) SCHOOL BOARD**; and **JAY NICHOLS**, in his official capacity as the Executive Director of The Vermont Principals' Association and in his individual capacity, <br><br> Defendants. | Case No. 2:23-cv-00652 <br><br><br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ii

Introduction ................................................................................................................ 1

Statement of Facts........................................................................................................ 3

    A.  Plaintiffs' religious beliefs guide all that they do....................................... 3

    B.  Overview of Vermont's public benefit programs. ....................................... 4

    C.  For decades, Vermont denies religious schools public funding. ................. 4

    D.  The Second Circuit ends Vermont's religious discrimination, and *Carson* confirms that religious schools cannot be excluded.......................... 5

    E.  Vermont imposes new nondiscrimination strings to exclude religious schools, originally triggering this lawsuit. .................................. 6

    F.  Act 73 permits dozens of secular schools to participate in the Town Tuition Program but excludes all religious schools.................................... 8

Legal Standard ............................................................................................................ 9

Argument .................................................................................................................. 10

  I.  Plaintiffs are likely to succeed on their free exercise claims. ......................... 10

    A.  Act 73 triggers strict scrutiny because it is not neutral and generally applicable....................................................................................... 10

        1.  Act 73 is borne of religious intolerance and hostility. ......................... 10

        2.  Act 73 creates a religious gerrymander.................................................. 14

        3.  Act 73 treats comparable secular schools more favorably than all religious schools.................................................................................. 17

    B.  Act 73 also triggers strict scrutiny because it excludes religious schools from an otherwise available government benefit, in violation of *Trinity Lutheran*, *Espinoza*, and *Carson*................................ 19

    C.  Act 73 triggers strict scrutiny because it substantially interferes with parents' religious development of their children. ............................. 19

  II.  Plaintiffs are likely to succeed on their equal protection claim. ..................... 21

  III. Act 73 cannot survive any level of judicial scrutiny. ..................................... 22

  IV. Plaintiffs satisfy the remaining preliminary injunction factors. .................... 23

Conclusion ................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*A.H. ex rel. Hester v. French,*
985 F.3d 165 (2d Cir. 2021) ............................................................. 1, 4, 5, 11, 12, 14

*Agudath Israel of America v. Cuomo,*
983 F.3d 620 (2d Cir. 2020) .................................................................................. 23

*Campbell v. Manchester Board of School Directors,*
641 A.2d 352 (Vt. 1994) ......................................................................................... 4

*Carson v. Makin,*
596 U.S. 767 (2022) ....................................................................... 2, 6, 17, 19, 23

*Chittenden Town School District v. Department of Education,*
738 A.2d 539 (Vt. 1999) ..................................................................................... 5, 11

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .......................................................... 10, 11, 14, 15, 16, 17, 18

*City of Cleburne, Texas v. Cleburne Living Center,*
473 U.S. 432 (1985) ............................................................................................. 21

*E.W. v. French,*
Case No. 2:22-cv-59, 2022 WL 845700 (D. Vt. Feb. 24, 2022) ............................ 1, 6

*Espinoza v. Montana Department of Revenue,*
591 U.S. 464 (2020) ............................................................................................... 5

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ............................................................................................. 22

*In re A.H.,*
999 F.3d 98 (2d Cir. 2021) ........................................................................ 1, 4, 5, 11

*Kennedy v. Bremerton School District,*
597 U.S. 507 (2022) ............................................................................................. 17

*Mahmoud v. Taylor,*

606 U.S. 522 (2025) .............................................................................. 2, 19, 20, 21

*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*

584 U.S. 617 (2018) ........................................................................................... 11

*Mid Vermont Christian School v. Saunders,*

151 F.4th 86 (2d Cir. 2025) .................................................... 9, 12, 14, 23, 24

*New Hope Family Services, Inc. v. Poole,*

966 F.3d 145 (2d Cir. 2020) ......................................................................... 12, 16, 17

*Our Lady of Guadalupe School v. Morrisey-Berru,*

591 U.S. 732 (2020) ........................................................................................... 16

*Roman Catholic Diocese of Brooklyn v. Cuomo,*

592 U.S. 14 (2020) ............................................................................................. 23

*Swart v. South Burlington Town School District,*

167 A.2d 514 (Vt. 1961) ............................................................................... 4, 11

*Tandon v. Newsom,*

593 U.S. 61 (2021) .......................................................................................... 2, 17

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*

582 U.S. 449 (2017) ..................................................................................... 5, 19, 20

*Village of Willowbrook v. Olech,*

528 U.S. 562 (2000) ........................................................................................... 21

*Wisconsin v. Yoder,*

406 U.S. 205 (1972) ........................................................................................... 21

**Statutes**

16 V.S.A. § 166 ..................................................................................................... 4

16 V.S.A. § 822 ............................................................................................ 4, 15, 20, 21

16 V.S.A. § 828 .................................................................. 1, 8, 9, 15, 16, 18, 22

iii

16 V.S.A. § 944 ................................................................................................ 4

16 V.S.A. § 946 ................................................................................................ 4

21 V.S.A. § 495 ................................................................................................ 7

9 V.S.A. § 4502 ................................................................................................ 7

**Other Authorities**

Act 73, 2025 Vt. Acts & Resolves 73 (2025) ................................................ 9, 17, 22, 24

*Hearing on H.454 Before the House Committee on Education,*

    Mar. 11, 2025, 2025-2026 Reg. Sess. (Vt. 2025) ........................................ 17

*Hearing on H.454 Before the Senate Committee on Education,*

    Apr. 25, 2025, 2025-2026 Reg. Sess. (Vt. 2025) ...................................... 16

**Regulations**

Vt. Admin. Code § 7-1-3:2223.2.1. ................................................................ 8

Vt. Admin. Code § 7-1-3:2224.5. .................................................................. 8

Vt. Admin. Code § 7-1-3:2226.6 (2022) ...................................................... 7

