**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

MID VERMONT CHRISTIAN SCHOOL,     )
*et al.*,     )
    )
    Plaintiffs,     )
    )
    v.     )     Case No. 2:23-cv-652
    )
ZOIE SAUNDERS, *et al.*,     )
    )
    Defendants.     )

**STATE DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendants Jennifer Deck Samuelson, in her official capacity as Chair of the Vermont

State Board of Education, and Zoie Saunders, in her official capacity as Vermont Secretary of

Education (collectively, "State Defendants") oppose Plaintiffs' motion for preliminary injunction.

**MEMORANDUM OF LAW**

For decades, Vermont's student population has declined while its per-pupil costs—and,

by extension, its education property taxes—have increased. Those cost increases have been

starker in some communities than in others, such that students in some areas of the state cost

substantially more to educate than their peers just a few towns over.

In 2025, the Legislature addressed those problems by streamlining Vermont's education

system. The Legislature's solution, enacted as Act 73 of 2025, called for the consolidation of

public school districts and, relevant here, imposed eligibility criteria to likewise limit the number

of independent schools eligible to receive public tuition funding. Specifically, the Legislature

confined public tuition funding to approved independent schools that are in sparsely populated

areas of Vermont, already educate large populations of publicly funded students, and comply

with the class sizes requirements applicable to public schools.

Plaintiff Mid Vermont Christian School is one of the independent schools that does not meet Act 73's eligibility criteria for public tuition. Plaintiff O.P. is a student who hopes to attend high school at Mid Vermont, and Nathan Partington is his father.[1] Plaintiffs allege that because the Christian education offered at Mid Vermont is an important expression of their religion, the statutory criteria making Mid Vermont ineligible for public tuition unconstitutionally burden their right to freely exercise that religion. Plaintiffs therefore ask the Court for an injunction requiring the State Defendants to authorize public tuition payments to Mid Vermont.

But Plaintiffs are not entitled to that injunction. Act 73's eligibility criteria do not violate Plaintiffs' constitutional rights, because those criteria have nothing to do with religion. Nor do Plaintiffs face a threat of irreparable injury, because their asserted harms are not imminent and all redound to monetary losses. Finally, the balance of equities and public interest favor allowing the State to impartially implement the Legislature's public policy judgments.

## BACKGROUND

### I.    Vermont's History of Tuitioning

Under Vermont law, school districts that do not maintain full kindergarten-through-twelfth-grade school systems may educate their students by paying tuition to other districts' public schools or to eligible approved independent schools. *See Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 544 (1999); *see also* Vt. Stat. Ann. tit. 16, §§ 821-28. This system, known as "town tuitioning," enables school districts that lack full K-12 school systems to educate their children without incurring the cost of building and operating those schools.

---

[1] Plaintiffs' motion makes no reference to Plaintiffs Abel Goodwin, M.G., Christopher Goodwin, or Bethany Goodwin. That is because the Goodwin family does not allege any injury from Act 73. Abel Goodwin has already graduated from Mid Vermont. Amended Compl. ¶ 85 (ECF No. 100). M.G. already attends Mid Vermont, Amended Compl. ¶ 86, so Act 73 entitles her to receive town tuition payments until she graduates, *see* 2025 Vt. Acts & Resolves No. 73 § 22.

2

The statutory criteria governing town tuition have always been neutral as to religion. *See Chittenden Town*, 738 A.2d at 545. But how Vermont school districts have applied the town tuition program to religious schools has shifted over the decades as state and federal courts issued evolving rulings on the constitutional parameters around public funding for religious schools. *See, e.g.*, *id.* at 547-49. In 1999, the Vermont Supreme Court held that the state constitution's Compelled Support Clause prohibits towns from paying tuition to religious schools without adequate safeguards to prevent public support for religious training. *Id.* at 563 (citing Vt. Const. Ch. 1 Art. 3). But over the ensuing decades, a series of decisions from the United States Supreme Court made increasingly clear that some state funding rules designed to avoid government entanglement with religion in fact violate the U.S. Constitution's Free Exercise Clause. *See, e.g.*, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 (2017). Vermont school districts updated their practices to comply with both the federal and state constitutions, including by clarifying that religiously-affiliated schools could receive public tuition so long as they did not use that money to fund instruction in religious doctrine. *See* Pls.' Mot. at 1 (ECF No. 105). But in 2022, the Supreme Court made clear that such use-based funding prohibitions violated the Free Exercise Clause. *See Carson v. Makin*, 596 U.S. 767, 786-88 (2022). Vermont updated its practices accordingly, including by allowing Mid Vermont to receive town tuition payments. *See* Amended Compl. ¶ 16 (ECF No. 100).

