

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 MAY 12  PM 2: 54

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

| | | |
|---|---|---|
| MID VERMONT CHRISTIAN SCHOOL, et al ; | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 2:23-cv-652 |
| ZOIE SAUNDERS, JENNIFER DECK SAMUELSON, and WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY SCHOOL BOARD), | ) ) ) ) | |
| Defendants. | | |

ORDER ON MOTION FOR PRELIMINARY INJUNCTION (Doc. 105-1)

As originally filed, this case concerned a dispute over plaintiff Mid Vermont Christian School's ("Mid Vermont") expulsion from the Vermont Principals Association after its forfeiture of a girls' basketball game at which the opposing team included a transgender player. Following a decision by the Second Circuit Court of Appeals holding that "Plaintiffs are likely to succeed in establishing that [state education administrators] acted with hostility toward Mid Vermont's religious beliefs," this court entered a preliminary injunction restoring Mid Vermont's membership in the athletic organization. *Mid Vt. Christian Sch. v. Saunders*, 151 F.4th 86, 95 (2d Cir. 2025).

On October 31, 2025, Mid Vermont and members of two families seeking financial support through the town tuition program filed a motion to amend the

complaint. (Doc. 86). The court granted the motion. (Doc. 98.) The amended complaint challenges the constitutionality of Section 21 of Act 73 – a statute enacted in 2025 that imposes broad changes on many aspects of public education in Vermont. (Doc. 100).[1]

One feature of Act 73 is a marked reduction in tuition payments to independent high schools by school districts that do not operate high schools of their own. *See* Act 73, § 21. Vermont has long provided for the education of these students by requiring the so-called "sending towns" to pay a base amount established by the Agency of Education to public and independent schools that receive the students. 16 V.S.A. § 822. Mid Vermont is among the independent schools that no longer qualify for these "town tuition" payments. Mid Vermont alleges that its exclusion from these payments is the result of religious discrimination in violation of the First Amendment. It also alleges a violation of the Equal Protection Clause.

Plaintiffs seek a preliminary injunction restoring Mid Vermont's eligibility to receive town tuition payments. (Doc. 105.) Because the Agency of Education conditions eligibility for two programs for college-bound students on an independent school's qualification for town tuition payments, Mid Vermont also challenges the exclusion of its students from these programs.

---

[1] Act 73 is a substantial statute, 147 pages in length. Its provisions will be codified primarily in Titles 16 (Education) and 32 (Taxation and Finance) of the Vermont Statutes Annotated. For purposes of this decision, the court uses the citations to the various sections as these appear in the session laws for the 2025 legislative session. This version appears in the record of this case as Ex. 1 to the Amended Verified Complaint (Doc. 100-1). Section 21 is the section most relevant to this case. It is codified at 16 V.S.A. § 828. That portion of Act 73 took effect on July 1, 2025, and is codified at 16 V.S.A. § 828. Other portions of Act 73—particularly the mandatory consolidation of school districts—are the subject of continuing legislative action but are not at issue in this case.

Defendants respond that Act 73 is neutral with respect to religion.[2] They defend the limits Act 73 places on eligibility for town tuition payments on the ground that the limits apply to all independent schools whether these are secular or religious. In Defendants' view, Act 73 restricts which schools qualify for the town tuition payments in order to achieve economies of scale through a more centralized educational system.   (*See* Docs. 121, 122.)

The court heard argument on Mid Vermont's preliminary injunction motion on May 8, 2026. At the court's invitation (Doc. 132), the State Defendants provided a witness at the May 8 Hearing. The court has also considered supplemental declarations filed by Mid Vermont in support of its preliminary injunction motion. (Doc. 141.)

## Background

To understand the parties' dispute, it is necessary to understand something of the history of public and independent schools in Vermont, the role of the Vermont state constitution in shaping that history, and the effect of recent U.S. Supreme Court decisions concerning the Free Exercise Clause. The provisions of Act 73, including Section 21, reflect Vermont's long engagement in questions of local control over education, the establishment of common standards for all schools, economies of scale, and equitable levels of tax support. The court seeks to give full consideration to "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements

---

[2] After the amendment of the complaint shifting the focus of the case from the question of athletics to the question of Act 73's constitutionality (Doc. 100), and after dismissal of the claims against the Executive Director of the Vermont Principals Association (Doc. 135), the remaining defendants in this case are the Vermont Secretary of Education, Zoie Saunders, and the Chair of the Vermont State Board of Education, Jennifer Deck Samuelson (collectively, the "State Defendants"), plus the Waits River Valley (Unified #36 Elementary) School Board.

made by members of the decisionmaking body." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 510, 541 (1993). Through this process, the court seeks to answer the central question in this case which is whether Section 21 is a neutral and generally applicable provision of law subject to a rational basis test or if it infringes on the free exercise of religion by improperly excluding religious schools from a benefit afforded to other schools, both public and independent.

## A. The Education and Compelled Support Clauses of the Vermont Constitution

In July 1777, following its own Declaration of Independence in January of that year, Vermont adopted its first Constitution. The document drew heavily on the Pennsylvania Constitution of 1776 which itself owed much to the Virginia Declaration of Rights, also published in 1776. Vermonters are proud that their original Constitution was the first in America to abolish slavery. More to the point here, it addressed two fundamental issues that converge in this case: freedom of religion and public support of education.

Section 40 of the 1777 Constitution called for the creation of a state-wide system of schools:

> A school or schools shall be established in each town, by the legislature for the convenient instruction of youth … One grammar school in each county, and one university in the State ought to be established by the General Assembly.

In 1786 Vermont combined two provisions of the original 1777 Constitution to create the Education Clause which remains in effect today. The Education Clause calls for the creation of a system of public education.

4

Laws for the encouragement of virtue and prevention of vice and immorality, ought to be constantly kept in force, and duly executed; and a competent number of schools ought to be maintained in each town unless the General Assembly permits other provisions for the convenient instruction of youth.

Vt. Const. ch. II, § 68.    It endorses the role of religious education in Vermont.

All religious societies, or bodies of people that may be united or incorporated for the advancement of religion and learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities, and estates, which they in justice ought to enjoy under such regulations as the general assembly of this state shall direct.