**INTRODUCTION**

For decades, Vermont's religious schools have faced overt religious discrimination by being categorically excluded from Vermont's Town Tuition, Dual Enrollment, and Early College Programs. When the Supreme Court "made clear that th[is] prevailing practice" was unconstitutional, the Agency of Education still "did not alter course," forcing religious schools and their students to seek relief from the Second Circuit. *In re A.H.*, 999 F.3d 98, 103 (2d Cir. 2021) (*French II*); *A.H. ex rel. Hester v. French*, 985 F.3d 165 (2d Cir. 2021) (*French I*). That should have been the end of it, but Vermont didn't relent. Instead, the State and local school districts denied public funds to religious schools because of their "religious worship" or "religious education." Verified Complaint at 10–12, *E.W. v. French*, Case No. 2:22-cv-59, 2022 WL 845700 (D. Vt. Feb. 24, 2022) (*French III*). When *Carson v. Makin* held such religious-use-based restrictions unconstitutional, Vermont then sought to weed-out religious schools by imposing new regulations under Rule 2200. Mid Vermont sued. The State then backtracked, telling this Court that the school remained eligible. But that didn't last long.

Vermont is at it again. Recently, the State enacted its newest iteration of the same old religious discrimination. The new law—Act 73—changes various aspects of Vermont's education system, and Mid Vermont Christian is challenging part of the statute here. That part—Section 21 (codified 16 V.S.A. § 828)—creates a de facto religious exclusion and reverts the state to the past era of "no public funds for religious schools." Act 73 is a new means to reach the same unconstitutional ends.

Mid Vermont is entitled to an injunction that permits it (and its students) to receive Town Tuition, Dual Enrollment, and Early College Program funds while this case proceeds. Mid Vermont is likely to succeed on its free exercise claims for at least four reasons. First, Act 73's new requirements were borne out of hostility to

religious schools. Act 73 was enacted in the wake of (1) multiple federal court decisions commanding Vermont to fund religious schools equally and (2) myriad religiously hostile comments by public officials. Second, Act 73 creates a religious gerrymander by "manipulat[ing]" the "definition" of eligible schools to exclude all the religious ones. *Carson v. Makin*, 596 U.S. 767, 784 (2022) (citation modified). Third, Act 73 violates the cardinal rule that the government may not "treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The law permits dozens of secular schools— including several winter sport academies, out-of-state public schools, and "historic" academies—to continue receiving public funds but bans funding to Mid Vermont. The First Amendment doesn't tolerate such disparate treatment of the religious. Fourth, Act 73 forces Plaintiff Nathan Partington to choose between funding or his religious obligation to educate O.P. at a Christian school—he cannot do both. That Hobson's choice substantially burdens and interferes with Nathan's religious exercise in parenting O.P., violating *Mahmoud v. Taylor*, 606 U.S. 522 (2025).

In the end, Vermont continues to fund private schools but still refuses to fund private *religious* schools. So Act 73 must face strict scrutiny. Vermont lacks any compelling interest in treating private religious schools as second class.

Mid Vermont needs a preliminary injunction to end its ongoing irreparable harm—the school can no longer use the Town Tuition, Dual Enrollment, or Early College Programs as a recruiting tool for prospective families. And students like O.P. will soon be denied town tuition funds. This forces Nathan to choose between continuing to send O.P. to Mid Vermont—and thus lose out on a public benefit—or violating his religious convictions by sending O.P. to a secular school—to receive tuition funding. Prospective Mid Vermont families are facing this impossible choice

today. This Court should intervene, require the State to treat Mid Vermont equally, and end the State's decades-long cycle of discrimination against religious schools.

## STATEMENT OF FACTS

### A. Plaintiffs' religious beliefs guide all that they do.

Mid Vermont is a Christian, pre-K through 12th grade school in Quechee, Vermont. Am. Ver. Compl. ("AVC"), ECF 100, ¶ 54. Since its founding in 1987, Mid Vermont has excelled academically and athletically. The School's religious beliefs form the foundation for all it does and are a primary reason families choose the School. *Id.* ¶¶ 59–62. Its beliefs—including on sexuality and gender—guide its curriculum, admissions, employment decisions, and daily operations. *Id.* ¶ 71. While Mid Vermont welcomes students of all faiths and backgrounds, it teaches from a biblical worldview and asks that at least one parent of each student affirms its beliefs. *Id.* ¶¶ 63, 554. The School also employs only those who share and live out its faith, *id.* ¶ 72, and it separates locker rooms and restrooms, uses pronouns, implements a dress code, and separates athletic teams based on sex, not "gender identity," *id.* ¶ 75.

Nathan Partington and his son, O.P., are Christians. They live in the Waits River Valley School District—a sending district that is legally required to pay tuition for its residents to attend high school elsewhere. Partington Declaration ¶ 7. Nathan sends his children, including O.P., to Mid Vermont because the school teaches the same beliefs and values that he teaches at home. *Id.* ¶¶ 9–11. Sending his children to a secular school would expose them to "worldly influences" and conflict with Nathan's religious duty to raise his children in the Christian faith. *Id.*¶¶ 4–6. Nathan's middle child is in high school at Mid Vermont and is grandfathered-in under Act 73. *Id.* ¶¶ 12–13. But O.P. is not and will be ineligible to use town tuition funds at Mid Vermont or any other Christian school. *Id.* ¶¶ 14–15.

3

**B. Overview of Vermont's public benefit programs.**

*Town Tuition Program.* Vermont's Town Tuition Program requires school districts without their own public high school to pay tuition for resident-students to attend a public high school or an approved private school "selected by the parents or guardians of the student." 16 V.S.A. § 822(a)(1). A private ("independent") school is "approved" if it "provides a minimum course of study" and "substantially complies" with statutory and regulatory requirements. *Id.* § 166(b).