## II. Vermont's Education Funding Crisis

Over the same period, Vermont faced a crisis of education funding. In Fall 2024, after voters rejected a historic number of school district budgets, the Vermont Agency of Education prepared a series of reports describing fiscal and demographic threats to Vermont's education funding system. The Agency noted that "[s]chools are facing an increasing number of students identified for special education, higher costs to provide required services, [and] staffing

shortages." Vt. Agency of Educ., *Key Themes from the Listen and Learn Tour* at 30, (Jan. 8, 2025), https://perma.cc/MZW4-L2XK. The Agency concluded that "resource sharing, regionalization of services, or consolidation should be considered as means to increase educational opportunities for students and to address budget sustainability." *Id.*

At the start of the 2025 legislative session, Governor Scott announced an Education Transformation Proposal that built on the Agency's analysis. *See generally Governor Scott's Education Transformation Proposal: Governance* (Feb 7, 2025), https://perma.cc/5LVP-RRC8. The Governor's proposal was designed to achieve economies of scale to lower costs to taxpayers while also improving educational outcomes for children across Vermont. *Id.* at 2, 7-8. Specifically, the plan proposed consolidating Vermont's 52 supervisory unions and 119 school districts into significantly fewer districts. *See id.* at 2-3. At the same time, the proposal recognized the increased burden that larger districts would place on students in sparsely populated areas of the state and the historic role that certain independent schools have played filling gaps in the state's education system, so retained a role for independent schools. *Id.* at 7-8.

The Legislature then began work on a bill to reform and consolidate the public school system. With respect to town tuitioning, the draft legislation considered over the course of the 2025 session proposed to limit public tuition payments to only those independent schools that (1) are in areas that did not historically operate high schools, and (2) have historically served as de facto public schools by educating a significant percentage of their students using public tuition funds. *See, e.g.*, 2025 H.454 Draft 4.1 §§ 3, 13, 2025-2026 Gen. Assem., Bien. Sess. (Apr. 24, 2025), https://perma.cc/UK2E-NEGQ; 2025 H.454 Draft 4.1 § 10 2025-2026 Gen. Assem., Bien. Sess. (Mar. 24, 2025), https://perma.cc/LGF4-M7MQ. The Senate Education Committee heard a series of presentations from Education Secretary Saunders and Agency personnel describing

4

Vermont's education system and the challenges it faces. This included discussion of Vermont's repeated prior attempts to consolidate public school districts. *See, e.g.*, Vt. Agency of Educ., *Vermont Education Governance*, at 4–6 (Jan. 17, 2025), https://perma.cc/6EGX-XWYL (citing 2015 Vt. Acts & Resolves No. 46; 2011 Vt. Acts & Resolves No. 156 (Adj. Sess.); 2009 Vt. Acts & Resolves No. 153 (Adj. Sess.)). The Agency also described "[r]educed tuitioning" as an "[o]perational [o]bjective" of education reform because it would "[r]educe the complexity and achieve parity in cost structure." *See* Vt. Agency of Educ., *Education Governance: Priorities & Objectives*, at 14 (March 28, 2025), https://perma.cc/58UC-QA26. The result of the Legislature's effort—Act 73 of 2025—was signed into law on July 1, 2025. *See* 2025 Vt. Acts & Resolves No. 73 (H.454) § 70.

### III.    Act 73 of 2025

As enacted, Act 73 initiated a sweeping overhaul of Vermont's education system. Most notably, the Act formed a task force to propose new, larger school districts. *See* 2025 Vt. Acts & Resolves 73 § 3. This task force was instructed to, among other things, propose a set of larger school district boundaries that would "allow for . . . continued access to independent schools that have served geographic areas that do not operate public schools for the grades served by the independent schools." *See id.* § 3(c).

Consistent with those aims, the Act also imposed new eligibility criteria to limit which independent schools may receive town tuition. Previously, any approved independent high school could receive public tuition funds. *See* Vt. Stat. Ann. tit. 16, § 828 (2024); *see also* Opp. to Mot. for Preliminary Injunction (ECF No. 26) at 4–8 (describing Vermont's previous public tuitioning system). Under Act 73, an independent school is eligible for town tuition payments if it: (1) is in Vermont; (2) was an approved independent school as of July 1, 2025; (3) is in a school district that does not operate a full K-12 school system (or a supervisory union with at

least one district that does not operate a full K-12 school system); (4) had at least 25 percent of its students receive town tuition funding during the 2023-2024 school year; and (5) complies with the minimum class size requirements applicable to Vermont public schools. Vt. Stat. Ann. tit. 16, § 828(a)(2) (2025).

According to the Agency's analysis, 18 approved independent schools meet those eligibility criteria. *See* Vt. Agency of Educ., *Independent School Directory* at 3-9 (Sept. 2025), https://perma.cc/5N9G-HWQP ("2025 Independent School Directory").[2] That is a substantial decrease from the number of independent schools eligible for public tuition before Act 73 went into effect. *See id.* at 10-16 (listing ineligible approved schools); *see also* Vt. Agency of Educ., *Independent School Directory* at 3-14 (Sept. 2024), https://perma.cc/2VYP-4QKF ("2024 Independent School Directory"). To minimize disruption to the students and schools, Act 73 allows school districts to continue paying tuition for any student currently enrolled at an ineligible school until the student graduates. *See* 2025 Vt. Acts & Resolves No. 73 § 22.