*Id.*

The Vermont Constitution also contains the Compelled Support Clause. This clause recognizes the importance of religious freedom, both in the form of free exercise ("That all persons have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings...") and disestablishment ("no person ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience." Vt. Const., Ch. 1, Art. 3.

These state constitutional provisions, both predating Vermont's admission to the union in 1791, touch directly on the issues raised by Act 73 and the claims made in this case. These include public support of local and regional schools, debate about

5

whether funding and control are matters for the towns or the state legislators, and the recognition of a constitutionally protected role for religious schools.

Of the three central constitutional elements – free exercise; no compelled support; and the essential role of education –it would be the Compelled Support Clause that would direct state policy concerning religious schools in the modern era.[3] Before considering the rise and fall of that clause, we detour to consider the development of public education in Vermont.

## B.   Development of Public Education

In the years prior to statehood, public education generally meant primary education.  In 1782, the Vermont legislature enacted a law authorizing the creation of local school districts, funded by tuition payments from parents of children attending schools.  *Laws of Vermont 1781-1784,* pp. 137-139 (John A. Williams, ed. 1965.)  "Townspeople traditionally maintained complete control over collecting taxes, building schools, and hiring teachers."  Potash, *State Government and Education: "For the Due Encouragement of Learning and the Better Regulating and Ordering of Schools,"* 65 *Proceedings of the Vermont Historical Society*, 45, 48 (1997),  https://vermonthistory.org/journal/misc/StateGovernmentAnd Education.pdf [https://perma.cc/B39M-SG7R].  In the early nineteenth century, Vermont developed a patchwork of independent academies, supported by tuition, and county grammar schools to educate high school age children.  Five of the independent academies survive to the present day and function both as the local public high school where they are located and as independent schools accepting students from outside their communities.

---

[3] Vermont was not among the 37 states that adopted the anti-Catholic "Blaine Amendments" that sought to prevent public support of parochial education in the 1870's.  See Komer, *Trinity Lutheran and the Future of Educational Choice,* 44 Mitchell Hamline Law Rev. 551 (2018).

Local control and funding – and the severe limits on travel in the state's early years – led to an astonishing number of individual school districts. In 1846, the first annual report of the State Superintendent of Schools reported more than 2,000 districts. Potash, *State Government and Education* at 54.

In 1856, the Vermont legislature created the State Board of Education. The annual report of the Secretary of Education in 1857 describes the establishment of union high schools in cities including St. Johnsbury, Rutland, Burlington, St. Albans, Williston and Montpelier. George Gary Bush, *History of Education in Vermont* 61 (1900). In 1869, the legislature passed an act allowing school districts that lacked their own high school to pay tuition for students at the independent academies. Public Act No. 9, 1869 Session Laws. This measure was the forerunner of what would become the town tuition system and was one of the first school-choice measures in the United States.

## C. Vermont's Struggle with Property Tax Inequity

From its earliest days, the Vermont system of public education has struggled with the problem of equitable funding of local schools due to the uneven distribution of wealth among communities. The original funding formula based on tuition payments by parents of students resulted in relatively wealthy districts in population centers and inadequate schools in rural areas.

In 1864, the legislature authorized property taxes for all landowners, including those without school age children, at rates set by school districts. No. 61 of the Acts of 1864 of the State of Vermont 69. Funding levels varied widely based on the distribution of wealth as well as the high number of very small districts (2,951 statewide in 1860).

7

In 1890, legislators from rural towns, aided by an electoral system awarding one House representative to each town, regardless of population, enacted a statewide property tax. Tax revenue was divided on the basis of the number of schools in a district, not by student population. Legislation in 1892 required municipalities to form single school districts, reducing the total number of districts to 251.

In 1931, the state income tax replaced the state property tax. School funding returned to local property taxes with resulting inequity between property-rich and property-poor towns. State government sought to address the unfairness through a series of formulas to distribute state aid to education: in 1935 (Vermont State Tax Commission); early 1960's (Hunt-Simpson Formula); 1969 (Miller Formula); 1982 (Morse-Giuliani Formula); and 1988 (Foundation Formula). Short History of Education Finance in Vermont, Secretary of State. https://ljfo.vermont.gov/assets/Meetings/Task-Force-n-the-Implementation-of--the-Pupil-Weighting-Factors-Report/2021-06-29/eaff3ab644/GENERAL-356877-v1-Short_History_of_Education_Finance_in_Vermont.pdf [https://perma.cc/FF33-JSZP].

In 1997, the Vermont Supreme Court issued its decision in *Brigham v. State*, 166 Vt. 246, 256 (1997), ruling that the distribution of local tax revenues and state-wide aid to education through the Foundation Formula "which concededly denies equal educational opportunities, is constitutionally deficient." The Court held that the Education Clause identifies public education as a fundamental obligation of the state, subject to the Common Benefits Clause. The decision struck down the funding formula as it existed at the time and referred the "specific means of discharging this broadly defined duty [to make educational opportunity available on substantially equal terms]" to the legislature. *Id.* at 268.

The immediate result of the *Brigham* decision was the passage of Act 60 in 1997. The statute redistributed the funds available for school funding by requiring relatively wealthy school districts to share property tax revenues with less affluent districts. The details of Act 60 are not relevant to this dispute. While Act 60 reduced disparities in educational funding, Vermont continued to struggle with unresolved issues including the burden of increased spending on education, growing property values and slower income growth, and concerns about where the education tax burden falls most heavily as the basis for further reform. See Dary Rollins Saas, *School Finance in Vermont: Balancing Equal education and Fair Tax Burdens*, New England Public Policy Center, Federal Reserve Bank of Boston (2007). https://www.bostonfed.org/-/media/Documents/Workingpapers/PDF/nep-cdpf0701.pdf [https://perma.cc/8V8Z-27841].

Two more school funding laws, Act 68 in 2003, and Act 130 in 2004, sought to address the problem of inequality between towns through state aid to augment local school district property taxes. Vermont Department of Education, Vermont's Education Funding System 2011, http://education.vermont.gov/documents/EDU-Finance_Education_Funding_System_2011.pdf

A recent vexing problem has been the decline in student enrollment. Between 2002 and 2024, the total number of students enrolled in the Vermont public schools (pre-k –12) fell from 94,038 to 77,408 students. https://education.vermont.gov/data-and-reporting/vermont-education-dashboard/vermont-education-dashboard-enrollment (navigate to "information Page") [https://perma.cc/XUB7-Z8KX]. This decline has resulted in calls to consolidate small schools, often in rural areas, and increase minimum class size to reduce costs.