*Dual Enrollment and Early College Programs.* Two other public benefit programs depend on a private school's eligibility for town tuition funding. First, Dual Enrollment pays for high school students in grades 11 and 12 to take up to two college courses. *Id.* § 944. Second, Early College pays for high schoolers to enroll full-time in an early college program during their senior year. *Id.* § 946. Private school students are eligible for these programs only if they are "publicly funded" through the Town Tuition Program. *See French I,* 985 F.3d at 171 (explaining Dual Enrollment's dependency on the Town Tuition Program).[1]

**C. For decades, Vermont denies religious schools public funding.**

For nearly 60 years, Vermont barred religious schools from town tuition funding and other public benefits. In 1961, the Vermont Supreme Court held that it violated the federal Establishment Clause to pay tuition to religious schools. *Swart v. S. Burlington Town Sch. Dist.*, 167 A.2d 514, 521 (Vt. 1961), *overruled by Campbell v. Manchester Bd. of Sch. Directors*, 641 A.2d 352 (Vt. 1994). That erroneous decision was reversed in 1994. *Campbell*, 641 A.2d at 456. But the State quickly convinced the Vermont Supreme Court that sending money to religious schools violated the state constitution. *French II*, 999 F.3d at 102 (recounting this

---

[1] This "publicly funded" rule is not in the Early College statute, 16 V.S.A. § 946 but has been imposed by the Agency of Education. *Early College*, Vermont Agency of Education, https://perma.cc/9BVB-KCSD.

history). Specifically, Vermont persuaded the state high court that a school district's payment of tuition to religious schools violated Vermont Constitution's Compelled Support Clause—at least "in the absence of adequate safeguards against the use of such funds for religious worship" and "religious instruction." *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 541–42, 562 (Vt. 1999). Rather than develop "adequate safeguards," however, the Agency of Education categorically excluded all religious schools from the Town Tuition Program and invoked *Chittenden Town* to justify the "status-based exclusion." *French II*, 999 F.3d at 107.

### D. The Second Circuit ends Vermont's religious discrimination, and *Carson* confirms that religious schools cannot be excluded.

As Vermont continued its discrimination, the U.S. Supreme Court twice held that states could not exclude religious organizations from public benefits because of their "religious character" or "status." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 476, 479 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 (2017). Those cases "made clear" that Vermont's "policy" of "excluding religious schools" from its public benefit programs was "unconstitutional." *French II*, 999 F.3d at 103. Vermont, however, "maintained" its "discriminatory practice," *id.* at 107, forcing the Second Circuit to intervene *twice*.

In *French I*, the Second Circuit held that the Dual Enrollment Program's "publicly funded" requirement likely violated the Free Exercise Clause because it "falls by design on religious school students and almost no others." 985 F.3d at 182. Such unequal treatment was "no accident": the Agency long interpreted *Chittenden Town* to bar public funding of religious schools, so it "c[a]me as no surprise" that the restriction disproportionately affected religious students. *Id.* at 181–82. In *French II*, the court held that Vermont's "prevailing practice ... of excluding religious schools from" the Town Tuition Program was "unconstitutional." 999 F.3d at 103.

5

Despite these binding decisions, Vermont officials resisted compliance. For example, one religious family had to sue again because a school district denied tuition funds, based on Agency of Education guidance saying that funds could not be used for religious instruction. *See French III*, 2022 WL 845700. It wasn't until the Supreme Court's decision in *Carson*—holding that states cannot "exclude religious persons" because "of their anticipated religious use of the benefit[ ]," 596 U.S. at 789—that the Agency finally told school districts that they "may not deny tuition payments to religious approved independent schools," French Sept. 13, 2022 Guidance, ECF No. 100-5.[2] As a result, 2022–23 was the first school year religious schools could fully participate in Vermont's tuition system.

### E. Vermont imposes new regulations to exclude religious schools, originally triggering this lawsuit.

After *Carson*, Vermont officials still insisted religious schools should not receive public funding. They promised to "fight this decision" and accused schools with beliefs like Mid Vermont of being "bigot[ed]." *See* AVC ¶¶ 211–17. Others said the State must stop giving "religious schools" "public tax dollars." *Id.* ¶ 220. In 2023, the legislature introduced S.66 and H.258 "in response to [*Carson*]" seeking "to prevent public funds from reaching religious independent schools."[3] But the bills would've ended town tuition entirely. Secular schools objected and the bills stalled.

---

[2] Vermont supported Maine in *Carson*, arguing it could not "comply with both its state constitution" and the Free Exercise "position advanced by" the religious schools and families. Brief for Vermont as Amicus Curiae Supporting Respondent, *Carson v. Makin*, 596 U.S. 767 (2022) (No. 20-1088), 2021 WL 5086374. After Maine lost, Vermont stipulated that *Carson* "renders Vermont's 'adequate safeguards' requirement unconstitutional" and religious schools can no longer be denied tuition payments. Modified Stipulated Judgment at 2, *French III*, Case No. 2:22-cv-59, 2022 WL 845700 (D. Vt. Oct. 27, 2022).

[3] Keith Whitcomb Jr., *School choice bills raise concerns, face uncertain political future*, Rutland Herald, https://perma.cc/MS84-3MAB. The two bills—S.66 and H.258 (2023)—are available at https://legislature.vermont.gov/.

But the Agency and Board of Education used a more targeted strategy. Anticipating defeat in *Carson*, the Board conditioned town tuition on compliance with new regulations in Rule 2200—the rule that governs Independent School Approvals. Independent schools now had to create and post a "statement of nondiscrimination ... consistent with"—and "assur[e]" compliance with—the Vermont Public Accommodations and Fair Employment Practices Acts. Vt. Admin. Code § 7-1-3:2226.6 (2022) (amended July 4, 2024). Both laws, in turn, prohibit discrimination based on religion/creed, sexual orientation, and gender identity, among other things. 9 V.S.A. § 4502; 21 V.S.A. § 495. The State knew these requirements would obstruct religious schools' admissions, employment, and internal policies, but did not include a religious exemption. It was a new scheme to continue excluding religious schools.