In addition to approved independent schools receiving town tuition payments, Act 73 also authorizes other situations in which a school district may pay student tuition. School districts may pay tuition to public schools, Vt. Stat. Ann. 16, § 828(a)(1), including public schools in other states, *id.* § 828(a)(6). The law also authorizes tuition to "independent school[s] meeting educational quality standards," *id.* § 828(a)(3), which are subject to extensive State curricular and operational involvement such that they effectively operate as public schools, *id.* § 165(f). Public funding is available for "tutorial programs" that evaluate and treat students on a short-

---

[2] The Independent School Directory also includes 27 therapeutic schools that are eligible to receive public tuition under § 828(a)(7) for a total of 45 eligible institutions. *See* 2025 Independent School Directory at 3-9, https://perma.cc/5N9G-HWQP. Though listed under the same heading in this directory, therapeutic schools are not subject to the eligibility criteria at issue here. *See* Vt. Stat. Ann. tit. 16, § 828(a).

term basis. *See id.* §§ 11(a)(27), 828(a)(4). The Act allows "education programs" that collaborate with a school district to meet nontraditional student needs, *id.* §§ 11(a)(34), 828(a)(5), such as the needs of pregnant or parenting teens, *see* 2025 Independent School Directory at 17, https://perma.cc/5N9G-HWQP. Finally, the Act allows funding to therapeutic schools to educate students with disabilities, Vt. Stat. Ann. tit. 16, § 828(a)(7), (d), as mandated by the Rehabilitation Act of 1973, 29 U.S.C. § 794.

## IV.    Procedural History

Plaintiffs initiated this action in 2023 to challenge Mid Vermont's alleged ineligibility for town tuition funds under Vermont's pre-Act 73 school funding laws, and to bring unrelated claims against the Vermont Principals' Association and the Waits River Valley School Board. *See* Compl. (ECF No. 1). Plaintiffs sought a preliminary injunction against both sets of defendants that would (1) require the State Defendants to authorize town tuition funding for Mid Vermont and (2) require the non-state defendants to take other actions on Plaintiffs' unrelated claims against them. This Court denied injunctive relief in June 2024. *See* Order at 27 (ECF No. 57).

Plaintiffs appealed the Court's denial of a preliminary injunction as to the non-state defendants, but did not appeal the Court's denial of a preliminary injunction as to the State Defendants. *See* Appellant's Br. 3, *Mid Vermont Christian Sch., et al. v. Saunders, et al.*, 151 F.4th 86 (2d Cir. 2025) (No. 24-1704). The Second Circuit reversed the denial of Plaintiffs' requested preliminary injunction against the non-state defendants and remanded to this Court. *See Mid Vermont Christian Sch., et al. v. Saunders, et al.*, 151 F.4th 86, 96 (2d Cir. 2025).

Plaintiffs then amended their complaint over the State Defendants' objection and now move again for a preliminary injunction.

**ARGUMENT**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must show (1) that it is likely to succeed on the merits, (2) that it is likely to suffer immediate irreparable harm in the absence of an injunction, (3) that the balance of equities tips in its favor, and (4) that the requested injunction is in the public interest. *Id.* at 20. Where, as here, the government is the opposing party, the latter two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because Plaintiffs seek a "mandatory" injunction that "alters the status quo . . . by commanding some positive act," they must satisfy a "heightened standard" by showing a "clear or substantial" likelihood of success on the merits and making a "strong showing" of irreparable harm. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (citation modified). Plaintiffs cannot meet even the normal standard for a preliminary injunction, let alone the heightened standard.

**I.      Plaintiffs have not shown a substantial likelihood of success on their Free Exercise claim.**

The Free Exercise Clause "protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 475 (2020) (citation modified). But "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *M.A. on behalf of H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 36 (2d Cir. 2022) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990)). So long as "a law is both neutral and generally applicable, rational basis review applies." *Id.* Because Act 73's eligibility criteria are generally applicable and neutral, and in any event satisfy any level of judicial scrutiny, Plaintiffs are unlikely to succeed on their Free Exercise claim.

**A.**     **Act 73's eligibility criteria are generally applicable.**

The eligibility criteria apply equally to secular and religious institutions. The general applicability prong guards against laws that "impose burdens only on conduct motivated by religious belief." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). Courts have found violations of this prong where laws permit "individualized exemptions" based on solely secular factors, or otherwise "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533-34 (2021) (citation modified). So long as a law "treats similar conduct similarly, without regard to whether the conduct is religiously motivated," it is generally applicable. *We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 145 (2d Cir. 2023), cert. denied, 144 S. Ct. 2682 (2024).

That is precisely what Act 73 does. The law applies a single, uniform set of criteria to determine which approved independent schools are eligible for public tuition funding. *See* Vt. Stat. Ann. tit. 16, § 828(a)(2). None of those factors makes *any* reference to religion. *See id.*

To be sure, Act 73 also authorizes public tuition funding for public schools, *id.* § 828(a)(1),(6), and four other categories of education programs, *id.* § 828(a)(3),(4), (5), (7). But those categories respond to different needs—so implicate different state interests—than the town tuition program. For instance, independent schools that meet education quality standards are subject to more State operational involvement than are approved independent schools, such that the schools that meet education quality standards function as an extension of rather than an alternative to the public school system. *Compare id.* § 165(b), (f) (requirements for independent school meeting educational quality standards) *with id.* § 166(b) (requirements for approved independent schools). In any event, nothing prohibits Mid-Vermont—or any other religious school—from electing to become an independent school meeting education quality standards.