This abbreviated tour of two centuries of educational policy brings us to the enactment of Act 73 in 2025. Before taking up that legislation, it is necessary to consider the history of tax support for religious schools in Vermont through the town tuition program.

### D. Tax Support of Religious-Based Education

Over the course of the last 75 years, Vermont has followed the evolving decisional law of the Vermont Supreme Court and the U.S. Supreme Court in determining whether to pay town tuition to religious-based schools. Prior to the decision of the Vermont Supreme Court in *Swart v. South Burlington Town School Dist.*, 122 Vt 177, *cert. denied*, 366 U.S. 925 (1961), towns that did not operate their own high schools (or join supervisory unions that did) paid tuition to Catholic high schools as well as public schools and other approved independent schools. *Id.* at 179. In the *Swart* decision, the court held that these payments violated the Establishment Clause of the U.S. Constitution.

In *Campbell v. Manchester Bd. of School Directors*, 161 Vt. 441, 456 (1994), the Vermont Supreme Court abrogated the *Swart* decision, holding that under the three-part test established in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), "giving tuition reimbursement to this plaintiff will not offend the Establishment Clause."

But what the Vermont Supreme Court gave, it soon took away. In *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 169 Vt. 310, 312 (1999), the Court held that "a school district violates [the Compelled Support Clause] when it reimburses tuition for a sectarian school under [16 V.S.A.] § 822 in the absence of adequate safeguards against the use of such funds for religious worship." There the issue rested until 2017 when the U.S. Supreme Court issued its ruling in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). The *Trinity Lutheran*

decision and the subsequent rulings in *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020) and, most significantly, *Carson v. Makin*, 596 U.S. 767 (2022) held that any educational benefit available to public school students must also be afforded to students enrolled in religious schools.

Before the *Carson* decision, Vermont was involved in litigation that closely parallelled the *Carson* case in Maine. See *A.H. ex rel.Hester v. French*, 985 F.3d 165 (2d Cir. 2021). Following the *Carson* decision, the State of Vermont announced that the town tuition program would be open to students attending religious schools that met state educational standards. On February 19, 2025, Mid Vermont appeared in a state directory of independent schools approved for public funding. (Doc. 100-11, p. 4) This state of affairs changed in 2025 when the Vermont legislature enacted Act 73, the relevant components of which became effective July 1, 2025. A new directory issued in September 2025 placed Mid Vermont on a list of approved independent school ineligible for public funding. *Id.* at 35.

### E. Changes to Vermont Educational Law in Act 73

Act 73 is entitled "An act relating to transforming Vermont's education governance, quality and finance systems." The title accurately captures the comprehensive overhaul embodied in the Act. It is helpful to review the provisions of the Act, including those not directly relevant to this case, to understand the scope of the Act and its place within two centuries of Vermont educational policy.

The Act opens with a series of legislative findings highlighting the decline in public school enrollment from more than 110,000 students in the 1980's to 84,000 in 2025. The findings describe the legislative intent to enact further reforms in the 2026 legislative session, including the consolidation of school districts;

11

improvements in career and technical education; school board elections by ward; mitigation of school taxes by redrawing district boundaries, updating programs to improve the delivery of services in the areas of pre-K, career and technical, and special education; returning educational funding to a "foundational formula" that reduces variations in levels of support between towns; reducing property tax bills through budget changes and a cap on local spending; and increasing income sensitive tax benefits for low and moderate income property owners.

As often happens with reform efforts, the Act creates a new Commission on the Future of Public Education in Vermont to study future changes as well as a School District Redistricting Task Force to recommend new school district boundaries and a School District Voting Ward Working Group. These bodies are tasked with studying additional measures to implement the changes identified in the Findings.

In Sections 5-8 entitled "Class Size Minimums," the Act establishes minimum class sizes for the various grades to "transform education in Vermont by leveraging attainable and research-based scale to increase equity of opportunity and promote efficiency and affordability." There is a waiver program through the State Board of Education that addresses particular obstacles to meeting the class size requirement. In the event of repeated violations of the minimum class size rules, the State Board has authority to take measures including closing schools and consolidating districts.

At the preliminary injunction hearing, the State Defendants' witness testified that implementation of these sections is subject to additional rulemaking by the Agency of Education. The minimum class size requirements are not yet in place and have not led to the disqualification of any independent school from the town tuition program.

Section 21 addresses Tuition to Approved Schools. It permits school districts to pay the tuition of a student to a public school located in Vermont or to "an approved independent school" that meets the following criteria:

- Located within Vermont;
- Qualified as an approved independent school before July 1, 2025;
- Located within a district or supervisory union that does not operate a public school for some or all grades as of July 1, 2024;
- Received district-funded tuition for at least 25 % of its enrollment during the 2023-2024 school year; and
- Complies with minimum class size requirements, subject to the right to seek a waiver.

Section 22 provides for the continuation of tuition payments for students who received payments during the 2024-2025 school year until graduation even though their schools may no longer qualify.

The remaining sections (9-11 and 23-70) order significant changes to educational practices, primarily through consolidation and state-wide changes to the property tax system. [4]  These are not directly relevant to the town tuition program. The

---

[4] Section 9 proposes changes to graduation requirements.

Section 10 authorizes rulemaking by the State Board of Education.

Section 11 is deleted.

Sections 12-20 address changes in the program governing state aid for school construction. Sections 23-26 make changes to the governance of the State Board of Education.

At Sections 27-28A, the Act returns to the issue of tuition payments by revising the formula used to set tuition paid by sending schools.

Sections 29-30 call for a broad reevaluation of the delivery of special education, including a review of special ed programs offered by independent schools.

Sections 31 and 33 authorize additional staff positions at the Agency of Education.  Section 32 authorizes support for school districts undergoing consolidation.

court summarizes them in the footnote to draw attention to the breadth of the changes to state education policy.

Act 73 imposes change on public school education and its funding through several directions, all sharing common themes of centralization, equalization of funding, and economies of scale. These include combining more than 200 school districts into a small number of far larger districts, consolidating or closing schools that cannot maintain minimum class size, recalculating support for programs such as

---

Sections 34-35 make changes to the calculation of per-pupil spending or so-called "base amounts" by public schools.