When the State asked Mid Vermont to confirm compliance with these new regulations in early 2023, the school did so but explained it had a lawful right to operate according to its religious beliefs, including those related to biblical "marriage and sexuality." 2022 Application Addendum, ECF 100-6. In August 2023—right before the start of the school year—the Agency of Education told Mid Vermont that it had been demoted to a "Recognized Independent School," making it ineligible for town tuition funds. AOE Aug. 3, 2023 Letter, ECF 100-7.

Mid Vermont sued. The State backtracked and claimed (contrary to its earlier statements) that Mid Vermont was eligible because the Board of Education never *formally* acted on the school's application. AOE Jan. 4, 2024 Letter, ECF 100-9; *see also* French Feb. 1, 2023 Memo. at 2, ECF 14-3 (recommending Mid Vermont "not be approved" unless it fully complied). Defendant Samuelson testified that she expected the Board to formally decide "in late spring or early summer" 2024. Samuelson Declaration at 2, ECF 26-1. But that never happened. Instead, the

7

Board preserved the same regulations but amended them to say a school need only comply "consistent with its constitutional and statutory rights." Vt. Admin. Code § 7-1-3:2223.2.1. The Board has not explained what this means or whether it considers Mid Vermont to be compliant. Mid Vermont submitted a new application for approval in March 2025, but the Board still has not acted on it.[4] AVC ¶¶ 274–76.

### F. Act 73 permits dozens of secular schools to participate in the Town Tuition Program but excludes all religious schools.

The doors temporarily opened by *French I, II,* and *III* and *Carson* were slammed shut by Act 73, which took effect on July 1, 2025. That law accomplished the State's continued goal of excluding religious schools after *Carson* by adding *new* eligibility conditions for private schools to receive tuition funds—conditions that no religious school in Vermont can satisfy. *See* 16 V.S.A. § 828. Three new conditions operate as a de facto religious exclusion.

*First*, Act 73 imposes a "public-funding floor." A private school must have "had at least 25 percent of its student enrollment composed of [town tuitioned students] during the 2023–24 school year." *Id.* § 828(a)(2)(D). But it was practically impossible for religious schools to meet this goal because the 2023–24 school year was just the second year (first *full* year) that religious schools could participate in the Town Tuition Program.

*Second*, Act 73 imposes a "geographic restriction." A private school must be located within either (1) "a supervisory district that does not operate a public school for some or all grades as of July 1, 2024," or (2) "a supervisory union with one or more member school districts that does not operate a public school for some or all

---

[4] Because the Board has not formally acted, Mid Vermont remains an "approved independent school." *Id.* § 7-1-3:2224.5. So this preliminary injunction focuses on Act 73. If the State rejects Mid Vermont's application based on Rule 2200, Plaintiffs reserve the right to seek a preliminary injunction against those regulations.

grades as of July 1, 2024." *Id*. § 828(a)(2)(C). In effect, schools in non-sending districts are ineligible, which eliminates 11 out of 15 religious schools right away.

*Third*, Act 73 imposes a minimum "class size requirement": 10 students for first-grade; 12 students for grades two through five; 15 students for grades six through eight; and 18 students for grades nine through twelve. *Id*. § 828(a)(2)(E); *see* Act 73 § 6, ECF 100-1 (listing class size standards). Plus, "[m]ultiage classrooms for grades kindergarten through eight are also limited to two grade levels per classroom." Act 73 § 6. These class size requirements serve to eliminate the smaller religious schools like Mid Vermont.

Not a single religious school satisfies all three new requirements. As a result, every religious school that was eligible in the 2024–25 school year—including Mid Vermont—is now barred from tuition funds, and consequently from the Dual Enrollment and Early College Programs. *See* Independent School Directories at 3–13 and 27–33, ECF 100-11 (15 religious schools downgraded to "ineligible" in September 2025). Yet dozens of secular private schools remain eligible, including several winter-sports academies and Vermont's "historic" academies. *Id*. at 27–33. And independent schools meeting education quality standards, tutorial programs approved by the State Board, approved education programs, out-of-state public schools, and therapeutic approved independent schools are all exempt from the geographic restriction, public-funding floor, and class-size requirements and, therefore, can still get public tuition. 16 V.S.A. § 828 (a)(3), (4), (5), (6), (7).

## **LEGAL STANDARD**

Plaintiffs are entitled to a preliminary injunction because they can show "a likelihood of success on the merits," will suffer "irreparable harm absent injunctive relief," and the "public interest weigh[s] in favor of granting the injunction." *Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 92 (2d Cir. 2025).

9

## ARGUMENT

**I.    Plaintiffs are likely to succeed on their free exercise claims.**

Act 73 violates the Free Exercise Clause three different ways: (1) it is not neutral and generally applicable because it results from hostility to religious schools, creates a religious gerrymander, and treats comparable secular private schools better than religious schools; (2) it excludes religious schools from an available public benefit, in violation of *Trinity Lutheran*, *Espinoza*, and *Carson*; and (3) it conditions a public educational benefit on parents' willingness to accept a burden on their religious exercise, in violation of *Mahmoud* and *Yoder*.

### A. Act 73 triggers strict scrutiny because it is not neutral and generally applicable.

"The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). The Clause thus "extends beyond facial discrimination" and "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs." *Id.* at 534 (citation modified). So the Court "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id.* (citation omitted). Act 73 is not neutral toward religion or generally applicable and "must undergo the most rigorous of scrutiny." *Id.* at 546.

### 1. Act 73 is borne of religious intolerance and hostility.

"Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of

10

the decisionmaking body.'" *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 639 (2018) (citing *Lukumi*, 508 U.S. at 540). These factors demonstrate that Act 73 is not neutral.