9

*See id.* § 828(a)(3). Similarly, tutorial programs, approved education programs, and therapeutic schools all serve specific classes of students with needs that public schools are not well-suited to meet. *See id.* § 11(a)(27), (34), *id.* § 828(d). None of those categories authorize the sort of discretionary "individualized exemption" that undermines a law's general applicability for purpose of a Free Exercise claim. *Fulton*, 593 U.S. at 533.

**B.    Act 73's eligibility criteria are facially neutral as to religion.**

As Plaintiffs implicitly concede, the eligibility criteria are neutral on their face. The criteria do not "explicitly single[] out" any "religious practice," *We The Patriots USA*, 76 F.4th at 145—in fact, Act 73 makes no mention of religion at all, *see generally* Act 73, 2025 Vt. Acts & Resolves No. 73 (2025).

Because the Act is facially neutral, the Supreme Court's line of previous religious school funding cases is inapposite. *See* Pls.' Mot. at 19.[3] Each of those cases involved challenges to state funding criteria that—in contrast to Act 73's marked silence on religion—"expressly discriminate[d]" against religious schools. *Trinity Lutheran*, 582 U.S. at 462. For instance, both the Montana law struck down in *Espinoza* and the Maine law struck down in *Carson* "specifically carved out private religious schools from those eligible to receive . . . public funding 'solely because they are religious.'" *Carson*, 596 U.S. at 768 (quoting *Espinoza,* 591 U.S. at 487). Plaintiffs do not and cannot contend that Vermont's law is comparable.

---

[3] Plaintiffs suggest that the Supreme Court's line of governmental benefit cases create an alternative route to establishing a First Amendment violation. *See* Pls.' Mot. at 19 (citing *Carson v. Makin*, 596 U.S. 767, 778-80 (2022)). Not so. In each of those cases, the Court treated the state law's express exclusion of religious institutions as a species of non-neutrality. *See, e.g.*, *Carson*, 596 U.S. at 781 (concluding that "there is nothing neutral about Maine's program").

**C.    Act 73's eligibility criteria do not implicitly discriminate against religion.**

Nor do Act 73's eligibility criteria reflect an impermissible anti-religious agenda. "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation" or to "suppress[] religion or religious conduct," then "the law is not neutral." *Lukumi*, 508 U.S. at 533. "To fail the neutrality prong, it is not enough for a law to simply affect religious practice; the law or the process of its enactment must demonstrate hostility to religion." *We The Patriots USA*, 76 F.4th at 145 (citation modified). That is, Plaintiffs must show that the Legislature "selected [the eligibility criteria] at least in part 'because of,' not merely in 'spite of,' [their] adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). If the record shows that "the same decision would have resulted even had the impermissible purpose not been considered," then the law is neutral and subject to rational basis review. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977).

"[A]s in equal protection cases," the Court may determine legislative motive "from both direct and circumstantial evidence," including "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history." *Lukumi*, 508 U.S. at 540 (lead opinion of Kennedy, J.) (citing *Arlington Heights*, 429 U.S. at 266–68). The "effect of a law in its real operation" can also be "strong evidence of its object." *Id.* at 535. It is "the plaintiffs' burden to overcome the presumption of legislative good faith and show that the . . . Legislature acted with invidious intent." *Abbott v. Perez*, 585 U.S. 579, 605 (2018). Plaintiffs are unlikely to carry that burden.

**1.**    Plaintiffs overstate the disparity between how many secular schools and how many religious schools will be eligible for town tuition under Act 73 in "real operation." *Lukumi*, 508 U.S. at 535. Plaintiffs assert that "more than 40 secular private schools" remain eligible for town tuition. Pls.' Mot. at 14. That is incorrect: only 18 independent schools are expected to meet

11

§ 828(a)(2)'s eligibility criteria for receiving public funding. *See* 2025 Independent School Directory at 3-9, https://perma.cc/5N9G-HWQP (listing schools eligible for tuition under § 828(a)(2), (3), (7)). Plaintiffs appear to have included Vermont's 27 therapeutic schools in their tally of eligible secular schools. *See id*. That is a reasonable oversight, but a misleading comparison. Therapeutic schools are needed throughout the state to serve students who cannot be appropriately served by their public schools, including students who live in districts with full K-12 school systems. *See* 16 Vt. Stat. Ann. Tit. 16, § 828(d). Accordingly, therapeutic schools are not subject to § 828(a)(2)'s eligibility criteria. *See id.* § 828(a)(7). Of the 50 formerly eligible non-therapeutic independent schools that *are* subject to those criteria, 16 apparently secular approved independent schools and 16 apparently religious approved independent schools stand to lose eligibility under Act 73.[4] *Compare* 2025 Independent School Directory at 3-9, https://perma.cc/5N9G-HWQP, *with* 2024 Independent School Directory at 3-14, https://perma.cc/2VYP-4QKF. That is a far cry from the religious "gerrymander" in *Lukumi*, where religious exercise was "almost the only conduct subject to" the discriminatory ordinances. 508 U.S. at 535-36 (noting that "few if any killings of animals are prohibited [by city ordinances] other than Santeria sacrifice").