Section 36 authorizes the payments of base amounts and other state-wide funding amounts to public schools on a per-pupil basis.

Section 37 creates an exception to the funding formula for small rural schools. These schools may receive additional state funds.

Sections 38-39 create a state-wide Education Fund to receive revenues from the "supplemental district spending tax."

Section 40 authorizes payments from the Education Fund to school districts.

Section 41 modifies the statutory powers of school boards to enable them to address the supplemental district spending funds through their budget process.

Section 42 is a "housekeeping" section addressing repeals of existing provisions.

Section 43 creates a spending reserve for the supplemental district spending tax.

Section 44 requires more information about school transportation.

Section 45 calls for evaluation of measures to combat inflation as well as funding alternatives for pre-K education.

Sections 45a and 45b revise the funding formula for special education and ESL students.

Sections 46-56 impose very substantial changes to the system of statewide property taxation. These sections address tax rates, homestead exemptions, income sensitivity and many other issues related to the creation of a new tax system for supporting public education.

Section 57 creates a new advisory body to monitor Vermont's education financing system.

Sections 58 and 59 are deleted.

Sections 60-67 impose broad changes on the computation of the grand lists. This changes include a distinction between homestead and nonhomestead uses of property (second homes).

Sections 68 and 69 are omitted.

Section 70 governs effective dates for the various sections.

special education and ESL, and providing a more equitable level of state-wide aid to districts. Many changes appear as topics referred to study groups for specific proposals. But the general purpose of the Act is clear: an increase in centralized authority over school spending, administration, and taxation. These changes, all in the service of greater uniformity and efficiency, come at some cost to Vermont's tradition of local control and property tax funding.

## F. Reduction in the Number of Approved Independent Schools

Act 73 greatly reduces the eligibility of independent schools, secular and religious, for town tuition payments. On February 19, 2025, prior to enactment of Act 73, the Vermont Agency of Education published a directory of approved independent schools eligible for public funding. (Doc. 100-11.) Excluding therapeutic schools serving students with special educational needs, there are 48 schools on the list, including eleven Roman Catholic day schools and one school described as "Christian." (The court understands the term "Christian" to refer to schools that follow the evangelical Protestant faith.) The list is not exact. It includes Mid Vermont Christian Academy and Rutland Area Christian School but does not describe these as "Christian." The court understands this to be an inadvertent omission and counts three Christian schools, including Mid Vermont, on the approved list, bringing the total number of approved religious schools to 14.[5]

On September 9, 2025, following the effective date for Act 73, the Agency of Education published a new Independent School Directory. Excluding therapeutic schools, 18 independent schools remain eligible for town tuition payments. All the Catholic and Christian schools previously approved for town tuition are no longer

---

[5] The September 2025 directory and the table provided as State's Ex. A at the hearing are not entirely consistent. The court counts 14 ineligible religious schools on the first and 15 on the second. Neither list identifies schools as religious or secular so the court has drawn conclusions from the names of the schools about their religious basis.

15

eligible. 17 secular independent schools also lost their eligibility for town tuition. Vermont Technical College in Randolph Center also lost town tuition payments for its special 12th grade only science-based program.

The independent schools that remain eligible for town tuition include four ski academies located in East Burke, Ludlow, Stratton, and Killington as well as the five traditional Vermont academies. These hybrid institutions are Lyndon Institute, Burr & Burton Academy, The Sharon Academy, Thetford Academy, and St. Johnsbury Academy. 10 other secular independent schools remain eligible.

At the hearing, the state defendants' witness provided a table showing the basis for ineligibility. Most schools that lost eligibility did so on the basis of *both* geography (location in a community already served by a public high school) and the 25 % town tuition requirement. These included 10 religious schools and 10 secular schools. Five religious schools were disqualified on the basis of the 25 % requirement only. Eight secular schools were disqualified on that basis. One secular school (the Pond Brook Project) met the 25 % requirement but not the geographic requirement.

What is undisputable is that Section 21 disqualifies religious and secular schools alike and in similar numbers. Of the independent schools that remain eligible, five are traditional academies. These have long served the function of the public high school in their community. Four are ski academies located in relatively remote areas where there are no high schools. Only a handful of independent schools remain of the 48 schools eligible for town tuition immediately before passage of Act 73.

## ANALYSIS

The legal standard governing issuance of a preliminary injunction requires a showing by the plaintiffs that they meet three criteria:

- Likelihood of success on the merits;

16

- Irreparable harm if they do not receive injunctive relief;
- Public interest in favor of the proposed injunction.

*Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 92 (2d Cir. 2025).

I.      Likelihood of success on the merits

Plaintiffs identify four reasons for their contention that they are likely to succeed. These are:

1. The provisions of Act 73 disqualifying Mid Vermont from receiving town tuition payments were "borne out of hostility to religious schools." (Doc. 105-1 at 6-7.)  Plaintiffs allege that Act 73 was enacted in the wake of "myriad religiously hostile comments by public officials" and following multiple court rulings requiring equal treatment of religious schools. *(Id.* at 7.)

2. Act 73 manipulates the definition of eligible independent schools to exclude all the religious ones in violation of *Carson v. Makin*, 596 U.S. 767 (2022).

3. Act 73 treats comparable secular activity more favorably than religious exercise in violation of *Tandon v. Newsom*, 593 U.S. 61 (2021).

4. Act 73 requires a student's parents to choose between funding or his religious obligation to send his child to a Christian school in violation of *Mahmoud v. Taylor*, 606 U.S. 522 (2025).

The state responds:

1. The eligibility criteria in Act 73 governing town tuition are neutral as to religion and apply to all independent schools. (Doc. 122 at 9-10.)

2. There is no implicit discrimination against religion because Act 73 disqualifies secular and religious independent schools from town tuition in

similar numbers and based on rules that apply equally to all independent schools. (*Id.* at 11-16.)

3. Act 73 does not interfere with a parent's right to guide the religious development of their child. (*Id.* at 16-18.)

The State Defendants also argue that Plaintiffs have not shown that they will be irreparably harmed without an injunction. (*Id.* at 20.)