*First*, "the historical background" and "specific series of events" leading to Act 73 show pervasive religious intolerance and hostility. *Id.* Act 73 repeats the cycle of religious discrimination that has existed in Vermont for decades. From 1961 to 1994, the State wrongly invoked the federal Establishment Clause to bar religious schools from town tuition funds. *Swart*, 167 A.2d at 514. After that, the Vermont Agency of Education invoked the state constitution to bar funding and convinced the Vermont Supreme Court that public funding of religious schools violated the Vermont Constitution's Compelled Support Clause, at least in the absence of "adequate safeguards." *Chittenden Town*, 738 A.2d at 542. But rather than develop any "safeguards," the Agency simply told school districts that the law prohibited them from "pay[ing] tuition to 'religious schools.'" *French I*, 985 F.3d at 181.

Worse still, the Agency "maintained [its] discriminatory practice even after the Supreme Court's ruling in *Espinoza*." *French II*, 999 F.3d at 107. And after the Second Circuit *twice* held this status-based discrimination unconstitutional, the Agency tried to restrict funding religious schools based on their religious use. *See id.* at 104. *Carson* ended that effort. But even then, the State wasn't finished. In response to *Carson*, the legislature introduced S.66 and H.258 to create a new way to prevent religious schools from receiving tuition. *Supra* fn. 3. And the Board of Education amended Rule 2200—for the first time since 2010—by adding nondiscrimination requirements it knew religious schools could not satisfy, causing the Waits River Valley School Board to claw back tuition funds from Mid Vermont and prompting this lawsuit. After Mid Vermont sued, the Agency promised to decide

11

the school's application for approval by late spring or early summer 2024, but it never did. Instead, the Agency stalled until Act 73 passed the next year.

In short, every time federal courts instructed Vermont to provide tuition funds to religious schools, the State pursued a different path to exclude them. When the Second Circuit held Vermont's status-based discrimination unconstitutional, the State tried to impose a use-based restriction. When *Carson* derailed that attempt, the State implemented nondiscrimination requirements for the first time ever. And when Mid Vermont sued to ensure it could receive funding without giving up its religiously based practices, the State told this Court that it had not yet made a final decision but would by summer (it didn't). Rather, it waited until Act 73 passed, which imposed new arbitrary conditions that no religious school satisfies. Each tailor-made change was enacted "against th[e] [legal] backdrop and with knowledge" of Vermont's "constitutional constraints." *French I*, 985 F.3d at 181–82. The timing and effect of these changes—one right after another—signify a lack of neutrality.

*Second*, "a suspicion of religious animosity is further raised here" by statements Vermont officials and legislators made before Act 73's passage. *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 166 (2d Cir. 2020). Indeed, "even before discovery," the record contains "statements ... that are similar to statements in *Masterpiece Cakeshop* the Supreme Court interpreted as arguably evincing religious hostility." *Id.* at 167–68; *see also Mid Vermont*, 151 F.4th at 94–95.

For example, during the 2024 election season, several Vermont legislators who voted for Act 73 said—in disregard of *Carson* and the *French* rulings—that religious schools shouldn't be able to receive public tuition:

- Representative Masland: "No taxpayer money for religious schools[.]"

- Representative Emmons: "[N]o, taxpayer dollars should not fund religious schools[.]"

12

- Representative Waszazak: "No, no religious school/institution should be receiving public dollars."

- Representative Satcowitz: "No, absolutely not," taxpayer money shouldn't fund religious schools.

- Representatives Goldman and Hooper: "No," taxpayer money shouldn't fund religious schools.

AVC ¶¶ 284–89; *Candidate Questionnaire*, Friend of Vermont Public Education, https://perma.cc/WYM6-AFM2.

And other officials publicly castigated religious schools. The day *Carson* was decided, Rebbeca Holcombe—Vermont's Secretary of Education from 2014 to 2018, former candidate for governor, and current state representative—protested the decision, accused religious schools of "stigmatiz[ing] LGTBQ people," and suggested that allowing families to use town tuition funds at religious schools "risks" turning Vermont into a "place[] like Afghanistan." AVC ¶ 212. She also retweeted and thanked Rory Thibault—then a candidate for Vermont Attorney General—who said that "[p]ublic education funds have no place supporting religious schools that discriminate or push bigotry." AVC ¶ 213. And in 2024, she said *Carson* "threaten[ed] the freedom of conscience of VT taxpayers," so officials "need[ed] to move aggressively ... despite the radical US Supreme Court." *Candidate Questionnaire, supra*. Representative Arsenault agreed religious school shouldn't receive funding because of "good, old-fashioned separation of church and state, and the compelled support clause," but "*Carson v. Makin* complicates things for us given our tuitioning system in Vermont." *Id.* And Representative Headrick foreshadowed what was accomplished by Act 73: "We must amend the process by which religious schools have been included as recipients of Vermont's Town Tuition Program. Given recent federal distinctions, this may not be a straightforward task." *Id.*

Such religiously hostile statements—by legislators and public officials— combined with Vermont's persistent exclusion of religious schools, establish that the

13

State has not acted "with the neutrality that the Free Exercise Clause requires." *Mid Vermont*, 151 F.4th at 95 (citation omitted). Such religious hostility is per se unconstitutional. *Id.*

### 2. Act 73 creates a religious gerrymander.

Act 73 also is not neutral because it was "gerrymandered with care" to exclude all religious schools from town tuition funding. *Lukumi*, 508 U.S. at 542.