     **2.**      Plaintiffs' cherry-picked statements from a handful of Vermont legislators do not support an inference of animus. As an initial matter, statements by individual legislators are minimally probative as to a statute's purpose, because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *United*

---

[4] The limited record before the Court does not support a reliable determination of which independent schools are "religious" and which are "secular." But the best reading of that record suggests that Act 73 rendered many secular schools—not just religious schools—ineligible for public tuition.

*States v. O'Brien,* 391 U.S. 367, 384 (1968). *See also League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 939 (11th Cir. 2023). For this reason, "it is virtually impossible to determine the singular 'motive' of a collective legislative body." [5] *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) (declining to "consider the subjective motivation of the lawmakers").

Plaintiffs' argument drives that point home. Plaintiffs cite alleged comments from ten of the 150 members of the Vermont House of Representatives and only one member of the Vermont Senate. Pls.' Mot. at 12-13, 16-17. None of the quoted legislators sponsored Act 73. *Compare id. with* H.454 at 1, 2025-2026 Gen. Assem., Bien. Sess. (Vt. 2025), https://perma.cc/QJH5-TUDD (listing sponsors). Nearly all the alleged comments appear to be responses to a leading question on an advocacy group's candidate questionnaire. *See generally Candidate Questionnaire*, Friends of Vermont Public Education, https://perma.cc/WYM6-AFM2. And the website hosting that compilation provides no basis to determine whether the alleged comments are complete, genuine, or accurately attributed. *See id.* Only two of the cited comments arose in the deliberations over Act 73, and Plaintiffs fail to explain why the Court should impute a discriminatory motive to the entire Legislature based on those stray remarks.[6] *See* Pls.' Mot. at 16-17.

Tellingly, Plaintiffs' principal authorities on anti-religious discrimination involve challenges to administrative adjudications, not challenges to legislative enactments. *See*

---

[5] Though two justices in *Lukumi* would have held that "contemporaneous statements made by members of the decisionmaking body" can show discriminatory intent, *Lukumi*, 508 U.S. at 540 (lead opinion of Kennedy, J.), that position did not command a majority, *see id.* at 523.

[6] Plaintiffs also take Representative Harple's comment on religious schools out of context. During early debate over the bill that would become Act 73, Representative Harple raised the issue of whether the state should exempt religious schools from certain non-discrimination requirements. *See Hearing on H.454 Before the H. Comm. on Ed.*, Mar. 11, 2025, 2025-2026 Reg. Sess. (Vt. 2025) at minute mark 17:23–17:50, https://perma.cc/Z82P-JYD2. Representative Harple then expressed comfort upon learning that the issue likely would be moot because no religious school was likely to meet Act 73's tightened eligibility criteria. *See id.*

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 640 (2018)*; New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 159 (2d Cir. 2020). Those cases are not relevant here, because claims of administrative bias present "a very different context" than claims of statutory discrimination. *Masterpiece Cakeshop*, 584 U.S. at 636. Administrative tribunals are smaller than legislatures, such that a handful of members' personal motivations can prove dispositive. And administrative bodies must abide by procedural due process and impartiality requirements that do not apply to legislatures. *See id.*

3.      The history of town tuitioning is one of ongoing efforts to comply with shifting and at times conflicting constitutional landscapes, not one of anti-religious animus. For decades, courts construed various constitutional provisions—first the federal Establishment Clause, then Vermont's Compelled Support Clause—to *prohibit* the use of public tuition dollars at religious schools. *See Swart v. S. Burlington Town Sch. Dist.*, 167 A.2d 514, 520 (1961) (citing U.S. Const. amend. I); *Chittenden Town*, 738 A.2d at 562 (citing Vt. Const. Ch. 1 Art. 3). *See also Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 780 (1973) (Establishment Clause barred payments to religious schools under New York's tuition reimbursement program). Over the years, a series of state and federal court decisions chipped away at those rulings. *See, e.g.*, *Campbell v. Manchester Bd. Of Sch. Dirs.*, 641 A.2d 352, 361 (1994) (overruling *Swart*). Vermont town's school funding practices evolved to comply with those legal changes and to fit within the "play in the joints between what the Establishment Clause [and Compelled Support Clause] permit[] and the Free Exercise Clause compels." *Espinoza*, 591 U.S. at 473 (citation modified). Finally, after *Carson* made clear that similar tuitioning practices violated the Free Exercise Clause, *see* 596 U.S. at 786–88, Vermont authorized public tuition payments to religious schools, including Mid Vermont, *see* Amended Compl. ¶ 16.

14

Vermont towns' previous hesitance to pay tuition to religious schools cannot support an inference of anti-religious animus by the Legislature. For one, those restrictions flowed from individual school district's application of judicial decisions, not any statutory restriction enacted by the Legislature. *See, e.g.*, *Chittenden Town*, 738 A.2d at 545. Moreover, even if Vermont's prior school funding regime were motivated by bias—which it was not—that still would be irrelevant to Plaintiffs' claims here. "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 585 U.S. at 603 (citation modified). And Act 73's "significant change[s]" to Vermont's entire public education system cleansed any taint of discrimination that might have attached to prior tuitioning practices. *Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010). Plaintiffs must show that the statute under review—Act 73 itself—reflects a discriminatory intent.[7] *Abbott*, 585 U.S. at 603. Plaintiffs have not made that showing.