## A. Establishment v. Free Exercise Clause

It is helpful in this case to identify which First Amendment guarantee is at issue – the Establishment or Free Exercise Clause. The Supreme Court first considered the issue of public financial support of religious education in *Everson v. Board of Education of Ewing Tp.*, 330 U.S. 1 (1947). The case concerned the use of public funds to pay for school buses for parochial school children. When it came to the use of tax money for religious purposes, the majority was unequivocal about the effect of the Establishment Clause:

> No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they adopt to reach or practice religion.

*Id.* at 16. But *Everson* does not end there. Turning to the Free Exercise Clause, the decision observes that the state cannot exclude citizens of various and multiple and religious faiths "from receiving the benefits of public welfare legislation." *Id.* The First Amendment "requires the state to be neutral in its relations with groups of religious believers and non-believers: it does not require the state to be their

18

adversary." *Id.* at 18. Since denying children transportation on a public bus – and a host of other public services identified in the decision – burdens their participation in religious observance, the Free Exercise Clause prevents the state from withholding the public subsidy.

Since the *Everson* ruling, the Supreme Court has frequently extended the public benefits available to religious institutions on the grounds that particular subsidies of religious education did not violate the Establishment Clause. See *Bd. of Ed. of Central Sch. Dist. No. 1 v. Allen*, 392 U.S. 236 (1968)(upholding New York statute requiring public schools to lend textbooks to parochial schools); *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970)(upholding property tax exemption for church property); *Mueller v. Allen*, 463 U.S. 388 (1983)(upholding state income tax deduction for educational expenses incurred in the course of religious education); *Witters v. Wash. Dept. of Services for the Blind*, 474 U.S. 481 (1986)(public assistance to blind student at religious college); *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1 (1993)(allowing publicly-funded ASL interpreter to assist parochial school student); *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)(upholding 'school choice' tuition payments to religious schools). These cases held that the public support in particular cases remained neutral as to religion and thus avoided violating the Establishment Clause either because they were paid to third-parties such as parents or because their effect on religious observance was *de minimis*.

The trend towards allowing public support of religious education took a step back in *Locke v. Davey*, 540 U.S. 712 (2004), in which the Court upheld a Washington State constitutional ban on funding a devotional degree. In the Court's view, the scholarship sought by a seminary student did not violate the Establishment Clause, but it did violate a more stringent state constitutional provision similar to the Compelled Support Clause in Vermont.

The distinction in *Locke* between the federal and state constitutional restrictions did not last long. In *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449 (2017), the Court applied strict scrutiny to Missouri's denial of access to an educational grant program on state constitutional grounds. The Establishment Clause – so long the field of battle for disputes about government payments to benefit religious organizations – played no role. "The parties agree that the Establishment Clause ... does not prevent Missouri from including Trinity Lutheran [in the grant program.]" *Id.* at 458. Instead, the Court identified the Free Exercise Clause as the basis for striking down a state policy derived from a state constitutional bar to public subsidies of religious institutions.

*Trinity Lutheran* was followed in short order by *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), extending the Free Exercise Clause to require a state-sponsored scholarship program to support study at a religious school. In place of the incremental consideration of whether a subsidy was too closely tied to religious purposes, the Court announced a broad prohibition against excluding religious organizations and their members from any public benefit on the basis of their beliefs. "Status-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses." *Espinoza*, 591 U.S. at 478.

In *Carson v. Makin*, 596 U.S. 767 (2022), the Supreme Court applied this principle to town tuition payments to religious schools. The *Carson* decision struck down Maine's system of restricting these payments to secular independent schools. The Court ruled that "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Id.* at 781. Applying a standard of strict scrutiny, the majority ruled that Maine's interest in separating church and state "more

fiercely" than the Federal Constitution requires violated the Free Exercise rights of parents and students who sought tuition payments for their choice of a religious school.

Vermont was involved in litigation that closely parallelled the *Carson* case. *See A.H. ex rel. Hester v. French*, 985 F.3d 165 (2d Cir. 2021). Following the *Carson* decision, the Vermont Agency of Education announced that the town tuition program would be open to students attending religious schools that met state educational standards.

## A. Explicit Exclusion v. Inferred Effects on Religious Practices

The public subsidy cases described above, including *Trinity Lutheran* and subsequent decisions, all addressed the *explicit* exclusion of religious organizations from public benefits on grounds of separation of church and state. Today neither the Establishment Clause nor state constitutional provisions permit states to exclude students at religious schools from programs such as town tuition that are available to public school students. As the majority wrote in *Trinity Lutheran*, "[t]he State has pursued its preferred policy to the point of expressly denying a qualified religious entity a public benefit solely because of its religious character. Under our precedents, that goes too far." 582 U.S. at 466.

This case presents a different issue. If a state law is silent about religion but has the practical effect of barring access to a benefit to students enrolled in religious schools, does it violate the Free Exercise clause? Mid Vermont does not claim that Act 73 says anything about religious independent schools. It does not. Instead, Mid Vermont objects to Section 21 because it has the *effect* of excluding the school from the town tuition program. It also directs attention to the statements of some state legislators who opposed spending public funds on religious education.

21

Cases in which public funds are alleged to have been withheld from religious organizations for unstated reasons of discrimination against religious belief are uncommon. But cases in which a law of general application is passed that has the effect of curtailing free exercise have long been with us. These include mandatory flag salutes in public schools, *West Virginia v. Barnette*, 319 U.S. 624 (1943), the application of compulsory education laws to the Amish community, *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and ordinances against proselytizing, *Cantwell v. Conn.*, 310 U.S. 296 (1940). Each of these cases required the Supreme Court to weigh religious freedom against some other public good. These cases establish the principle that a state statute may limit or encroach on religious practice if it is a neutral law of general application. The critical case establishing this legal standard in the modern era is *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878 (1990).

In *Oregon v. Smith*, the state sought to defend its practice of denying unemployment benefits to people who possessed drugs in violation of state law. The drug at issue was peyote which Smith claimed to use for sacramental purposes. The law which denied him access to unemployment benefits due to his use of peyote was silent about religion. It neither singled out religion for adverse treatment nor provided a sacramental exception to the ban on peyote. It applied to all persons.