In *Lukumi*, the City of Hialeah passed several ordinances aimed at stopping Santeria adherents' religious practice of animal sacrifice. *Id.* at 535. The Court held that the group of ordinances were not neutral because they created a "religious gerrymander." *Id.* First, the Court explained that "[a]part from the text, the effect of a law in its real operation is strong evidence of its object." *Id.* And the effect of the ordinances—through "careful drafting"—was that "few if any killings of animals [were] prohibited other than Santeria sacrifice." *Id.* at 536. Second, the "fact that [the ordinances] proscribe[d] more religious conduct than [was] necessary to achieve their stated ends" also allowed the Court to "infer" a lack of neutrality. *Id.* at 538. And third, "the historical background," including religiously hostile statements by city officials, further showed that the City "target[ed]" Santeria sacrifice in violation of the Free Exercise Clause. *Id.* at 540–42.

The same is true here. Act 73's "effect ... in its real operation" is to exclude religious schools. *Id.* at 535. Every religious school is now excluded from the Town Tuition, Dual Enrollment, and Early College Programs, while more than 40 secular private schools remain eligible for all three. During the 2024–25 school year, 15 religious schools were eligible for public tuition; now *none* are. That is "no accident" but was by design. *French I*, 985 F.3d at 181. Like the various ordinances in *Lukumi*, Act 73's geographic restriction, public-funding floor, and class size requirements work in tandem to ensure that religious schools cannot participate.

14

Start with the geographic restriction. A school must be in a sending supervisory district or a supervisory union that includes a sending school district. 16 V.S.A. § 828(a)(2)(C). The effect of this restriction is that schools in more populated areas are ineligible. Yet most religious schools are in or near Vermont's largest cities—Mid Vermont (Hartford); Rice Memorial (South Burlington); Rutland Area Christian, Mt. Saint Joseph Academy, and Christ the King (Rutland); and Christ the King and Mater Christi School (Burlington). In fact, 11 of the 15 religious schools that were eligible before Act 73 sit in non-sending districts or unions and are therefore excluded. *See* List of Religious Schools, attached as Exhibit 1 to Fogg Decl. But no legitimate rationale supports restricting tuition funds—and thus parental choice—based on the private school's location. Before Act 73, only *the student's* location mattered. 16 V.S.A. § 822(a)(1).

Next, the public-funding floor guarantees that any religious school surviving the geographic restriction will be eliminated. To meet this requirement, a private school's enrollment must have been at least 25% town-tuitioned students during the 2023–2024 school year. 16 V.S.A. § 828(a)(2)(D). That, too, was "careful[ly] draft[ed]" to exclude Vermont's religious schools. *Lukumi*, 508 U.S. at 536. Recall that Vermont barred religious schools from the Town Tuition Program for decades and did not tell school districts they could send tuition payments to religious schools until *after* the 2022–2023 school year started. French Sept. 13, 2022 Guidance, ECF No. 100-5. That means 2023–2024 was the first full year students could use town tuition funds at religious schools, so religious schools had no realistic opportunity to meet the 25% threshold. Take Mid Vermont for example. It enrolled 18 new students that year, meaning that even if *all* 18 were publicly funded, the school *still* would not have crossed the 25% requirement. Fogg Decl. ¶ 12. Requiring religious

15

schools to jump from zero publicly funded students to 25% of their enrollment in one-year reeks of "covert" religious targeting. *Lukumi*, 508 U.S. at 534.

What's more, one senator revealed whom the funding floor was aimed at. During a Senate Education Committee hearing, Senator Ram Hinsdale (who voted for Act 73) explained that it's "important that the percentage be guiding the decision" of which schools to fund because "*otherwise we're starting to send people back to religious schools.*" *Hearing on H.454 Before the S. Comm. on Ed.*, Apr. 25, 2025, 2025-2026 Reg. Sess. (Vt. 2025) at minute mark 1:51:02–1:52:17 (emphasis added).[5] Although the context was discussing out-of-state religious schools, her comments reveal that the 25% threshold was targeted for religious schools.

The class size requirement, 16 V.S.A. § 828(a)(2)(E), is also part of the gerrymander. Many religious schools, Mid Vermont included, prioritize small class sizes for a better learning environment and to ensure teachers can—through close personal relationships—"educat[e] young people in their faith." *Our Lady of Guadalupe Sch. v. Morrisey-Berru*, 591 U.S. 732, 753 (2020); Fogg Decl. ¶¶ 23–24. Yet Act 73 demands a *minimum* number of students in each class. That makes no sense; mandating *larger* class sizes will not improve education throughout the state. This "apparent disconnect" between the class size requirement and the law's asserted goal further proves Act 73 was designed to ensure the exclusion of religious schools. *New Hope*, 966 F.3d at 165.

Legislators knew that Act 73's requirements created a religious gerrymander. For instance, in one House Education Committee hearing, Chairman Peter Conlon explained that "the way [the bill] divides what private schools would be eligible to be a school-choice school, I don't think any [religious school] would qualify." *Hearing on H.454 Before the H. Comm. on Ed.*, Mar. 11, 2025, 2025-2026 Reg. Sess. (Vt.

---

[5] Video available at https://www.youtube.com/watch?v=w01PzeEpT0U.

2025) at minute mark 17:45–17:50.[6] Represented Harple celebrated that exclusion: "Okay, great. Good news." *Id.* But Vermont cannot simply "manipulate[ ]" the "definition" of who is eligible to avoid "the substance of free exercise protections." *Carson*, 596 U.S. at 784 (citation modified).

Vermont will likely argue that some secular private schools also are not eligible under Act 73. But "[i]t is no answer" that Vermont "treats some comparable secular [schools]" "as poorly as or even less favorably" than religious schools. *Tandon,* 593 U.S. at 62. What matters is that each of the new restrictions "contribute[s] to the gerrymander" and "in practical terms" exclude all religious schools. *Lukumi*, 508 U.S. at 536–37. That triggers strict scrutiny regardless of whether some secular schools might be affected too. *Id.* at 546; *see also New Hope*, 966 F.3d at 169 (regulation that "fell almost exclusively on adoption services holding particular religious beliefs" was likely not neutral).