4.      The Agency's and the Board of Education's conduct leading up to Act 73's passage offers no support to Plaintiffs' challenge to the statute. Of course, neither the Agency nor the Board can vote in the Legislature, so those bodies' motives are irrelevant to determining legislative intent. Nor, for that matter, did the Agency's or the Board's conduct suggest anti-religious bias. For instance, *all* independent school reapproval applications—not just Mid Vermont—faced a backlog in the past few years, first because Agency took time to assist each school in a technical review of its application and then because the Agency was updating its rules

---

[7] Nor is it relevant that Act 73's lookback provision disproportionately impacts religious schools by conditioning ongoing funding eligibility on a time shortly after religious schools began receiving public tuition payments. A showing of disparate impact alone does not establish unlawful discrimination. *Washington v. Davis*, 426 U.S. 229, 242 (1976). Rather, a plaintiff must also show that the "disproportionately adverse effect . . . can be traced to a discriminatory purpose." *Feeney*, 442 U.S. at 272. And, as explained above, Plaintiffs do not make that showing.

for independent school tuitioning. *See* Samuelson Decl. ¶¶ 3–9 (ECF No. 50-2). In any event, Mid Vermont remained an approved independent school while its reapproval application was pending. *See* Samuelson Decl. ¶ 4. Similarly, the Board issued new anti-discrimination rules in 2022 not to ensnare religious schools as Plaintiffs suggest, but to comply with legislation that expanded school choice for students with disabilities. *See* Memorandum from Vermont State Board of Education to Legislative Committee on Administrative Rules (Mar. 15, 2022), https://perma.cc/AQ3V-N2HD. At bottom, Plaintiffs identify a series of benign and quotidian regulatory actions and ask the Court to infer from them an invidious discriminatory motive. Plaintiffs are unlikely to succeed in that speculative mission.

**D.    Act 73 does not interfere with parents' ability to guide their children's religious development.**

In a narrow class of cases involving public education, even a neutral and generally applicable law may be subject to strict scrutiny if it "substantially interfere[s] with the religious development" of the plaintiff's child. *Mahmoud v. Taylor,* 606 U.S. 522, 565 (2025) (citation modified). For this exception to apply, a plaintiff must make a "fact-intensive" showing that the "specific nature of the educational requirement or curricular feature at issue" and "the specific context in which the instruction or materials at issue are presented" are "hostile" to the plaintiff's "specific religious beliefs and practices." *Id.* at 550.

Plaintiffs have not made the "fact-intensive" showing of conflict and coercion that would support their challenge to Act 73. *Id*. Plaintiffs do not, for instance, identify any specific values inherent to public education that directly conflict with specific religious beliefs of theirs, or explain why public education is incompatible with their religious way of life. *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 210 (1972) (because living "aloof from the world and its values [was] central to [plaintiffs'] faith," any "worldly influence" necessarily interfered with those beliefs.);

16

*id.* at 217-18 (describing in detail the "sharp conflict" between "the values and programs of the modern secondary school" and "the fundamental mode of life mandated by the Amish religion."). Nor do Plaintiffs identify any specific curricular elements or policies that threaten to undermine their beliefs and practices. *Cf. Mahmoud*, 606 U.S. at 551-53 (engaging in close reading of offensive language in challenged storybooks); *id*. at 555 (noting guidance document that instructed teachers to "correct" children for expressing "religious confusion"). Instead, Plaintiffs offer only the generalized, vague, and conclusory assertion that secular school environments include unspecified influences and ideas that conflict with their beliefs. Pls.' Mot. at 20-21. Having offered no basis for the Court to conduct the fact intensive analysis *Mahmoud* requires, Plaintiffs are unlikely to establish an unconstitutional burden on their religious exercise.

Nor, in any event, do Plaintiffs allege a "burden of the same character as that imposed in *Yoder.*" *Mahmoud*, 606 U.S. at 564. In *Yoder* and *Mahmoud* alike, the challenged policies "affirmatively compel[led]" the plaintiffs "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218. But Act 73 does not require students to attend a secular school "under threat of criminal sanction," *id.,* or to engage with specific "hostile" content while in the classroom, *see Mahmoud*, 606 U.S. at 553–54. Nor does Act 73 force Plaintiffs to choose between a public benefit and their religious exercise. *See Trinity Lutheran*, 582 U.S. at 462; *Mahmoud,* 606 U.S. at 561. Instead, the burden that Plaintiffs assert here is that the State does not provide them financial support for their religious exercise. And the Supreme Court has made clear that the Free Exercise Clause confers a right against government coercion, not an entitlement to government support. *See Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 223 (1963) ("[I]t is necessary in a free exercise case for one to show the

17

coercive effect of the enactment as it operates against him in the practice of his religion.");

*Espinoza*, 591 U.S. at 487 ("A State need not subsidize private [religious] education.").