Writing for the majority, Justice Scalia announced a new legal standard, discarding the strict scrutiny standard previously described in *Sherbert v. Verner*, 374 U.S. 398 (1963). In its place, the Court substituted the current rule. "[I]f prohibiting the exercise of religion … is not the object of the [state law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." 494 U.S. at 878.

22

*Oregon v. Smith* requires the court to make two inquiries: whether the law burdens religious practice and whether it is neutral and generally applicable. The requirement of "burden" is present in this case. The amended complaint alleges that Nathan Partington wishes to send his child to a religious school as part of the free exercise of his religious beliefs. Act 73 disqualifies the school he has chosen from his town's tuition payments. The denial of payment makes it more difficult for him to practice his faith, thereby placing a burden on his free exercise. Plaintiffs have supplied evidence of similar burdens for other observant families in the state. (See Docs. 141-1, 141-2, 141-3).

The more critical question is whether Act 73 is neutral about issues of religious belief and practice and generally applicable to everyone. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Mid Vermont points to the Act's effect of disqualifying all religious schools from town tuition payments. The State points to the neutral standards for qualification for the payments and the comparable number of secular independent schools that lost eligibility for the same reasons as the religious schools.

If the only issue was whether the language of the statute was neutral, the State would win in a walk. As the State Defendants observe, "[t]he statutory criteria governing town tuition have always been neutral as to religion." (Doc. 122 at 3). It is the state and federal courts that have forbidden Vermont to provide financial support to religious schools on Establishment Clause grounds, restored it on the same basis, subsequently removed it on state constitutional grounds, and, most recently, restored it once again through operation of the Free Exercise Clause. .

Mid Vermont has a second string to its bow. Drawing on the "animus" cases such as *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 584 U.S. 617 (2018),

23

it offers evidence of what it describes as prejudice against public support for religious schools by some of the legislators who voted for Act 73. Whether this court should consider subjective evidence of legislative intent to restrict the free exercise of religious belief is a relatively novel issue. *See Slattery v. Hochul*, 61 F. 4th 278, 293 (2d Cir. 2023)  In several decisions, the Supreme Court has allowed such evidence to be considered in evaluating municipal and state agency decision making for evidence of intolerance of religious practice.  It is not so clear that the same principle applies to the passage of state statutes. "It is an open question whether a court considering a free exercise claim should consider evidence of individual lawmakers' personal intentions, as is done in the equal protection context." *Stormans, Inc. v. Wiesman*, 579 U.S. 942 n.3 (2016)(Alito, J. dissenting from the denial of certiorari).

Supreme Court cases allowing inquiry into the motives of lawmakers restricting free exercise begin with *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).  Faced with the prospect of animal sacrifice at a proposed Santeria church in Hialeah, Florida, the city council enacted ordinances prohibiting the ritual slaughter of domestic animals.  The Court determined that the texts of these laws, although neutral on their face, were not conclusive in identifying their purpose. Instead, the Court turned to "the effect of a law in its real operation [as] strong evidence of its object." *Id.* at 535. The Court reviewed resolutions of the city council describing the concerns of residents of Hialeah about religious practices, the exemption of kosher practices, the allowance of fishing and hunting, pet euthanasia, and slaughter houses, and the eradication of insects and pests as evidence of improper animus directed against religious belief. The Court welcomed direct and circumstantial evidence of purpose including "the historical background of the decision under challenge, the specific series of events leading to the enactment or

24

official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision making body." 508 U.S. at 540. The plurality opinion conducted a detailed summation of statements by city councilors, residents, and other city officials, all exhibiting fear and dislike of the Santeria faith. On this fulsome record, the Court concluded that "the neutrality inquiry leads to one conclusion: [t]he ordinances had as their object the suppression of religion." *Id.* at 542.

The Court also addressed the principle of general applicability. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543. The Court identified numerous ways in which the ordinances at issue were "under inclusive" and applied only to the religious sacrifice of animals without reaching broader concerns of animal suffering or human health.

Not every member of the Court was pleased with the analysis. Justice Scalia joined in the result but questioned the methodology of "consider[ing] the subjective motivation of the *lawmakers*, i.e. whether the Hialeah City Council actually *intended* to disfavor the religion of Santeria." *Id.* at 558 (Scalia, J., concurring in part.) In the case of First Amendment cases, Justice Scalia proposed an examination not of the legislators' purpose but of the effects of the law at issue. "This [mode of analysis] does not put us in the business of invalidating laws by reason of the evil motives of their authors....Nor, in my view, does it matter that a legislature consists entirely of the pure-hearted, if the law it enacts in fact singles out a religious practice for special burdens." *Id.* at 558-559.

In *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018), the Court extended similar reasoning to detecting whether a state civil rights

25

commission exhibited "some elements of a clear and impermissible hostility toward the sincere religious beliefs [motivating a baker's refusal to make a wedding cake for a gay couple." *Id.* at 634.

In this case, the appeals panel that considered the actions of the Vermont Agency of Education and the Vermont Principals Association also cast a wide net in identifying "official expressions of hostility to religion." *Mid Vermont Christian Sch.*, 151 4th at 93. These included testimony by the Executive Director of the VPA before a state legislative committee considering a bill that would prevent religious schools from receiving public funding and a written statement by the VPA committee that heard the disciplinary case.

*Lukumi, Masterpiece Cakeshop* and the panel decision in this case permit judicial inquiry into the statements of municipal leaders, members of independent state commissions, and state administrators in the search for prejudice against religious belief. The methodological issue presented by the amended complaint in this case is whether the same subjective inquiry into motivation is appropriate when a federal court considers the constitutionality of state legislation.[6] Certainly the plaintiffs invite such an inquiry although they also contend that the effect of Section 21 is

---

[6] The question of legislative motive in constitutional jurisprudence is hardly a new problem. In *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960), the Supreme Court struck down state legislation redrawing the boundaries of the city of Tuskegee, Alabama because "[acts] generally lawful may become unlawful when done to accomplish an unlawful end." In the Sunday closing law cases, the Supreme Court applied a similar analysis, holding that a law intended by the legislature to aid or hinder religion would violate the establishment or free exercise clauses despite its general application to all stores. See *Abington School District v. Schempp*, 374 U.S. 203, 222 (1963)("The [constitutional] test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."). The Court applied similar tests for purpose and effect in the establishment clause context in *Board of Education v. Allen*, 392 U.S. 236 (1968) and *Epperson v. Arkansas*, 393 U.S. 97 (1968). In contrast, in *United States v. O'Brien*, 391 U.S. 367 (1968), a Free Speech clause case challenging a federal statute making it a crime to burn a draft card, the Court inveighed against consideration of legislative purpose. "The decisions of this Court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." Id. at 383. Professor John Ely provides an early and comprehensive review of the issue in his article *Legislative and Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205 (1970).

enough to demonstrate its unconstitutionality. Plaintiff's memorandum in support of the motion for preliminary injunction recounts a dozen or more statements by state administrators and lawmakers who oppose state funding of religious schools.