### 3. Act 73 treats comparable secular schools more favorably than all religious schools.

Nor is Act 73 generally applicable. Government regulations are not generally applicable (or neutral), and thus trigger strict scrutiny, "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. And "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

No matter what interest Vermont advances, Act 73 fails to treat private schools "in an evenhanded, across-the-board way." *Kennedy v. Bremerton School District*, 597 U.S. 507, 527 (2022). Consider Act 73's asserted interest to "provide substantially equal educational opportunities." *See* Act 73 §§ 1(a)(4), 1(b)(1). No

---

[6] Video available at https://www.youtube.com/watch?v=cUhb73o943Q.

religious approved independent schools are eligible under Act 73, but at least 18 secular approved independent schools still are. The religious and secular schools are "comparable" under the Free Exercise Clause because both are *approved independent schools*, satisfying the same state regulations. The only ways they are different is that the excluded religious schools are religious, had fewer tuitioned students in 2023–2024, and are in a different area of the state. But those characteristics have no bearing on providing "equal educational opportunities"—it makes no difference if a tuitioned student attends a school with 100 other tuitioned students or 2 or if a school is in a more or less populated area. In fact, Act 73 directly undermines any interest in providing "equal educational opportunities" by providing *less opportunities* for Vermont students and families.

Next, whatever interest the State might have in enforcing Act 73's new criteria against Mid Vermont, it does not pursue that interest evenhandedly. A law "cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547. Act 73 creates several categories of schools that are exempt from the geographic restriction, public-funding floor, and class-size requirements and therefore still eligible for public tuition: independent schools meeting education quality standards, tutorial programs approved by the State Board, approved education programs, out-of-state public schools, and therapeutic approved independent schools. 16 V.S.A. § 828 (a)(3), (4), (5), (6), (7). No religiously neutral interest justifies paying for a student to attend an out-of-state public school, for example, while withholding tuition for Mid Vermont.

In short, Act 73 favors comparable secular schools over religious schools. "This precise evil is what the requirement of general applicability is designed to prevent." *Lukumi*, 508 U.S. at 545–46.

18

### B. Act 73 also triggers strict scrutiny because it excludes religious schools from an otherwise available government benefit, in violation of *Trinity Lutheran*, *Espinoza*, and *Carson*.

In addition to not being neutral and generally applicable, Vermont's actions also trigger strict scrutiny under the Supreme Court's recent free exercise decisions in *Trinity Lutheran*, *Espinoza*, and *Carson*. Those cases hold "that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. So if a state allows "public funds" to "support tuition payments at private schools," it cannot then "carve out private religious schools from those eligible to receive such funds." *Id.* at 780. Yet Act 73 does precisely that. As detailed above, Act 73 excludes all religious schools while providing funding to secular schools—that's the reality "[r]egardless of how the benefit and restriction[s] are described." *Id.* at 789. Act 73 therefore "must be subjected to 'the strictest scrutiny.'" *Id.* at 780.

### C. Act 73 triggers strict scrutiny because it substantially interferes with parents' religious development of their children.

Act 73 also triggers strict scrutiny—regardless of whether it is neutral or generally applicable—because it "substantially interferes with the religious development of [religious parents'] children." *Mahmoud*, 606 U.S. at 565.

In *Mahmoud*, the Supreme Court addressed a free exercise challenge to a policy that subjected public school students to LGBT-related curriculum without the ability to opt-out. *Id.* at 529–39. First, the Court held that imposing the curriculum without opt-outs burdened parents' religious exercise because it carried "a very real threat of undermining the religious beliefs that the parents wish[ed] to instill in their children." *Id.* at 550–55 (citation modified). Second, the Court said that public education was a "public benefit," and the government could not "'condition' its 'availability' on parents' willingness to accept to accept a burden on their religious exercise." *Id.* at 561 (quoting *Trinity Lutheran*, 582 U.S. at 462). So it was no

19

answer to the religious burden that parents could send their children elsewhere. Third, strict scrutiny was "appropriate regardless of whether the law is neutral or generally applicable" because of the "special character" of the burden on parents' religious development of their children. *Id.* at 565 (citation modified).

*Mahmoud* controls here as applied to Nathan Partington and other religious parents at Mid Vermont.

First, Act 73 burdens Nathan's right to direct O.P.'s religious upbringing. Parents choose Mid Vermont precisely for the Christian education it provides. Nathan Partington's religion requires him to "send" his "children to a private Christian school." Partington Decl. ¶ 9. Sending his children to a public or secular private school would expose them to "worldly influences and ideas that are contrary to [Nathan's] religious beliefs and convictions," *id.* ¶ 4, posing "a very real threat of undermining [his] religious beliefs and practices." *Mahmoud*, 606 U.S. at 565 (citation modified).

Second, Act 73 forces Nathan to pick between a public benefit or burdening his religious exercise. Nathan is entitled to town tuition funds (a public benefit) just as the parents in *Mahmoud* were entitled to a public education (a public benefit). Vermont law *mandates* that Nathan receive public financing for his children's schooling because his school district doesn't operate a public school. 16 V.S.A. § 822 (school district to maintain high school or pay tuition to a school "selected by the parents"). But Vermont only gives the public benefit if Nathan chooses one of the State's preferred schools. Because the State has chosen "to provide public benefits"—town tuition funding—it "cannot 'condition' its 'availability'" on Nathan's "willingness to accept a burden on [his] religious exercise"—sending O.P. to a secular school. *Mahmoud* 606 U.S. at 561 (quoting *Trinity Lutheran*, 582 U.S. at 462). Like in *Mahmoud*, it's no answer for Nathan to simply go somewhere else.

20

Nathan is a taxpaying citizen of Vermont, and he should not be denied funding that all others receive because he wants O.P. to be educated at a school that shares his religious beliefs and teaches his religious worldview.