**E.      Act 73's eligibility criteria survive any level of judicial scrutiny.**

Because Act 73's eligibility criteria are neutral, generally applicable, non-discriminatory, and do not interfere with Plaintiffs' right to exercise their religion, they need only withstand rational basis review. *See Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021). And the law easily survives that test because the independent school eligibility criteria are "rationally related" to Vermont's "legitimate" education policy goals. *Id*.

But even if strict scrutiny applied, Plaintiffs still would be unlikely to succeed, because Act 73's eligibility criteria are narrowly tailored to advance a compelling state interest. *Id.* at 164. Vermont has a compelling interest in providing a high-quality, cost-effective, and substantially equal education to every child. *See Yoder*, 406 U.S. at 213 ("Providing public schools ranks at the very apex of the function of a State."), *Brigham v. State*, 692 A.2d 384, 395 (1997) (recognizing duty under state constitution to provide substantially equal educational opportunities to all Vermont students). Act 73's consolidation of Vermont's public school system furthers the State's compelling interest by creating economies of scale, 2025 Vt. Acts & Resolves 73 § 1(b)(3)(A), and reducing education quality disparities between communities, *id.* § 1(a)(6). The same goes for the independent school eligibility criteria, which the Legislature enacted to direct public tuition dollars to only those independent schools that are necessary to fill the gaps in Vermont's existing public school infrastructure.

Take the geographic criteria. Vermont's town tuition laws exist because many school districts with small populations have historically struggled to justify building and maintaining public schools, leaving independent schools to fill in the gaps. While Vermont's tuitioning laws have always conditioned funding on a student's location, *see* Vt. Stat. Ann. tit. 16, § 822, Act 73

18

more closely aligns the program with its goal by also limiting eligibility based on the school's location, *see id.* § 828(a)(2)(C). That Act 73 excludes schools near population centers is a feature, not a bug.

The enrollment threshold likewise is narrowly tailored. Directing funding to the schools that already educate lots of students with public tuition dollars furthers the Legislature's goal of school consolidation, while having the salutary effect of minimizing disruption to existing educational arrangements. Though the first draft of the bill that became Act 73 would have set that threshold at 51 percent of a school's population, *see* H.454 § 6, 2025-2026 Gen. Assem., Bien. Sess. (Vt. 2025), the Legislature revised the threshold down to a less restrictive 25 percent, Vt. Stat. Ann. tit. 16, § 828(a)(2)(D). The Legislature also ensured the least restrictive policy by basing the enrollment threshold on data from the 2023-2024 school year, *see id.*, which was the most up-to-date enrollment data that was final and verified as of the Act's July 1, 2025, effective date. Reliable and verified data for the 2024-2025 school year was not available until several months after the Act became effective, because schools need not even report year-end operational data to the Agency until August 15th of each year. *See* Vt. Stat. Ann. tit. 16, § 242(4)(A)(iii); *see also* Vt. Agency of Educ., *Vermont State Education Profile* at 2 (Aug. 2024), https://perma.cc/M9J6-W6DY (noting processing time for final enrollment data).

So too the minimum class size requirement. Consistent with the Legislature's aim to streamline the education system, Act 73 imposes class size minimums on public schools and approved independent schools "to increase equity of opportunity and promote efficiency and affordability." 2025 Vt. Acts & Resolves 73 § 5. The eligibility criteria ensure that independent schools receiving public tuition meet the same minimums as public schools. *See* Vt. Stat. Ann. tit. 16, § 828(a)(2)(E). Requiring independent schools to abide by the same restrictions as public

19

schools is the narrowest way to ensure that all Vermont students, no matter where they are educated, receive substantially equal educational opportunities.

Plaintiffs attempt to analogize to cases like *Fulton* by characterizing the other categories of education programs that Act 73 makes eligible for public funding as "exemptions." Pls.' Mot. at 22 (citing *Fulton*, 593 U.S. at 541). But those statutory classifications are not departures from the eligibility criteria for independent schools—they are entirely separate classifications that address specific needs more appropriately than either a public school or a general independent school. *See supra* Section I.A.

Plaintiffs therefore are unlikely to succeed in any of their claims for relief. For that reason alone, the Court should deny the requested injunction. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (noting that in "the First Amendment context . . . likelihood of success on the merits is the dominant, if not the dispositive, factor" in injunction test).

## II.    Plaintiffs have not shown a substantial likelihood of success on their Equal Protection claim.

Plaintiffs' equal protection claims fail for the same reason as their First Amendment claim. Courts apply the same inquiry to analyze religious discrimination claims under the Equal Protection Clause as under the Free Exercise Clause. *See Lukumi*, 508 U.S. at 540 (lead opinion of Kennedy, J.). So "when a free exercise challenge fails, any equal protection claims brought on the same grounds" likewise fails. *New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319, 332 n.5 (2d Cir. 2025) (citation modified).

## III.   Plaintiffs have not shown that they will be irreparably harmed without an injunction.

A party seeking a preliminary injunction must demonstrate that it faces "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax*, 62 F.4th at 672. "An irreparable

injury is an injury for which a monetary award cannot be adequate compensation." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (citation modified). Plaintiffs do not make that showing.