There is very little authoritative guidance about what evidence a court may consider in determining whether "a purportedly neutral law 'targets' religious exercise or has the restriction of religious exercise as its 'object.'" *Fulton v. City of Philadelphia*, 592 U.S. 511, 605 (2021)(Alito et al concurring)(cleaned up). Justice Alito's concurrence in *Fulton* frames the issue:

> A threshold question is whether 'targeting' calls for an objective or subjective inquiry. Must 'targeting' be assessed based solely on the terms of the relevant rule or rules? Or can evidence of the rulemakers' motivation be taken into account? If subjective motivations may be considered, does it matter whether the challenged state action is an adjudication, the promulgation of a rule, or the enactment of legislation? Should courts consider the motivations of only the officials who took the challenged action, or may they also take into account comments by superiors and others in a position of influence? And what degree of hostility to religion or a religious group is required to prove 'targeting'?

*Id.* at 606. A comprehensive and authoritative answer to these searching questions would be welcome, but Justice Alito was after bigger game – reconsideration of the *Smith* neutrality test. Since *Fulton*, the Court has had few occasions to address these issues of proof because the cases concerning public benefits and tuition payments have involved the explicit exclusion of religious schools from tax funding.[7]

---

[7] The *Fulton* decision concerned agency action, not a legislative enactment. Similarly, *New Hope Family Services, Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) addresses agency action. Research reveals no cases in which the Supreme Court or the Second Circuit has endorsed consideration statements of state legislators as evidence of religious animus and counsel have not provided any either. In *Slattery v. Hochul*, 61 F.4th 278, 292 (2d Cir. 2023), the court

The court proposes to answer the questions identified in the *Fulton* concurrence by considering all of the evidence offered by both sides concerning the effects and the intent of Act 73. The court will start with the question of whether the text of Act 73 is neutral as to religion. It will then consider the effects of the Act on town tuition eligibility, both for religious and for secular independent schools. Finally, the court will survey the statements of legislators and other leaders in state government in a search for evidence of subjective animus or prejudice against religion. No category of information is excluded altogether. The text weighs most heavily because it is the most direct, unfiltered expression of legislative purpose. The effects come second because they are objective facts from which a court may infer purpose. The subjective statements of intent by individual lawmakers come third and weigh least since they represent the views of a fraction of the legislators, speaking in their individual capacities, in many cases in response to an opinion survey.

## 1. Text

The text of Act 73 contains no reference to religious belief or religious education. Section 21, the provision at issue here, identifies seven categories of schools or education programs that qualify for town tuition payments. These are: public schools located in Vermont; approved independent schools that meet certain criteria; independent schools meeting education quality standards; approved tutorial programs; approved education programs; public schools located in another state; and therapeutic schools. A religious organization may sponsor or operate a school or program fitting into any of these categories (excluding public schools.)

---

rejected a claim that a licensing provision, neutral on its face as to religious belief, was the product of hostility by some legislators to religious belief.

28

The most relevant category is that of "approved independent school." Mid Vermont has long been recognized by the Vermont Department of Education as an approved independent school. To qualify for town tuition payments, an approved independent school must now meet the criteria set out in Section 21. None of these concern religious belief or practice. The application of the statutory criteria resulted in the disqualification of both religious and secular independent schools in similar numbers.

The criteria that disqualify Mid Vermont include its location in White River Junction, Vermont – a mid-sized city by Vermont standards that operates a high school, a middle school, 3 primary schools, and several specialty programs. Mid Vermont satisfies the requirement of being approved for town tuition payments before July 1, 2025. It does not satisfy the 25 percent requirement.

## 2. Effect of Section 21 on town tuition eligibility

Like the text, the effect of Section 21 is neutral as to religion. By limiting town tuition payments to public schools when available in the same location, Act 73 eliminates town tuition payments to 18 secular independent schools and 15 Catholic and Christian schools. Eligibility remained unchanged for therapeutic schools.[8] The

---

[8] Mid Vermont lumps the therapeutic schools in with other independent schools, greatly increasing the number of secular schools that continue to be eligible for the town tuition program. Therapeutic schools differ from other independent schools because they serve only students eligible for individualized education programs ("IEPs") or as otherwise mandated by federal law or court order. Act 73, Section 21(d). Therapeutic schools are subject to regulation by the Vermont Agency of Education. Code of Vermont Regulations, Section 2232. A religious organization is free to establish a therapeutic school. The record contains no evidence that any religious organization has done so.

Because therapeutic schools are not subject to the location, class size and other limits placed on secular and religious independent schools by Act 73, they now form the majority of schools qualifying for town tuition. But including them in the category of "secular independent schools" distorts the statistical effect of Act 73 by increasing the number of secular schools that remain eligible for town tuition.

Similarly, in assessing the neutrality of section 21, the court does not count "independent school[s] meeting education quality standards," "tutorial program[s] approved by the State Board," or "approved education program[s]" as these appear in §§ 21(a)(3)-(6). None of these programs are subject to the geographic requirements

traditional academies remained eligible because their communities have never offered public high school education, long preferring to support the independent academies.

Considered in its entirety, the policy concerns addressed by Act 73 are also neutral as to religion. These are primarily issues of local versus central control that have long informed public debate over education in Vermont. They also include concerns about economies of scale and equity among the towns. Act 73 contains many elements that favor a more centralized system of public education. It does not favor school choice and reduces access to public funding of independent schools. These are policy decisions made by the state legislature. They concern issues that have been present in Vermont since before statehood. Act 73 also favors consolidation of schools through class size restrictions for public and independent schools alike. Act 73 prevents the addition of more independent schools to the town tuition program by closing the program to new applications after July 1, 2025, and by imposing a 25 % requirement for student enrollment. Like the other requirements of Section 21, these restrictions apply equally to secular and religious schools.