Third, the burden's "special character"—undermining Nathan's religious development of O.P.—triggers strict scrutiny no matter the neutrality or general applicability of Act 73. *Id.* at 565. In fact, the burden on Nathan mirrors the one in *Wisconsin v. Yoder*, 406 U.S. 205 (1972). In *Yoder,* Amish parents objected to sending their children to school after the eighth grade because they didn't want them "expos[ed]" to "worldly influence[s]." *Id.* at 211. Nathan has a similar objection to sending O.P. to secular schools. Partington Decl. ¶¶ 3–6. The only difference is the punishment in *Yoder* was a fine for violating the law; here it is the loss of a public benefit. Either way, this type of burden requires strict scrutiny.

## II.    Plaintiffs are likely to succeed on their equal protection claim.

Vermont violates the Equal Protection Clause too. First, the unequal treatment violates the Clause's cardinal command that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When the government discriminates based on a suspect classification like religion or deprives a fundamental right such as the free exercise of religion, strict scrutiny applies. *Id.* at 440.

Second, even when a suspect class or fundamental right is not at issue, the Equal Protection Clause prohibits the government from intentionally treating citizens differently from others similarly situated without a rational basis that furthers a legitimate government interest. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Act 73 treats approved independent schools—all of which were supposed to receive public tuition funding under 16 V.S.A. § 822—differently based on their location, enrollment percentages, and class sizes. The law's stated purpose

21

is to provide each student with "substantially equal educational opportunities that will prepare them to thrive." Act 73 § 1(b)(1). But the Act's geographic restriction, public-funding floor, and class size requirement irrationally decrease educational opportunities—all to advance the State's illegitimate, anti-religious goal of excluding religious schools.

### III.   Act 73 cannot survive any level of judicial scrutiny.

To justify its exclusion of Mid Vermont, the State must satisfy strict scrutiny. But "[a] government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021) (citation modified). If Vermont "can achieve its interests in a manner that does not burden religion, it must do so." *Id.* And it cannot hide behind "broadly formulated interests." *Id.* Instead, it must show a compelling interest, not in enforcing the challenged law "generally," but "in denying an exception" to Mid Vermont specifically. *Id.*

Vermont can't meet that heightened burden or any level of judicial scrutiny. There is no compelling interest in restricting town tuition funds based on Mid Vermont's location, enrollment percentages, or class sizes. Nor can there be a compelling interest when Act 73 exempts dozens of secular schools and programs from these restrictions. *See* 16 V.S.A. § 828 (a)(3), (4), (5), (6), (7). These categorical exemptions belie any suggestion that those three requirements "can brook no departures." *Fulton*, 593 U.S. at 542. And these requirements *undermine* Act 73's stated purpose of providing "equal educational opportunities." Act 73 § 1(b)(1). By excluding all religious schools in the state from the Town Tuition, Dual Enrollment, and Earl College Programs, the new requirements result in less options for Vermont's families and students, not more.

22

And like Maine in *Carson*, Vermont has plenty of religious-neutral alternatives. Vermont could "expand the reach of its public school system, increase the availability of transportation, provide some combination of tutoring, remote learning, and partial attendance, or even operate boarding schools of its own." *Carson*, 596 U.S. at 785. But it hasn't done any of that, instead opting to cut out religious schools completely.

## IV.   Plaintiffs satisfy the remaining preliminary injunction factors.

Mid Vermont satisfies the remaining preliminary injunction factors warranting the entry of a preliminary injunction.

Absent an injunction, Mid Vermont and its students will continue to suffer irreparable harm both as a matter of law and as a practical matter. First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mid Vermont*, 151 F.4th at 96 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19 (2020)). So "religious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause violation." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020). Second, Mid Vermont's ineligibility for town tuition funds—or Dual Enrollment and Early College funds—"prevent[s] the school from using" those benefit programs "as a recruiting tool." *Mid Vermont*, 151 F.4th at 96. Thousands of Vermont students are tuitioned to out-of-district high schools, but now Mid Vermont is not an option for any of them. Mid Vermont will lose prospective students because they have been blacklisted from public benefits. Fogg. Decl. ¶¶ 31–33. Indeed, some parents, like Nathan Partington, are now facing that reality and must pick between receiving a public benefit or their desired school.

And Act 73 causes absurd results. Consider a family that has two (or more) children: one that is "grandfathered-in" and able to receive public tuition at a

23

religious school, and a younger child who is not grandfathered-in. That family will have to decide to (1) send their children to different schools, (2) send neither child to the religious school that they want to attend, or (3) send both children to the chosen religious school but lose town tuition funds for the younger student.

A preliminary injunction also serves the public interest. "There is a strong public interest in ensuring that students and schools do not lose out on valuable [public benefits] by virtue of the government's hostility" and lack of neutrality "to religion." *Mid Vermont*, 151 F.4th at 96. There is no legitimate public interest served by *reducing* school choice for rural Vermonters. Act 73 burdens rural families—it does not give them "equal educational opportunities." Act 73 § 1(a)(4).

## CONCLUSION

For all these reasons, the Court should grant the motion and issue the requested preliminary injunction.

Dated: January 20, 2026                Respectfully submitted,

                                       s/ David Cortman
                                       David Cortman
                                       AZ Bar No. 29490
                                       Ryan J. Tucker*
                                       AZ Bar No. 034382
                                       Katherine Anderson*
                                       AZ Bar No. 033104
                                       ALLIANCE DEFENDING FREEDOM
                                       15100 N. 90th Street
                                       Scottsdale, AZ 85260
                                       Telephone: (480) 444-0020
                                       dcortman@adflegal.org
                                       rtucker@adflegal.org
                                       kanderson@adflegal.org

                                       Jacob E. Reed*
                                       VA Bar No. 97181
                                       ALLIANCE DEFENDING FREEDOM

24

44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Attorneys for Plaintiffs*
***Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

<u>*s/David Cortman*</u>
David Cortman
*Counsel for Plaintiffs*

26