To start, Plaintiffs' alleged harms are not "imminent." *See JTH Tax*, 62 F.4th at 672. Plaintiffs include individualized allegations as to just one student who wishes to use town tuition dollars to attend high school at Mid Vermont, O.P. *See generally* Amended Compl.; Pls.' Mot. But O.P. is in seventh grade and will not be eligible for town tuition funding until high school, over a year away. Amended Compl. ¶¶ 93, 102. That is more than enough time to litigate this case in the normal course.

Plaintiffs' asserted First Amendment injury does not support a finding of irreparable harm. Though constitutional deprivations generally are irreparable, that is true only if the injury cannot be remedied through money damages. *See A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (noting that "a strong showing of a constitutional deprivation *that results in noncompensable damages* ordinarily warrants a finding of irreparable harm" (emphasis added)). Thus, the Second Circuit has distinguished between direct prohibitions on free exercise, which are irreparable, and economic losses suffered in pursuit of free exercise, which are not. *See Kane*, 19 F.4th at 171-72 (concluding that employees placed on leave for refusing vaccination on religious grounds were not irreparably harmed). Just so here. Nothing in Vermont law prohibits students from attending Mid Vermont or prohibits Mid Vermont from recruiting students. Rather, Plaintiffs simply seek money to help them pursue these goals. That is a straightforward economic injury that does not support the issuance of a preliminary injunction.

Plaintiffs' assertion that Mid Vermont will lose the opportunity to recruit students is no more availing. "[L]ost profits" generally do not constitute irreparable harm unless they threaten

21

"the very viability of the plaintiff's business." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). And Plaintiffs do not allege, much less demonstrate, that Mid Vermont's ineligibility to receive public tuition payments while this case plays out poses an existential threat to the school. Pls.' Mot. at 23.

Plaintiffs' delay in challenging Act 73 also undermines their assertion of imminent harm. Preliminary injunctions generally rest on "the theory that there is an urgent need for speedy action to protect the plaintiffs' rights," and delay in seeking injunctive relief tends to indicate "a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Plaintiffs have repeatedly made litigation choices that delayed rather than expedited this case's path to resolution, most notably by failing to pursue these claims while their unrelated claims against other defendants were on appeal. *See Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 225 (2d Cir. 2004) (noting that "a district court retains residual jurisdiction over collateral matters" during pendency of appeal). When Plaintiffs resumed pursuing their claims against the State Defendants, they prompted time-consuming motion practice by amending the complaint to include unsubstantiated individual capacity claims. Plaintiffs did all this when enrollment for the 2026-2027 school year runs from March 1, 2026, through April 15, 2026. Those actions hardly demonstrate urgency.

Because Plaintiffs have not made the requisite strong showing of irreparable harm, their motion should be denied. *JTH Tax*, 62 F.4th at 667.

## IV.     The balance of equities and public interest strongly counsel against a preliminary injunction.

The balance of equities and public interest weigh against Plaintiffs' requested injunction. When the defendant is the government, the factors of the balance of equities and public interest merge because the government's interest is the public interest. *Nken*, 556 U.S. at 435. In

22

assessing these factors, a court should consider "the public consequences of employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation omitted). Where state laws are "attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (quotation omitted).

Here, Act 73's narrowing of independent school's eligibility for public tuition is just one piece of a larger education reform that is restructuring Vermont's public education system to make it more equitable and cost-effective. Implementation of Act 73 is complex and ongoing, and Plaintiffs' requested injunction would risk frustrating that progress. Indeed, Plaintiffs' requested relief—a one-off exemption from Act 73's public tuition eligibility criteria—runs directly counter to the Legislature's policy decision to limit public tuition eligibility to the independent schools that are the most enmeshed in Vermont's education infrastructure. The public interest and balance of equities therefore favor denying Plaintiffs' motion.

## V.    Any injunction should be limited in scope.

If the Court were to grant Plaintiffs' motion—which it should not—any injunction should be limited in scope. Injunctive relief must be narrowly tailored to address specific harms to specific parties. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And the Court may only grant injunctive relief to the particular plaintiffs in a case, not to third parties. *Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025). At most, then, the Court could issue an injunction allowing Plaintiff O.P. (but not any other students) to use town tuition funding at Plaintiff Mid Vermont (but not any other independent schools).

Finally, the Court should not issue any injunction without first requiring Plaintiffs to post a bond to cover the amount of tuition funding that Plaintiffs would anticipate receiving from Vermont during an injunction. *See* Fed. R. Civ. P. 65(c) (a "court may issue a preliminary

23

injunction . . . only if the movant gives" a bond "in an amount that the court considers proper to pay the costs and damages sustained by" the defendant from an erroneous injunction).

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

DATED February 20, 2026

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

By:    */s/ Samuel B. Stratton*
       SAMUEL B. STRATTON
       *Assistant Attorney General*
       JONATHAN T. ROSE
       *Solicitor General*
       PATRICK T. GAUDET
       *Assistant Attorney General*
       Office of the Attorney General
       109 State Street
       Montpelier, VT 05609-1001
       (802) 828-3178
       sam.stratton@vermont.gov
       jonathan.rose@vermont.gov
       patrick.gaudet@vermont.gov