As these examples illustrate, Section 21 applies the same criteria for eligibility for the town tuition program to all independent schools. Its effect on eligibility falls on religious and secular independent schools alike as recipients of public aid. It disfavors both in equal measure.

### 3. Statements by lawmakers and administrators

Mid Vermont identifies statements by six members of the Vermont House of Representatives offered in response to a questionnaire circulated by the organization Friends of Vermont Public Education. All six opposed the use of taxpayer money

---

or other limitations that are challenged here. All of these programs are open to religious and secular organizations alike.

for religious schools. (Doc. 105-1, p. 12). To these statements, Mid Vermont adds statements by Rebecca Holcombe, Vermont's Secretary of Education from 2014 – 2018 and a current member of the Vermont House, criticizing the *Carson* decision. Finally, Mid Vermont identifies two more House members who advocated for separation of church and state (Representative Arsenault) and called for the amendment of the "process by which religious schools have been included as recipients of Vermont's Town Tuition Program." (Representative Headrick).

The Vermont House consists of 150 members. Mid Vermont identifies nine who have questioned the use of public funds to support religious education. None said anything critical of the Christian faith or its adherents. Representative Holcombe was the most critical, drawing a comparison with Afghanistan where (one assumes) religious education is the norm and arguing that religious schools were intolerant of LGBTQ people. (Doc. 105-1), p. 18.

The statements of the nine legislators identified by Mid Vermont are a thin basis for describing Act 73 – or just Section 21 – as motivated by religious animus. None of the statements were made in floor debate or as part of the Act's legislative history. Instead, most were made in response to an opinion survey and indicate no more than opposition to public funding of religious schools. They cannot reasonably be said to show "pervasive religious intolerance and hostility" as required by *Masterpiece Cakeshop* and *Lukumi* in the case of administrative action and enactment of a municipal ordinance. (Doc. 105-1 at 16.)

Mid Vermont seeks to augment the record of opposition to public funding of religious schools by drawing attention to the history of Vermont Supreme Court decisions finding a basis first in the First Amendment and later in the Compelled Support Clause for holding public funding to be unconstitutional. *(See* Doc. 105-1 at 9-10.) These decisions represent the best efforts of the Justices to interpret the

31

federal and state constitution. Their decisions were well within the mainstream of Establishment Clause jurisprudence until the recent line of cases that started with *Trinity Lutheran* in 2017. These judicial decisions do not establish an historical record of religious bigotry.

Finally, Mid Vermont relies on statements by administration officials opposing public funding for religious schools. Such statements served as a basis for a decision by the Second Circuit panel in this case that the administrative disciplinary action against Mid Vermont was a product of prejudice against religious belief. It is a step too far, however, to attribute the views of executive officials to state legislators. The executive branch officials who took action before passage of Act 73 had no vote on the measure.

The court has devoted space in this ruling to placing Act 73 and the town tuition program in the context of two centuries of educational policy in Vermont. Public funding of religious schools was permitted until the *Swart* decision in 1961. The Vermont Supreme Court abrogated *Swart* in 1994 in the *Campbell* decision. The Court restored the ban on public funding in the *Chittenden Town School District* case in 1999 where the matter rested at both the state and national levels until the *Trinity Lutheran* decision by the U.S. Supreme Court in 2017. With this history in mind, it is unsurprising that some legislators opposed public funding of religious schools after the *Carson* decision and may have voted in favor of Act 73 because its effects include restrictions on payments to religious schools. Their views as expressed in the survey results relied upon by Plaintiffs do not make them bigots and their support of Act 73 does not define it as the product of prejudice against religious belief.

The court concludes that the Plaintiffs are not likely to succeed in meeting their burden of proving that Act 73 as a whole or Section 21 alone is an unconstitutional infringement on the free exercise of religion. The Act is a complex funding and

32

organizational measure driven by long-standing concerns about the cost, equity and efficient delivery of public education. It excludes payments to all independent schools when a public school is present in the same district. It imposes limits on class size that are consistent with the limits it imposes on public schools. It discourages the application of independent schools to join the town tuition program by imposing requirements for the minimum percentage of students eligible for town tuition payments and foreclosing the admission of new schools to the program. These requirements may fairly be characterized as favoring tax support for public schools over independent schools at a time of declining enrollment and rising costs. Neither Act 73 as a whole nor Section 21 viewed in isolation is likely to be found to be the product of anti-religious bias.

If the court is correct in identifying Act 73 as a statute that is neutral as to religion, then its constitutionality is subject to a rational basis test. It is likely to pass such a test since it addresses multiple issues of educational policy through a program of comprehensive reform. Act 73 addresses issues of local versus central control and equitable funding that have formed the educational debate in Vermont for two centuries. The specific provision at issue – Section 21 – addresses issues of school funding, falling enrollment, class size and the role of public education in Vermont. The legislative choice that resulted in ineligibility for 15 religious schools and a somewhat higher number of secular independent schools was the preference for favoring the public school system over independent schools. That is the type of policy decision that state legislators are entitled to make. Their decision provides a rational basis for the changes to Vermont law that appear in Section 21.

## II.    IRREPARABLE HARM AND PUBLIC INTEREST

Because the court finds no reasonable likelihood of success, it does not reach the issues of irreparable harm and public interest. The court recognizes that the appellate

panel found these elements to be present in *A.H. ex rel Hester v. French,* and, in the event that the preliminary injunction ruling is reversed and remanded, it is likely that the plaintiffs will prevail on these elements of their claim.

## III.    EQUAL PROTECTION

The court agrees with the state defendants that an equal protection claim brought on the same grounds as a Free Exercise claim is subject to the same rational basis test. *New Yorkers for Religious Liberty, Inc. v. City of New York,* 125 F.4th 319, n. 4 (2025). Act 73 passes the rational basis test under either Clause.

## CONCLUSION

The court DENIES the motion for preliminary injunction on the ground that Plaintiffs have failed to make the required showing of a likelihood of success on the merits.

Dated at Burlington, in the District of Vermont, this 12 day of May, 2026.

Geoffrey W. Crawford, Judge
United States District Court

34